UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE CITY OF BOSTON, THE BOSTON
PUBLIC  HEALTH COMMISSION, THE
BOSTON HOUSING AUTHORITY

Plaintiffs,

                v.                                  Case No. 24-cv-10525-PBS

EXPRESS SCRIPTS, INC.,
One Express Way
St. Louis, MO 63121

EXPRESS SCRIPTS
ADMINISTRATORS, LLC,
One Express Way                                      **AMENDED COMPLAINT**
St. Louis, MO 63121                                        **(UNREDACTED)**

MEDCO HEALTH SOLUTIONS,
One Express Way                                        **Jury Trial Demanded**
St. Louis, MO 63121

EXPRESS SCRIPTS PHARMACY,
INC.,
One Express Way
St. Louis, MO 63121

ESI MAIL ORDER PROCESSING,
INC.
One Express Way
St. Louis, MO 63121

ESI MAIL PHARMACY SERVICES,
INC.
One Express Way
St. Louis, MO 63121

OPTUMRX, INC.,
2300 Main St.
Irvine, CA 92614

OPTUMINSIGHT, INC.,
11000 Optum Cir.
Eden Prairie, MN 55344

OPTUMINSIGHT LIFE SCIENCES,
INC.,
1325 Boylston St.
Boston, MA 02215

AND

UNITEDHEALTH GROUP, INC.
9900 Bren Road East
Minnetonka, MN  55343

Defendants.

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................................ 4

II. PARTIES ........................................................................................................................ 16

    A. Plaintiffs ................................................................................................................ 16

    B. Express Scripts Defendants ................................................................................... 17

    C. Optum Defendants................................................................................................. 20

III. JURISDICTION AND VENUE ..................................................................................... 23

IV. FACTUAL ALLEGATIONS ......................................................................................... 24

    A. A few large PMBs exert substantial influence in a way that is often not transparent, even to their customers. ................................................................................................ 24

    *What are PBMs?* ....................................................................................................... 24

    *PBMs and Financial Incentives from Manufacturers* ............................................ 27

    B. Defendants Had Access to Data Indicating Diversion, Misuse, and Abuse of Opioids But Failed to Use it to Make Meaningful Efforts to Prevent Diversion ...................................... 30

    C. Defendants Worked Directly With Manufacturers to Boost Opioid Sales and Aid Deceptive Marketing............................................................................................................ 38

        1. Background on Opioid Manufacturers' Deceptive Marketing of Opioids ............... 38

        2. Defendants Worked Directly with Manufacturers to Increase Opioid Sales............. 40

    D. Defendants Facilitated and Encouraged the Use of Opioids and Flooded the Market through Self-Serving Formulary and Utilization Management Offerings. ................................... 49

    E. ESI and Optum Chose Not to Use Their "Drug Utilization Review" Tools to Address Overprescribing, Abuse, and Diversion.......................................................................... 61

    F. Defendants' Publicity of Belated Efforts Effectively Admits They Could Have Acted Sooner ........................................................................................................................ 63

    G. Defendants Disregarded their Obligations Under Federal Controlled Substances and Massachusetts Law in Selling Opioids from Their Own Pharmacies........................................... 66

    H. Facts Pertaining to the Formulary & UM Enterprise .................................................. 71

        a. Formation of the Formulary & UM Enterprise ......................................................... 75

        b. The Common Purpose and Fraudulent Scheme of the Formulary & UM Enterprise.84

        c. Conduct and Participation of the Formulary & UM Enterprise Through a Pattern of Racketeering Activity. ...................................................................................... 96

        I. Defendants Concealed Their Unlawful Conduct.......................................................... 102

    J. Defendants Created a Public Health Crisis in Boston by Dramatically Increasing the Availability of Opioids ................................................................................................... 103

V.    CLAIM FOR RELIEF ........................................................................................... 115

VI. PRAYER FOR RELIEF ............................................................................................... 131

# I. PRELIMINARY STATEMENT

1.      The City of Boston, the Boston Public Health Commission, and the Boston Housing Authority ("the Plaintiffs"), bring this action against Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail Pharmacy Service, Inc., ESI Mail Order Processing, Inc., and Express Scripts Pharmacy, Inc. (referred to collectively herein as "Express Scripts," "ESI," or "Express Scripts Defendants") and UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc. (referred to collectively herein as "Optum," or "Optum Defendants") (Express Scripts Defendants and Optum Defendants are collectively referred to herein as "Defendants")  in order to abate the public nuisance caused in substantial part by Defendants' unreasonable acts and omissions fueling the opioid epidemic. Defendants collaborated with opioid manufacturers, partnering with them in the deceptive, dangerous marketing of these all too often lethal drugs and, in exchange for rebates and other payments from opioid manufacturers, placed opioids on their national formularies with preferred status and with little to no limits on their approval for use.  In addition, instead of reporting illegitimate prescribing and sales uniquely visible to them in the extensive data they collect, or using the data to reign in the deluge of opioid prescribing and limit abuse of these drugs, the Defendants ignored evidence of misuse, addiction, and diversion and used their data to boost their profits and manufacturers' sales at the expense of public health and safety.  Defendants also unlawfully controlled association-in-fact enterprises with opioid manufacturers and others through a pattern of racketeering activity. In support of their claims, the Plaintiffs state as follows:

2.      This case arises from the worst man-made epidemic in modern medical history – an epidemic of addiction, overdose and death caused by an oversupply of opioids flooding communities from powerful corporations who sought to profit at the expense of the public.

3.      By now, most Americans have been affected, either directly or indirectly, by the opioid disaster. Due in substantial part to the wrongful conduct of the largest pharmacy benefit managers (PBMs) in the nation, described further below, between 1999 and 2010, the amount of prescription opioids sold annually in the U.S. quadrupled. In 2016, 289 million prescriptions for opioids were filled in the U.S. - enough to medicate every adult in America around the clock for a month.  Since the late 1990s, the death toll has steadily climbed, with no sign of slowing. The CDC's National Center for Health Statistics provides provisional data on drug overdose deaths. According to the data, there were an estimated 107,622 drug overdose deaths in the United States during 2021. That is nearly a 15% increase from the estimated number of deaths in 2020.

4.      From 1996 through 2019, more than 500,000 people died from an overdose involving any opioids. The prescription opioids involved in these deaths include brand-name prescription medications like OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram, as well as generics like oxycodone, hydrocodone, tramadol, and fentanyl. The number of overdose deaths involving prescription opioids in 2021 was nearly five times the number in 1999.

5.      Many of the overdoses from non-prescription opioids are also directly related to prescription pills. Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin. According to the American Society of Addiction Medicine, and as acknowledged by Optum,[1] 80% of people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin.  In fact, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin, and the CDC has identified addiction to prescription

---

[1] See UnitedHealth Group, *Addressing the Opioid Crisis*, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/2018/AddressingTheOpioidCrisis_UHG.pdf (admitting that "[f]our in five new heroin users start out by misusing prescription painkillers and turn to heroin when their prescriptions run out or become too expensive.").

pain medication as the strongest risk factor for heroin addiction.  Individuals who used prescription opioids who have turned to heroin are now frequently exposed to illicit fentanyl, with even more lethal effects.

6.      As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and 2015, the life expectancy for Americans decreased for the first time in recorded history. Drug overdoses are now the leading cause of death for Americans of every age from 22 to 68.

7.      In the words of Dr. Robert Anderson, who oversees death statistics at the Centers for Disease Control and Prevention, "I don't think we've ever seen anything like this. Certainly not in modern times." On October 27, 2017, then-President Trump declared the opioid epidemic a public health emergency.  Since that time, Health and Human Services Secretary Xavier Becerra has twice renewed the determination that "a opioid public health emergency exists nationwide."

8.      Massachusetts Lieutenant Governor Kimberly Driscoll described the opioid epidemic as having "devastated every community in Massachusetts and fatal overdoses are continuing to increase." In 2022, "overdoses reached a record high, highlighting a critical need for harm reduction tools […]."

9.      Boston has experienced a surge of prescription opioids into its communities. Between 2010 and 2016, an average of 457 mg of oxycodone was dispersed per Boston resident, which is twice as high as the state average and nearly three times as high as the national average.

10.      Boston has also experienced a steady increase in opioid-related deaths.  In 2012, opioid-related deaths claimed 70 lives in Boston in just one year.  In 2015 this number increased to 146 opioid-related deaths for the year—more than double the number of deaths from 2012.   In 2016, there were 193 people in Boston who died due to opioid overdoses in a single year. Additionally, the number of deaths that Boston's Emergency Medical Services, ("EMS") reported

to the medical examiner increased by 50% from 2016 to 2017. This increase was attributed to opioid overdoses.

11.     The opioid crisis was fueled and sustained by those involved in the opioid supply and payment chain, with manufacturers, distributors, pharmacies, and Pharmacy Benefit Managers ("PBMs"), including ESI and OptumRx, each playing a role. The role of ESI and Optum in causing the opioid epidemic has been largely concealed from public view. But it has now become clear that, for no less than the last two decades, the Defendants have had a key role in facilitating the oversupply of opioids through intentional conduct that ignored needed safeguards in order to increase the prescribing, dispensing, and sales of prescription opioids. These Defendants inserted themselves into the chain of prescribing, dispensing, and sales of prescription opioids. As such, they assumed duties to act reasonably and to comport with the state and federal controlled substances laws.

12.     The Defendants contract with the manufacturers who make opioids, the pharmacies that dispense them, and the third-party payors who pay for them. Thus, they are at the center of the opioid dispensing chain. The conduct that fueled the increases in opioid prescribing and dispensing and led to oversupply included: (a) colluding with Purdue Pharma and other opioid manufacturers in the deceptive marketing of opioids in order to alter perceptions of opioids and increase their sales; (b) colluding with Purdue Pharma and other opioid manufacturers to increase opioid sales through preferred placement on national formularies in exchange for lucrative rebates and fees; (c) colluding with Purdue Pharma and other opioid manufacturers to restrict or eliminate utilization management tools on national formularies that would have limited opioid prescribing and/or dispensing; (d) deciding not to act on the vast amount of data and other information they had about the epidemic in order to limit the overflow of opioids into communities throughout the United States, including in Boston; and (e) dispensing prescription opioids through their mail order

pharmacies without effective controls against diversion, in violation of Massachusetts law and federal law.

13.     The Defendants' central role in the opioid crisis was made possible by their unique combination of knowledge and power that provided them with an extraordinary ability to control the opioid supply throughout the United States. While the PBM industry began with limited fiscal and administrative functions, it has since evolved into far more. Now, "[a]lthough many people have never heard of [them], these powerful middlemen have enormous influence over the U.S. prescription drug system."  Defendants along with their affiliated companies have more control over and insight into the flow of opioids into communities across the country than any other entities in the pharmaceutical distribution and payment chain.

14.     As one of the Defendants' own executives acknowledged, "[n]o component of our healthcare system is in a better position to deliver more immediate and more impactful changes to the current course of this crisis than our nation's PBMs . . ."  The executive noted the PBMs' "powerful position" as "an intermediary between the physician, pharmacies, patient, pharmaceutical manufacturer, health systems, and other components of the industry," which put the Defendants "in an ideal position to drive improvements in education and awareness of the dangers of opioid therapy[.]"

15.     PBMs provide services to prescription benefit plans sponsored by health insurers, self-insured employees, and state and federal government agencies.  PBMs have adopted business practices designed to increase the utilization of opioids and maximize their own profits.  As a result, far greater quantities of prescription opioids entered the market than Defendants knew could be necessary for legitimate, safe, or appropriate medical uses.

16.     PBMs' overall business practices have not gone unnoticed in Massachusetts. The Massachusetts Health Policy Commission has released an interactive webpage that describes

"Cracking Open the Black Box of Pharmacy Benefit Managers," which details their activity within the state.

17.     Further, Massachusetts and other states have pursued legal action to "increase oversight of PBMs to ensure that public dollars are spent efficiently at all points in the drug distribution chain."

18.     Nationally, a small number of PBMs dominate the market in their sphere. ESI and OptumRx are two of these giants.  As of 2020, ESI and OptumRx were two of the largest PBMs in the U.S.  Both are members of large, vertically integrated corporations. ESI is the self-described manager of the pharmacy benefit for more than 100 million Americans, providing PBM services to its parent, Cigna, as well as to many other insurers and payors. OptumRx provides PBM services to its parent, UnitedHealth Group, which is the largest commercial drug insurer in the U.S., and to other insurers and payors nationwide.

19.     ESI and OptumRx are also among the largest pharmacies in the country, and are owned by two of the largest insurance companies in the world.  ESI and Optum are two of the largest healthcare data, consulting and analytics companies in the United States.

20.     ESI and Optum have a significant presence in Massachusetts, and in the City of Boston specifically.  For example, until January 2023, Express Scripts Inc. was Blue Cross Blue Shield of Massachusetts' pharmacy benefit manager.   In further example, several colleges in Boston use OptumRx as the pharmacy benefit manager for their employee health plans.

21.     Defendants control pharmacy networks that include various retail pharmacies throughout the country, including pharmacies in Boston.  ESI's pharmacy network participants include "nearly 64,000 pharmacies," which it contends provides an available in-network retail pharmacy within a 15-minute drive of "nearly every member's home."   Optum controls a pharmacy network consisting of approximately 67,000 retail pharmacy locations nationwide.

22.     Defendants also dispense prescription opioids through their mail order pharmacies, serving patients nationally and throughout Massachusetts, including the City of Boston.

23.     Express Scripts and Optum receive, analyze, and track detailed claims data for the billions of prescriptions they process and dispense each year, including prescriptions for opioids. Defendants have unique insight into prescribing habits at both the patient and prescriber levels, as well as data on prescribing and use of opioids in the aggregate. For each prescription they know what doctor prescribed it, what pharmacy filled it, and where that pharmacy is located.  They know if patients whose benefits they manage fill opioid prescriptions written by multiple prescribers and if they fill them at multiple pharmacies.  They know if a patient who was prescribed opioids is later treated for overdose or substance use disorder.  They know if a patient is filling prescriptions for opioids, benzodiazepines, and muscle relaxant at the same time. They know how many times an opioid prescription is refilled.

24.      Defendants collectively have access to and analyze opioid utilization data for their approximately 166 million covered lives.  Through that data, Defendants could effectively track the opioid epidemic, pill-by-pill, as it unfolded over decades and chronicle the opioid epidemic in real time.

25.     Defendants have the power to drive prescribing, dispensing and sales of prescription drugs.  They do this through the national formularies they offer to pharmacy benefit plans and through the standard "utilization management" ("UM") rules they choose to offer. Formularies, which are lists of drugs covered by a pharmacy benefit plan, control which drugs are available to the PBMs' covered lives.  Formularies contain tiers, where drugs listed on higher tiers require larger copays, or as exclusionary formularies, where preferred brand drugs are included and nonpreferred drugs are not included.

26.     Standard UM programs include various tools for managing access and use of particular drugs.  Examples of UM measures include step therapy, where a beneficiary is required to try a different drug fist, quantity limits, where the dosage or days' supply of a particular drug are limited, and prior authorization ("PA"), which requires confirmation from a physician that a particular drug is therapeutically appropriate before the drug can be dispensed.  Data, including in studies that Defendants themselves conducted, shows that, when implemented, disfavored formulary placement and the implementation of UM measures reduce inappropriate prescribing by making certain drugs more difficult or more expensive to obtain.

27.     Defendants and opioid manufacturers knew that formulary offerings that provided preferred formulary placement without UM restrictions would result in prescriptions being written and dispensed with ease and frequency, to the detriment of public health and public safety.  Opioids that are preferred on PBM formularies have significantly greater sales than drugs that are either excluded or disadvantaged. As such, the PBMs act as the gatekeepers to the opioid market.

28.     Given Defendants' dominant position in the market and their level of expertise, their clients typically accept the offered standard, national formularies and UM programs without modification. While Defendants' clients elect to or not to use a particular plan, the Defendants' standard offerings, coupled with misinformation about opioids that Defendants delivered along with their manufacturer partners, minimized their clients' ability to make different choices regarding drug benefit programs.  Customers hire PBMs for their specialized knowledge regarding prescription drug formularies and policing pharmacy networks.  In addition, there are often significant financial penalties customers would incur for deviating from the offered national formularies. Thus, Defendants' national formularies effectively control what opioids enter the marketplace and with what restrictions. As such, PBMs are uniquely situated to address the opioid

crisis, influence they have admitted in making belated, partial remedial efforts as they came under public scrutiny and pressure.

29.     Instead of using their data and their power to ensure the appropriate use of prescription medication, improve safety and quality of care for patients, and make healthcare better - as they promised their clients and represented to the public that they would do – Defendants worked to further their own profits. This included offering services to Purdue and other opioid manufacturers to help them plan and carry out their marketing efforts and boost their sales. At the same time, Defendants colluded with manufacturers to further boost opioid sales, and Defendants' own profits, through formulary and UM offerings that encouraged opioid prescribing, paid for by manufacturers through rebates and fees.[2] Defendants are not bystanders in the opioid crisis; they helped fuel the fire.

30.     The Defendants and the opioid manufacturers formed an association-in-fact enterprise, the "Formulary & UM Enterprise." The common purpose of the Formulary & UM Enterprise was to profit from the increased and unrestricted prescribing, dispensing, and sale of prescription opioids without regard for public safety. The Defendants conducted, and participated in the conduct of the Formulary & UM Enterprise by agreeing not to take action that would undercut each other's business; agreeing to work together with the opioid manufacturers; agreeing to take and taking formulary action in their formulary offerings that would motivate and facilitate increased opioid prescribing; agreeing to take and taking UM actions in their formulary and prescription plan offerings that would facilitate easier and increased opioid dispensing and sales; working together with opioid manufacturers to disseminate the false marketing and to support their

---

[2] While some PBM contracts with customers now require the PBM to pass on 100% of rebates and administrative fees to customers, this was not the case during the majority of the operative time period.  In addition, PBMs continue to enter into contracts with manufacturers requiring manufacturers to pay the PBM based on overall volume of the manufacturers' drug that the PBM dispenses through mail order pharmacies or processes as a PBM along with other payments.

detailing of prescription opioids to prescribers; and failing to uphold their obligations under the Controlled Substances Act and its implementing regulations. All of this conduct furthered the underlying fraudulent scheme of the Formulary & UM Enterprise because it served to deprive people of money and property by means of an underlying fraudulent scheme, including taking actions that directly contradicted the public representations they made about their conduct as well as the promises they made to their clients.

31.    Express Scripts and Optum undertook and assumed a duty to create standard, national formulary offerings and UM program offerings based on the health and safety of the public and of the lives covered by their clients' benefit plans. Express Scripts and Optum represented to the public, as well as to their clients, that their national formulary and UM offerings were based on the health and safety of the public and the lives their clients insured, when in fact they were doing the exact opposite and acting to maximize their own revenue in concert with the opioid manufacturers. Optum and Express Scripts knew, at the time that they made these representations to the public and to their clients, that they would not base their national formulary and UM offerings on the health and safety of the covered lives involved, nor of the public, but that they would make, and were already making, formulary and UM decisions, and taking formulary and UM actions, designed solely (or at least primarily) to increase profits to themselves.

32.    As a result, the market for prescription opioids grew, prescribing, dispensing, and sales increased, and the Defendants collected the profits from their agreements and relationships with opioid manufacturers.  The Defendants' profits increased from the rebates and fees they earned from branded opioid manufacturers for making opioids easily available, and from pricing spreads and fees they received from the sale of generic opioids. Their profits also increased through the sale of the data they amassed about their covered lives, healthcare providers, and dispensing pharmacies, and from marketing agreements that they entered into with opioid manufacturers.

33.     In sum, the Defendants are legally responsible for their role in causing, contributing to, and maintaining the opioid epidemic because, among other things: (a) their conduct in colluding with the opioid manufacturers to increase the supply and utilization of opioids through false and misleading misrepresentations was intentional and/or negligent, and unreasonable and/or unlawful; (b) their knowing and/or negligent and unreasonable failure to offer formularies, UM protocols, and drug utilization review measures that would ensure safe and appropriate use of opioid medications was wrongful because they undertook to, and represented that they would, but instead, worked with the opioid manufacturers to increase the supply of opioids without regard to the safety or appropriateness of the drugs; and (c) they intentionally and/or negligently and unreasonably decided, offered, and continued to offer only formularies, UM protocols, and drug utilization measures that placed no meaningful limitations on the prescribing and use of opioids, despite knowing, through their vast stores of data, that (i) unrestricted access to opioids was causing, and foreseeably would continue to cause, harm, including the foreseeable harm of diversion, to Plaintiffs' communities, and (ii) those harms could be addressed through measures that the Defendants intentionally decided not to offer or otherwise make available; (d) their conduct in dispensing opioids was unlawful and/or unreasonable, as well as intentional and/or negligent because they failed to comply with the Massachusetts Controlled Substances Act and federal law, both in their own mail-order pharmacy dispensing and in their other activities that increased the risks of diversion; and (e) they unlawfully controlled association-in-fact enterprises with opioid manufacturers and others through a pattern of racketeering activity, as defined in the federal Racketeer-Influenced and Corrupt Organization Act ("RICO").

34.     Defendants' conduct has had severe and far-reaching public health consequences, the costs of which are borne by the City and state governmental entities.

35.     Defendants' conduct has created a public nuisance and a blight. The Plaintiffs, and the services they provide the citizens of Boston, have been strained by this public health crisis.

36.     Plaintiffs bring this suit to help address the devastating march of this epidemic and to hold Defendants responsible for the crisis they helped create. This lawsuit relates to the Defendants' conduct in the non-federal market which resulted in the increased use, abuse, and diversion of opioids.  The allegations in this Complaint do not include and specifically exclude Defendants' provision of PBM or mail order pharmacy services pursuant to contracts with the Department of Defense, the Office of Personnel Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.  The Complaint does not include and specifically excludes Defendants' provision of PBM or mail order pharmacy services for Medicare plans to the extent preempted by federal law.  The Complaint does not challenge the creation of custom formularies or administration or management of such formularies for or by a federal officer or federal agency, such as for any Federal Employees Health Benefits Act, Veterans Health Administration, or TRICARE governed health benefits plan, or any other federal health benefit plan.  The Complaint does not challenge Defendants' provision of mail order pharmacy services pursuant to contracts with the Department of Defense, the Office of Personnel Management, the Department of Veteran Affairs, or any other federal agency, and does not challenge the Defendants' administration or operation of the TRICARE Home Delivery/Mail Order Pharmacy.  The Plaintiffs do not seek to recover moneys paid by the federal government pursuant to such plans, nor do they seek recovery of federally mandated co-pays that were paid by such plans' patients.  The Plaintiffs do not seek declaratory relief, injunctive relief, abatement relief, damages, or any other relief for the conduct of any PBM Defendant related to the provision of any services pursuant to contracts with the Department of Defense, the Office of Personnel

Management, the U.S. Department of Veteran Affairs, the Veterans Health Administration, or any other federal agency.

## II. PARTIES

**A.    Plaintiffs**

37.    **The City of Boston** ("the City") is located in Suffolk County, Massachusetts. Boston is the capital of the Commonwealth and is the most populous municipality within the Commonwealth with a population of 654,776 residents.  Pursuant to M.G.L.A. 40 §§ 1 and 2, it has the authority to pursue litigation on behalf of the City.

38.    The City provides services to its citizens such as police and fire department services, public school services, and youth and family services, and funds two out of three of its own health insurance programs for its employees and their dependents, and a workers' compensation program.

39.    The **Boston Public Health Commission** is a legal entity located in the City of Boston.  The Boston Public Health Commission oversees several programs and departments which work to combat the opioid epidemic, including Emergency Medical Services, and the Office of Recovery Services.  Pursuant to M.G.L.A. 111 App. §2-7(11), it has the authority to prosecute suits on behalf of the Department.

40.    The **Boston Housing Authority** is a body politic located in the City of Boston. The Boston Housing Authority provides public housing to residents of Boston.  Pursuant to M.G.L.A. 121B. §11(a),  the Boston Housing Authority has the authority to prosecute suits on behalf of the Department.

41.    Collectively, the City of Boston, the Boston Public Health Commission, and the Boston Housing Authority are referred to as "Plaintiffs."

B.      **Express Scripts Defendants**

42.     **Defendant Express Scripts, Inc.** is a Delaware corporation registered to do business in Massachusetts with its principal place of business located at One Express Way, St. Louis, Missouri.

43.     During the relevant time, Express Scripts, Inc. was directly involved in the PBM mail order services business, as well as Express Scripts' data and research services, nationwide, including in the City of Boston.

44.     **Defendants Express Scripts Administrators, LLC** (d/b/a Express Scripts, f/k/a Medco Health, LLC) is a Delaware limited liability company. Express Scripts Administrators, LLC is registered to do business in Massachusetts with its principal place of business located at One Express Way, St. Louis, Missouri. Express Scripts Administrators, LLC is registered with the Massachusetts Division of Insurance.

45.     Upon information and belief, during the relevant time, Express Scripts Administrators, LLC provided PBM services in the City of Boston, as alleged in this Complaint.

46.     **Defendant Medco Health Solutions Inc.** (f/k/a Merck-Medco Managed Care LLC ("Medco")) is a Delaware corporation registered to business in Massachusetts with its principal place of business located at One Express Way, St. Louis, Missouri.

47.     Express Scripts acquired Medco in 2012 in a $29.1 billion deal.

48.     Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States. Medco provided PBM services to approximately 62 million members and provided mail order and data research services to customers nationwide.

49.     Following the merger, the combined company continued under the name Express Scripts. All of Medco's PBM, mail order pharmacy, and data and research business was combined into Express Scripts, and all of Medco's customers became Express Scripts' customers. Express

Scripts, Inc. became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers.

50.     As a result of the merger, Express Scripts Holding Company ("ESHC") was formed. In 2018, Cigna Corp. purchased Express Scripts Holding Company for $54 billion.

51.     In October of 2020, Express Scripts Holding Company changed its name to Evernorth Health, Inc. ("Evernorth").  Evernorth is the indirect parent of Express Scripts, Inc., along with pharmacy, and research subsidiaries that operate throughout Massachusetts, including in the City.

52.     Express Scripts provided PBM services to the City of Boston as the PBM for City health insurer Blue Cross Blue Shield of Massachusetts from 2020 to 2022.

53.     **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is an indirect subsidiary of Evernorth.  ESI Mail Pharmacy Service, Inc.'s principal place of business is in Missouri at the same location as Evernorth.

54.     ESI Mail Pharmacy Service, Inc. dispenses opioids nationwide, and upon information and belief, dispensed opioids into Massachusetts, including the City of Boston, during the relevant time period as a mail order pharmacy.

55.     **Defendant ESI Mail Order Processing, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth.

56.     ESI Mail Order Processing, Inc., upon information and belief, provided and/or offered mail order pharmacy services in Massachusetts, including the City of Boston, during the relevant time period.

57.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Evernorth. Express Scripts Pharmacy, Inc. is registered to do business

in Massachusetts with its principal place of business located at One Express Way, St. Louis, Missouri.

58.     Express Scripts Pharmacy, Inc., upon information and belief, provided and/or offered mail order pharmacy services in Massachusetts, including the City of Boston, during the relevant time period.

59.     Evernorth is the direct parent of and shares a physical address with Express Scripts, Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., ESI Mail Order Processing, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, and its website includes links to both Express Scripts "Pharmacy Benefits Management" and "Express Scripts Pharmacy." "Express Scripts Pharmacy" is described as providing home delivery pharmacy services.

60.     As a unit, ESI Mail Pharmacy Service, Inc., ESI Mail Order Processing, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions were the third largest dispensing pharmacy in the United States for the 2006 – 2014 time period.

61.     Collectively, Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., ESI Mail Order Processing, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts," "ESI," or "Express Scripts Defendants."

62.     In 2022, Evernorth, in large part through Express Scripts' PBM and mail order pharmacy business, generated revenue of $140.34 billion, contributing more than 75% of Cigna's revenue in 2022.

63.     Express Scripts Defendants are named for their conduct as:

- a PBM;

- a data, analytics, and research provider; and

- a mail order pharmacy (i.e. a dispenser).

64.     At all relevant times, Express Scripts Defendants performed these services in Massachusetts and in the City of Boston.

**C.     Optum Defendants**

65.     **Defendant UnitedHealth Group, Inc.** ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

66.     UnitedHealth Group is a Fortune 5 diversified managed healthcare company.  In 2022, UnitedHealth Group listed revenue in excess of $324 billion.  UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans and pharmacy benefits through its wholly-owned subsidiaries.

67.     UnitedHealth Group operates nationwide, including in Boston, through two connected divisions – Optum and UnitedHealthcare ("UHC").  As discussed in greater detail below, Optum provides PBM services, mail order pharmacy services, and data, analytics, consulting, and research services.  UHC provides health insurance and health benefit services.

68.     UnitedHealth Group, through its executives and employees, controls the enterprise-wide policies that inform both UHC and Optum's lines of business in order to maximize profits across the corporate family.

69.     Publicly available information demonstrates this control.  One document states, "When clients work with UnitedHealthcare, they tap into the power of UnitedHealth Group.  The enterprise – entrusted to help provide health benefits and services to 250M+ members worldwide – includes Optum, a technology and data-enabled health care services company. UnitedHealth Group has been a leader in the charge to transform health care for more than a decade, investing upwards of $5B annually in innovation, research and development and technology.  Its businesses,

UnitedHealthcare and Optum, are both laser-focused on bringing solutions to market that help people live healthier lives and make the health system work better for everyone. . . . Optum brings its clinical expertise, technology and data from serving as a pharmacy benefit manager (PBM) and health services administrator."

70.      With regard to opioids, UnitedHealth Group publicly states on its website that it "is addressing the crisis. . . .  applying and coordinating capabilities, data and efforts across our companies, which span the spectrum of health services,"[3] which demonstrates UnitedHealth Groups role in controlling and coordinating its subsidiaries with regard to opioids.

71.      UnitedHealth Group further states on its website that it is "leveraging our data analytics capabilities to help minimize exposure to opioids and stop misuse before it starts by . . . improving adherence to Centers for Disease Control and Prevention (CDC) guidelines for opioid painkillers . . . working to keep opioids in the hands of the people they're prescribed for by watching for potentially fraudulent activities like prescription reselling and false medical claims . . . promot[ing] evidence-based treatment that gives individuals the best chance for recovery . . . [and] using advanced data analytics to monitor for dangerous prescribing and use patterns."[4]

72.      Furthermore, UnitedHealth Group employees move between UHG entities.  For example, current UHG CEO Andrew Witty also served as CEO for Optum.

73.      UnitedHealth Group's conduct has had a direct effect in Massachusetts, including in Boston.

74.      **Defendant OptumRx, Inc.**, is a California corporation with its headquarters in Irvine, California. OptumRx, Inc. is registered to do business in Massachusetts. OptumRx provides

---

[3] https://www.unitedhealthgroup.com/newsroom/posts/opioid-epidemic.html
[4] *Id.*

pharmacy benefit management services and mail order pharmacy services nationwide, including in the City of Boston.  OptumRx is a subsidiary of UnitedHealth Group.

75.     Prior to 2011, OptumRx was known as Prescription Solutions. OptumRx was created out of a series of mergers and acquisitions.

76.     In 2012, SXC Health Solutions, another large PBM, purchased its rival, Catalyst Health Solutions Inc., in a roughly $4.14 billion deal. SXC Health Solutions renamed the company Catamaran Corp. After this, UnitedHealth Group bought Catamaran Corp in a $12.8 billion deal and merged Catamaran with OptumRx in 2015.

77.     OptumRx and all of its predecessors including, but not limited to, Prescription Health Solutions, Catalyst Health Solutions, Inc., SXC Health Solutions Corp., and Catamaran Corp. are referred to herein as "OptumRx."

78.     OptumRx provides services to more than 129 million people through a network of more than 67,000 pharmacies.

79.     In 2022, OptumRx's revenue was nearly $100 billion.

80.     **Defendant OptumInsight, Inc**. is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota and is registered to do business in Massachusetts. OptumInsight was formerly known as Ingenix, Inc. UnitedHealth Group changed the name in 2011 after the State of New York investigated Ingenix regarding a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State and giving rise to U.S. Congressional hearings.

81.     **Defendant OptumInsight Life Sciences, Inc**. is a Delaware corporation with its principal place of business located in Massachusetts.

82.     In 2012, UnitedHealth Group renamed QualityMetric, Inc. to OptumInsight Life Sciences, Inc.

22

83.     OptumInsight, Inc., OptumInsight Life Sciences, Inc., as well as their predecessors, successors, affiliates, including but not limited to Ingenix, Innovus, Innovus Research, i3, QualityMetric, Inc., Htanalytics, ChinaGate, and CanReg, are referred to herein as "OptumInsight."

84.     OptumRx, Inc. and OptumInsight are wholly owned subsidiaries of UnitedHealth Group.

85.     OptumInsight provides data, analytics, research, consulting, technology and managed services to companies nationwide.  As is discussed below, OptumInsight worked with opioid manufacturers to convince prescribers, patients, and the public, including in the City, that opioids were appropriate for long term use for the treatment of chronic pain conditions and were not addictive.

86.     Collectively, UnitedHealth Group, OptumRx and OptumInsight are referred to as "Optum" or "Optum Defendants."

87.     Optum Defendants are named for their conduct as:

- a PBM;

- a data, analytics, and research provider; and

- a mail order pharmacy (i.e. a dispenser).

88.     At all relevant times, Optum Defendants performed these services in Massachusetts and in the City of Boston.

### III. JURISDICTION AND VENUE

89.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 because Plaintiffs  claims under the Racketeer Influenced and Corrupt Organization Act ("RICO"). 18 U.S.C. § 1961, *et seq.*, raise a federal question. This Court has supplemental

jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

90.     This Court has personal jurisdiction over the Defendants because the Defendants' principal place of business is in Massachusetts, or because the cause of action alleged in this Complaint arises out of the Defendants transacting business in Massachusetts, contracting to supply services or goods in this state, or causing tortious injury by an act or omission in this state, and because Defendants regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in this state. The Defendants have purposefully directed their actions towards Massachusetts and/or have the requisite minimum contacts with Massachusetts to satisfy any statutory or constitutional requirements for personal jurisdiction. In the alternative, the Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b) as to Plaintiffs' RICO claims and pendant personal jurisdiction over all Defendants as to Plaintiffs' other claims, all of which arise out of a common nucleus of operative facts.

91.     This Court has venue of this action pursuant to 28 U.S.C. § 1391.

## IV. FACTUAL ALLEGATIONS

**A.      A few large PMBs exert substantial influence in a way that is often not transparent, even to their customers.**

*What are PBMs?*

83.     "According to the Pharmaceutical Care Management Association (PCMA), the PBM trade group, PBMs process prescriptions for the vast majority of Americans."

84.     PBMs review and pay claims. PBMs also review and decide "which medications are most effective for each therapeutic use."

85.     PBMs offer national formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed.  PBMs also decide what, if any, UM measures will be included in the national plans they offer.  PBMs commit to monitor their customers' drug plans and monitor their customers' utilization, including through concurrent drug utilization review ("Concurrent DUR" or "cDUR").

86.     Concurrent drug utilization review involves the PBMs real-time evaluation of drug therapy for potential problems, including over-utilization and clinical abuse/misuse of prescribed drugs. ESI's and Optum's cDUR terms in their standard client contract offerings required them to conduct concurrent DUR at the point of sale on all prescriptions.

87.     Defendants' standard, national formulary and plan offerings control:

a.      Which opioids will be available (or not available) to patients;

b.      In what quantities the opioids will be dispensed;

c.      At what co-pay will the opioids be dispensed;

d.      What level of authorization will be required for the dispensing of opioids to a consumer patient; and

e.      What less addictive pain treatments, beneficial drugs or other treatments will or will not be available.

88.     Defendant ESI made these formulary offerings in Massachusetts and served as a PBM for City residents who received insurance from their employers or other payors that utilized ESI as a PBM.

89.     Defendant Optum also made these formulary offerings in Massachusetts and served as a PBM for City residents who received insurance from their employers or other payors that utilized OptumRx as a PBM.

90.     Defendants represent to their clients, patients, and the public that they structure their national formularies and drug programs in a manner that promotes safe use and appropriate

prescribing of opioids.  For example, ESI claims that its Pharmacy and Therapeutics Committee (the "P&T Committee") considers drug safety and efficacy and "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy." ESI also claims that it uses drug utilization review to "review prescriptions for safety and effectiveness, in real-time, electronically and systematically, when presented to . . . pharmacies" and that it will "alert the dispensing pharmacy to detected issues." Additional examples of such statements are throughout ESI's, or its predecessor companies', SEC filings or other statements:

- ESI stated that it "is a company dedicated to making the use of prescription drugs safer . . . for plan sponsors and over 50 million members and their families."

- Medo represented in its filings that it "capitalize[s] on our clinical expertise and advanced information technology infrastructure . . . to improve safety and the quality of care for patients . . . by developing action-oriented clinical programs and services based on clinical rationale."

- ESI CEO stated that "by filling 1.4 billion prescriptions per year, we have over 10 petabytes of useful data from which we can gain insights and for which we can develop solutions . . . [to] improve the health of patients" and further stated that ESI "has researchers and scientists whose sole job is to interpret and analyze the data to identify opportunities to improve health outcomes."

91.     Optum and its predecessor companies have made similar claims.  For example:

- United Health Group stated in 2009 that OptumInsight's predecessor, Ingenix, was "committed to using the power of health information and analytics to help save lives, improve care and modernize the health care system."

- UnitedHealth Group's 2011 Annual Report stated that "OptumRx is dedicated to helping people achieve optimal health . . . improving quality and safety, increasing compliance and adherence, and reducing fraud and waste."

92.     In actuality, Defendants have structured their national formulary and benefit program offerings in a manner that maximizes their own profits, have entered into agreements with manufacturers to assist in marketing efforts in order to increase opioid prescribing, and have

refused to use their drug utilization review process to identify and control opioid misuse, fueling the opioid crisis as a result.

93.     Furthermore, while Defendants national formularies made it easier for patients to receive opioids, they made it harder for patients to receive addiction treatment.  A ProPublica/New York Times study found that insurers erected more hurdles to addiction treatment than they have for the addictive substances themselves.  Only after public pressure did some insurers make it easier for patients to receive addiction treatment drugs.

### PBMs and Financial Incentives from Manufacturers

94.     Opioid manufacturers cannot effectively influence drug prescribing and opioid utilization alone.  Other participants in the drug distribution and reimbursement system play key roles in the availability of their opioids.

95.     Using their market power, PBMs, including Defendants, require and receive incentives from manufacturers to keep certain drugs on and off their standard formularies. They also receive incentives from manufacturers through lucrative administrative fees.

96.     Drug manufacturers compete for placement on PBMs' standard, national formularies (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization and other utilization management tools that would slow down flow, such as quantity limits, refill limits, and step edits.  PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary offerings and plan structure.

97.     Generally, prescription drug manufacturers pay higher rebates for preferred formulary placement on lower tiers (i.e., tier 2 status instead of tier 3 status). This is because prescribers are more likely to write prescriptions and consumers to fill prescriptions for drugs with lower cost-share amounts.

98.     Higher priced drugs will typically generate higher rebates.  This creates an incentive to have standard formulary offerings that provide favorable formulary placement to brand-name, higher priced drugs such as OxyContin, a frequently diverted opioid.

99.     Under a traditional PBM pricing model, PBMs retain a portion of the payments they receive from prescription drug manufacturers and return the remainder to their third-party health plan clients.  The amount of the payments passed on to clients has increased over time, particularly after the PBMs began to be scrutinized for their rebate practices during the last few years.  Historically, administrative fees are not passed on, which prompted disputes and concerns over whether rebate payments are being disguised as other revenue, such as administrative fees, to enable PBMs to retain the full amounts.

100.    Since 2014, payments to PBMs by manufacturers as rebates or fees to ensure the formulary placement of their drugs have risen by 16% per annum, and now constitute 40% or more of branded prescription drug costs.

101.    The rebates PBMs negotiate are highly confidential and, for the most part, the exact terms of the agreements between PBMs and prescription drug manufacturers are unknown to others in the supply chain and their customers – creating a pricing black box.

102.    Additionally, Defendants obtain revenue through fees from maintaining pharmacy networks, profiting from the "spread" between what clients pay them for generic prescription drugs and the amounts the PBMs reimburse to pharmacies.  In addition, retail pharmacies pay Defendants fees for every opioid sold, and Defendants reimburse the pharmacies based on the lowest available published prices while paying their own mail order pharmacies based on higher published prices for the same drugs. In other words, the more filled prescriptions a PBM administers, the higher profit it earns.

103.     Defendants further increased their profits from generic opioids by failing to put into place utilization management tools that would have reduced illegitimate use and dissemination of these drugs.  As the market shifted from branded opioids to generics in the mid-2000s, ESI and Optum continued to provide generic opioids unrestricted and preferred placement on their standard formularies because of the profits generic drugs generated for the Defendants through spread pricing and other means.  Optum acknowledged in 2013 that generic utilization was a "high driver of revenue and profit."

104.     Defendants resisted efforts to limit access to prescription opioids due to the revenue generated from the dispensing of opioids and concerns about the impact on the rebates Defendants received from opioid manufacturers.  It was only well after the opioid epidemic had reached its peak and public pressure had mounted that the Defendants began to utilize their unique access to data to offer utilization measures to address the unfettered access to prescription opioids which they helped create.

105.     Much of this activity is not transparent to anyone, including those who, in good faith, hire PBMs to manage their benefits. Defendants used their position to collude with manufacturers, prioritizing their own profits instead of the public health.

106.     Defendants link opioid manufacturers to prescribing physicians, pharmacists, clients, and consumers with the objective of influencing drug utilization. Internal documents revealed that the services and products offered by PBMs "help drive [consumer] behaviors" by engaging in each link of the prescription drug distribution chain.

107.     As part of their business model, Defendants offer services to assist manufacturers in the marketing of drugs in other ways as well, as described further below.

108.     On information and belief, and as described below, Defendants engaged in all these practices in Massachusetts generally and in the City of Boston specifically.

**B.     Defendants Had Access to Data Indicating Diversion, Misuse, and Abuse of Opioids But Failed to Use it to Make Meaningful Efforts to Prevent Diversion**

109.    Armed with a wealth of information and data, Defendants knew or should have known of the dangerous prescribing patterns that demonstrated issues like diversion, misuse, abuse, doctor shopping, overdose, and outsized use in the City.  Yet, upon information and belief, Defendants took no steps to report or address outlier prescribers or pharmacies or to otherwise rein in the facially suspicious volume of opioids being dispensed in the City or throughout the country.

110.    Instead, as described further below, Defendants provided manufacturers with preferred formulary status without restrictions and aided their marketing efforts even though they knew that dangerous numbers of opioids were being utilized in the City and the nation and were causing an unprecedented crisis of addiction, overdose, and death.

111.    For the entire relevant time period, Defendants have had access to extraordinary data which they extensively review and analyze for various profit-making business objectives.

112.    ESI has publicly acknowledged its unique ability to collect data. An ESI representative has stated, "Because Express Scripts interacts with patients, pharmacies, prescribers, payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under pharmacy benefit."

113.    OptumInsight's predecessor, Ingenix, described itself as having "access to a proprietary Research Database containing data on ten million individuals dating back ten years with the opportunity to link pharmacy claims, medical claims, and clinical laboratory results. Underlying information is geographically diverse across the United States, and is updated frequently."

114.    Defendants recognize the value of their data. In a pitch to be selected as Purdue's "partner" for health economics and outcomes research, OptumInsight asserted that "its claims database" was superior to other databases for multiple reasons and further promoted its ability to

"link its data to many other data sources," including mortality data. ESI also has a "research arm" which performs health economics and outcomes research and/or drug utilization review using its "own database[]," including on behalf of Purdue.

115.    Apart from their research arms, Defendants can monitor their clients' opioid utilization and the overall utilization of particular opioids. They have extraordinary data across the opioid supply chain, including data showing: the volume, nature, dosage, and conditions for which health care providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed and the volume of opioids dispensed by geographic area, among other data. Defendants also track the number of opioids that move through their own mail order pharmacies.

116.    At the individual level, Defendants could monitor their data to identify conduct commonly associated with opioid misuse, addiction, and diversion, such as early refills of opioid prescriptions, multiple prescriptions for one individual or for dangerously high volumes or dosages of opioids or "doctor shopping," the practice by which individuals receive multiple opioid prescriptions from unknowing prescribers. On the prescriber level, they could identify problematic prescribers who were prescribing unreasonably high volumes of opioids to unreasonably high numbers of patients, co-prescribing opioids with drugs commonly abused with them, such as benzodiazepines or the "Holy Trinity", prescribing opioids outside the regular scope of their practice, or who wrote prescriptions for the same dose and duration to all of their patients – all classic signs of "pill mills."

117.    Thus, Defendants, like other PBMs, can see detailed information on individual prescribers, prescriptions, and pharmacies, but can also aggregate that data across manufacturers, patients, pharmacies, and payors. Their visibility is both uniquely granular and comprehensive.

118.    For example, in 2013, an OptumInsight Life Sciences consultant forwarded an article to Endo indicating that CVS was cutting opioid access for "risky" prescribers and that OptumInsight could do the same: "Within our data, we can track the physicians, their # of prescriptions within the Optum database, their patients comorbidities and conditions (e.g., do their patients have pain issues?)…We can also track the pharmacies as well."

119.    In 2013, Catamaran, a PBM subsequently acquired by UnitedHealth Group and merged with OptumRx, touted its ability to identify "current as well as future at-risk patients and drive interventions in our clinical programming" based on a "dynamic rules engine that continuously scans patient data." Catamaran claimed it could identify these risks "in real time" based on just 30 days of prescription data."

120.    Optum's evaluation of its own claims data in 2017 further demonstrates the information Defendants have always had at their fingertips and what they could have done with it. In a 2017 presentation entitled, "Confronting the Crisis we Brought Upon Ourselves: America's Opioid Abuse Epidemic," Optum used its claims data to show the severity of the epidemic and the fact that the vast majority of prescriptions it processed were noncompliant with the 2016 CDC Guidelines for Opioid Prescribing.

121.    Defendants tracked pill-by-pill data by employing advanced data analytics collected from hundreds of millions of pharmacy claims. The data showed nearly every aspect of the pills' movement through the prescription drug distribution and payment systems.

122.    Defendants had access to all of this data well before Massachusetts and other states established their Prescription Drug Monitoring Programs in order to perform these analyses and stem the tide of the opioid crisis.

123.    Furthermore, by 2011 at the latest, Defendants had been put on notice by the Centers for Medicare and Medicaid Services (CMS) that all actors involved in the delivery of

healthcare in the United States needed to take steps to address the overutilization of prescription opioids, which was contributing significantly to the growing opioid crisis.  CMS advised that Medicare data showed overutilization of opioids that was "highly indicative of drug seeking behavior due to drug abuse or diversion."

124.    Defendants represented to the public and their clients that they would identify potential fraud and abuse, giving rise to an expectation that they were identifying and addressing instances of over-prescribing and diversion.  Instead, they were making business decisions to increase their bottom line while eliminating patient safeguards in exchange for more lucrative contracts with manufacturers.

125.    Although Defendants were acutely aware of the opioid epidemic, they failed to use their extensive data to combat it, and instead helped to maintain the flow of opioids. By at least 2002, ESI was fielding questions from its customers who were concerned about abuse and diversion of OxyContin.  A March 2002 Purdue email discusses the fact that Medco requested an "overview of the abuse and diversion issue surrounding OxyContin" because it would help them "respond to their customers [sic] questions/concerns."

126.    In 2003, an ESI employee giving a presentation at a conference stated when discussing OxyContin, "This is a narcotic. All narcotics are addictive. In addition, this is a controlled release narcotic so when someone would crush it up and either ingest it or inject it there [is] … a potential for serious injury or even death. But ESI's own data demonstrated these problems as well.

127.    ESI was directly involved in the administration of Purdue's Indigent Patient Assistance Program ("IPAP"), which provided it with an additional source for prescribing and dispensing data regarding Purdue opioids, including the total number of prescriptions filled and

tablets dispensed each month, and with additional information about abuse and diversion of opioids.

128.    Purdue created the Indigent Patient Assistance Program to assure "that all patients for whom our oxycodone or morphine products are being prescribed not be denied the benefit of these products because of financial limitations," while reaping the "ancillary benefit" of "the goodwill of important physicians." Although the data could have been readily used to detect potential addiction and misuse, the Purdue-ESI partnership was focused more on ensuring the continued availability of Purdue's opioid products.

129.    In November 1994, ESI assumed operating responsibilities for the processing of Purdue prescriptions (OxyContin and MS Contin) through the IPAP program. As of at least January 2001, ESI's mail order pharmacy was acting as the "fulfillment pharmacy" for the IPAP opioids.

130.    Through the IPAP program in particular, ESI had a ringside seat to, and an active role in, the earliest rounds of the opioid epidemic. As early as 2000, Purdue's Vice President of Medical Affairs noted that, through the IPAP program, the ESI pharmacy was supplying large volumes of opioids, "supporting polypharmacy," and filling prescriptions for dosing more frequent than the 12-hour dosing Purdue marketed as a key selling point for OxyContin (including a prescriber writing for as many as 5 doses of OxyContin per day).

131.    For example, a pain doctor in Virginia was prescribing 900 tablets a month to a patient in the IPAP program.  An ESI representative allegedly commented to the doctor that  IPAP patients were "all on zillions of tablets." There is no reason to believe that such excesses, including from the prescribers whose goodwill Purdue sought to earn, was confined to the IPAP program. Quite the opposite, the prescribers writing these "zillions of tablets" for IPAP patients were doing the same for others. Purdue noted that the "more active" prescribers in the IPAP were "also

generally higher prescribers for the strong narcotic classes and usually for MS Contin/OxyContin in particular" and were a geographically diverse group that "share[d] the characteristic of generally being in the highest decile class of prescribing activity."

132.    By 2001, ESI was responsible for maintaining Purdue's prescription database. In a 2001 letter to FDA, Purdue described its IPAP program and Express Script's role in its administration, stating, "the patient is responsible for obtaining subsequent prescriptions from the practitioner and sending them to Express Scripts. The medications are shipped directly to the patient's home. The prescription information is maintained in a database managed by Express Scripts."

133.    Both Purdue and ESI knew, based on the prescription data, that issues had emerged regarding the overprescribing of opioids. In February 2001, the companies met to discuss the implementation of "additional controls" around the IPAP. The issues included "excessive dosing and quantities, off label prescriptions, shipping large quantities, lost shipments, education, grandfathered patients, Adverse Event Reporting, and the timeline of new policies."

134.    ESI had access to patient information as well. In 2002, it began administering the enrollment and eligibility functions of the IPAP.

135.    However, ESI's overall lack of diligence was such that it failed to meet even Purdue's standards. In 2008, Purdue Corporate Security conducted an audit of the IPAP and "discovered a series of discrepancies in ESI's due diligence on patients accepted into IPAP. The audit found numerous applications had been accepted from persons who submitted fraudulent information. As a result, new controls were placed on the program." Purdue concluded that as a result of ESI's lack of due diligence, during a 4-month period Express Scripts shipped 18,000 Oxy tablets to 39 people who falsified their applications.

136.    Outside of the IPAP program, ESI's own data capacities allowed the company to identify inappropriate use and prescribing of opioids, as seen in drug trends reports, research posters, and the 2014 ESI report *A Nation in Pain*.  The report discussed the results of ESI's review of 36 million opioid pharmacy claims, and detailed the indicia of the opioid epidemic that was apparent in the data. *A Nation in Pain* notes that the study found that 60% of patients using opioids were taking a dangerous combination of drugs that are potentially fatal, such as benzodiazepines with an opioid. The study also noted that a separate Express Scripts study that analyzed ESI's data found that 40% of opioid prescriptions filled by members with employer sponsored drug coverage between 2011 and 2012 were written by only 5% of prescribers.

137.    This unique access alerting ESI to the problems with opioids, should have triggered a robust data review to identify signs of misuse, abuse and diversion. This is particularly true, given ESI's knowledge of Purdue's improper marketing tactics. ESI knew, at least as of 2003, that part of the "high growth rate of OxyContin" appeared to be due to "improper detailing" by Purdue, which ESI was "looking at." At its 2003 annual conference, an ESI representative acknowledged as much in a presentation regarding an OxyContin study it was conducting for Georgia Medicaid. As part of its study, ESI looked "across the book of business at Express Scripts," not only at Georgia Medicaid, and found "similar patterns," including a shift to higher doses. Yet, ESI continued its efforts to reduce barriers to OxyContin use, and promote higher volumes of opioid prescribing.

138.    While Defendants had some programs aimed at identifying high narcotic usage among patients, these programs were limited in scope and availability, and were window dressing, at best. For example, ESI started utilizing its data as part of a Fraud, Waste and Abuse program in the late 2000s, but the program was only used for certain clients, and it was not widely known within the company. In 2015, a director in the Fraud, Waste, and Abuse department at ESI sent an

36

email to Andrew Behm, ESI Vice President, stating, "[w]e have been seeing way to [*sic*] many egregious drug seeking activity over the years . . . it is hard to defend how our system would allow 68 control scripts by 47 physicians, and 28 pharmacies in a year for one patient. This is one of many…examples…" Mr. Behm responded, "I think we'd all be supportive of shutting this down. We don't really understand the FWA offering. If you could provide some color there, it might help…to understand the existing gaps."

139.    Likewise in 2016 the Optum Defendants began mailing notice letters to "outlier prescribers," but no prescribers were dismissed from the network as a result of the investigation, and Optum never conducted any follow-up analysis to determine whether the letters had any impact on prescribing.

140.    Defendants knew or should have known from their own data that opioid abuse, overdose, and diversion were rising with the increasing amount of opioids that were being dispensed in the City and the surrounding communities—and yet they failed to take any of a number of steps they could have taken to stop it.

141.    Defendants, however, continued to prioritize their profits and decline to do anything meaningful about the opioid crisis.

142.    ESI was aware of and acknowledged its failures to utilize its data to reduce opioid misuse and diversion. In a 2014 email chain, ESI employees discussed ESI's poor score in a survey regarding, among other things, managing opioid misuse.  The employees also noted that ESI did have some monitoring programs in place for Medicare clients, but they did not have them for the commercial side of the business.  One employee stated, "That's unfortunate that what is available in Medicare is not fully available in Commercial, and we continue to just be okay with lacking in these areas."

143.    Optum admitted in a 2017 presentation that it failed to act to address the opioid crisis, stating that the PBMs brought the opioid abuse epidemic "on ourselves" because of their "delayed reaction in intervening as . . . our death toll rose substantially," and stating that "we can no longer sit idly by and watch."

## C.    Defendants Worked Directly With Manufacturers to Boost Opioid Sales and Aid Deceptive Marketing

### 1.    Background on Opioid Manufacturers' Deceptive Marketing of Opioids

144.    As Purdue developed OxyContin in the mid-1990s, it knew that to expand its market and profits, it needed to change the perception of opioids from medications that were appropriate only for short-term acute pain or for palliative (end-of-life) care to medications that could be used long-term for widespread chronic conditions, like back pain, migraines, and arthritis. Purdue, together with other opioid manufacturers, such as Teva, Janssen, and Endo, cultivated a narrative that pain was undertreated and pain treatment should be a higher priority for health care providers, and that opioids were safe, effective, and appropriate for long-term use for chronic, routine pain conditions. There were no studies that supported the claim that opioids were appropriate for chronic pain, and the manufacturers failed to disclose the lack of evidence that opioids were safe or effective long-term or the other risks from long-term use of opioids. Purdue and other manufacturers misrepresented the risk of addiction for pain patients as modest, manageable, and outweighed by the benefits of opioid use.

145.    Purdue and other manufacturers spent hundreds of millions of dollars on promotional activities and materials that continued to falsely deny or trivialize the risk of addiction and overstate the benefits of opioids.  They deceptively marketed opioids to prescribers through advertising, websites, and in-person sales calls.  They also relied upon paid physician speaker programs, continuing medical education ("CME") seminars, non-credit education programs, treatment guidelines, mass mailings to physicians and patients, and other publications and

programs they developed with patient advocacy groups, professional associations, paid physicians, and other third parties, including Defendants.

146.     The misrepresentations included claims that:

a.   patients receiving opioid prescriptions for pain generally would not become addicted, and that doctors could use screening tools to exclude patients who might;

b.   patients who did appear addicted were not; they were instead "pseudoaddicted" and needed more opioids;

c.   opioids relieved pain when used long-term and were appropriate for use for chronic pain conditions;

d.   opioids could be taken in higher and higher doses (without disclosing the increased risk to patients);

e.   OxyContin provided 12 hours of relief (when Purdue knew that, for many patients, it did not);

f.   opioids would improve patients' function and quality of life (while trivializing or omitting the many adverse effects of opioids that diminish patients' function and quality of life).

147.     Between the 1990s and 2011, prescriptions of oxycodone, an active ingredient in OxyContin and other opioid drugs, more than doubled in the United States. During the same time period, opioid prescriptions increased some 31% from approximately 1.6 million to approximately 2.2 million. According to a U.S. Department of Health and Human Services Fact Sheet, "[i]n 2014, more than 240 million prescriptions were written for prescription opioids, which is more than enough to give every American adult their own bottle of pills."

148.     The opioid manufacturers have faced substantial civil and criminal liability for their roles in contributing to the opioid public health crisis, and have agreed to pay billions of dollars to address the devastation caused by their misleading marketing and other misdeeds. For example:

a.   In 2007, Purdue pled guilty and agreed to pay approximately $600 million in fines and other payments to resolve criminal and civil charges related to the company's misrepresentations regarding OxyContin's addiction and abuse risks, admitting that it had falsely "marketed and promoted

OxyContin as less addictive, less subject to abuse and diversion and less likely to cause tolerance and withdrawal than other pain medications";

b. In October 2020, the Department of Justice announced that Purdue entered into a federal settlement of more than $8 billion to resolve pending criminal and civil allegations related to its marketing of OxyContin;

c. In February 2022, the largest U.S. drug distributor and opioid manufacturer, Janssen, agreed to finalize a proposed $26 billion settlement resolving claims by states and local governments that they helped fuel the opioid epidemic;

d. In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation regarding its role in the opioid crisis; and

e. In August 2022, Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

### 2. Defendants Worked Directly with Manufacturers to Increase Opioid Sales

149. Defendants worked directly with Purdue and other manufacturers to create, provide support for, and disseminate opioid manufacturers marketing messages in a number of ways. They made data and data portals available to manufacturers that would help them target their messages and develop marketing strategies for their sales forces. They partnered with manufacturers to conduct studies and develop data that would reinforce Purdue's and other manufacturers' deceptive messaging. In addition, they helped Purdue and other manufacturers draft and disseminate their messages to prescribers through "educational" materials. Even after Purdue's 2007 plea agreement where the company acknowledged the falsity of its claims regarding OxyContin (which also demonstrated the falsity of other opioid manufacturers' similar claims about their opioid products), the Defendants continued to participate in marketing efforts and otherwise assist Purdue and other opioid manufacturers in spreading the same misrepresentations about the safety and efficacy of opioids.

150. ESI touted its "Pharma Portal" as providing "pharmaceutical manufacturers concrete data on 40 million buyers spending $3 billion a year on prescription drugs." "Armed

with this intelligence" manufacturers could use ESI's "advanced tools" to, among other things, "[d]evelop marketing and sales strategies" and "monitor and evaluate their success." To make sure manufacturers could take full advantage of these tools, ESI's website "also provides customer service and FAQs."

151.    The portal, among other things, allowed marketers to use this aggregate data to "compare results with [their] competitors and calculate market share" by "matching details about therapy classes, manufacturers, physicians and Express Scripts' clients" and to "produce countless graphs and online reports" to help them "expect success" in their efforts.

152.    ESI also offered "Encore" "Contract Pulse" and "Invoice Direct" "database products" for the benefit of Purdue and, upon information and belief, other manufacturers. Encore (Contract Pulse) served, among other things, to "[a]llow the manufacturer to . . . evaluate . . . promotional programs and "develop sales force strategies." Together, ESI estimated that its Pharma Portal and Encore had enough worth to manufacturers to provide a "fair market value" of "around $125,000 per quarter." This meant that as of late 2002, the "current customers" were "big pharma only."

153.    In 2007, an internal document related to Opana and another Endo drug explained that Endo would be able to receive "market share data" and other information" from ESI. Upon signing its contract, Endo planned to send a five-person team to a six-hour training on ESI's databases.

154.    Endo appears to have found the pharma portal service as advertised. Years later, an Endo "Executive Summary" on ESI included the following as among the manufacturer's strategies: "utilize ESI's pharma portal to track and give all AE's, RD's and DM's feedback by the middle of the month." Upon information and belief, these refer to sales roles, such as account

executives. As such, it also listed as a required resource "[c]onsistent monitoring of ESI's monthly claims data to establish growth in the newly acquired business."

155.    ESI cooperated with Purdue and other manufacturers to pursue profits by directly collaborating in concerning marketing efforts in other respects as well. As early as 2000, ESI and Purdue conferenced to discuss a range of "initiatives," including "internet opportunities" such as placing a coupon on the web, a pharmacy preceptorship program that would "educate" clinical program managers regarding opioids, and "physician connectivity technology," as "Express Scripts demonstrated that technology can change prescribing behavior." Purdue also contemplated that Express Scripts might send out a piece related to "[o]pioid guidelines, NEJM quotes, and addiction terms" that its own legal department had said sales representatives could not use." The goal of a such a mailing "would be to educate the physician on the beneficial uses of OxyContin and the preferred formulary status."

156.    ESI developed a study for Purdue entitled, "Quantifying Patterns of Analgesic Use in Conditions with Non-Malignant Pain," which utilized ESI's data and, according to the study's summary, could "support [Purdue's] ongoing strategy to promote the effective use of OxyContin over other drugs and drug classes in the treatment of severe pain."

157.    As another example, a 2001 letter from ESI to a Purdue Brand Manager offered to assist with "strategic initiatives where Express Scripts can support Purdue Pharma in your efforts to educate the market on the prescribing, administration and consumption of Oxycontin" and proposed "three communication efforts that can be rapidly deployed to select audiences." ESI also provided a "more detailed description of the suggested programs," which include targeting physicians, pharmacies, and patients with Purdue Pharma produced materials such as "Dispelling the Myths about Opioids." Among other misrepresentations, "Dispelling the Myths about Opioids" labeled the true statement that "opioid addiction … is an important clinical problem in patients

with moderate to severe pain treated with opioids as a "myth" and further stated that "addiction risk appears to be low."

158.    In addition, ESI offered Purdue the opportunity to give a presentation as an "expert[] in pain management" at a June 2001 advisory board that Express Scripts was hosting, and which would consist of "leading workers' compensation carriers from across the country."

159.    ESI also coordinated with Purdue on a mailing planned for 1,900 physicians in relation to OxyContin in April 2001, with Purdue suggesting changes to the language about abuse and diversion, along with the addition of language on 12-hour dosing—a focal point of deceptive marketing claims by Purdue.

160.    An April 2001 Purdue memo explained the reasons Express Scripts was interested in sending a mailing to physicians at that time: "ESI has told use that this mailing is necessary so that they may squelch the anti-OxyContin pushback from their clients "Managed Care Organizations and Employer Groups) due in large part to the national media attention OxyContin is receiving."

161.    A 2011 email chain shows ESI allowed Purdue to edit its clinical guidance on the use of opioids that was required by an ESI worker's compensation client, in which ESI removed a sentence that stated (appropriately): "Opioids appear to be no more effective than safer analgesics." By removing this warning, ESI created the false impression that opioids are more effective than analgesics even though ESI knew it was false. This conduct, and the other conduct described herein, aided the overall effort by Purdue to deceptively inflate the benefits of opioids while downplaying their dangers.

162.    Documents produced by Purdue Pharma also indicate that Optum promoted and/or carried out research projects designed not to serve its customers or public health, but to generate evidence to support the "aspirational value proposition" – in other words, marketing – of

OxyContin and other Purdue opioids for the treatment of moderate to severe chronic pain. Purdue noted Optum's "support [of] the Purdue pain franchise and specifically OxyContin tablets."

163.    In October of 2002, OptumInsight proposed a "Chronic Pain Management" study and education initiative to present a series of teleconferences to providers in the UHG/UHC network. The purpose of the initiative was to "optimize patient care in the treatment of chronic pain." The themes of the initiative included that "[most specialists in pain medicine and addiction agree that patients with prolonged opioid therapy . . . do not usually develop addictive behavior" and one of the purposes of the initiative was to convince providers that "[o]pioids are effective, have a low addiction potential, and may have fewer long term side effects than other pain treatments." The initiative was launched that same year.

164.    In a 2003 email thread, Purdue employees discussed the value of partnering with Ingenix (OptumInsight) because "it is part of United Healthcare" and there would be a "ripple effect" caused by working with UnitedHealth Group's research arm, since UHG also housed Optum and UHC.

165.    Purdue worked closely with OptumInsight, UHC, UHG, and OptumRx. In February 2003, UHC and OptumInsight met with Purdue to give a presentation on "Managing Chronic Pain Associated with Lower Back Pain." The goal of the presentation was to develop a comprehensive plan between Purdue, UHC, and OptumInsight to re-educate physicians on opioid use for the treatment of chronic pain and low back pain. The program included "[t]argeting physicians not aligning with UHG clinical objectives [for treating chronic pain] to modify behavior."

166.    In 2004, OptumInsight and Purdue negotiated an agreement to implement a program to "Identify and Educate Physicians Treating Patients with Sub-Optimally Treated Chronic Pain." OptumInsight agreed to identify target physicians treating patients with "sub-optimal managed pain" using an algorithm applied to its "proprietary research database"

containing pharmacy claims data.  OptumInsight, with Purdue's assistance, would then develop

the content of the educational materials (including the content and messaging of the meeting

moderators), plan recruitment efforts, and develop and distribute "pull-through" follow up

materials to reinforce the messages.  The follow up materials would consist of a newsletter or

information packet that would be distributed to the targeted physicians every 3 to 4 months.  The

objectives of the program included to "position appropriate use of OxyContin as a treatment

option" for chronic pain patients.

167.    Optum provided research and evidence to Purdue to support the expansion of the

opioid market and promotion of beneficial use of opioids for various treatments, including chronic

pain, low back pain, and osteoarthritis. A few examples are:

a.    In 2002, OptumInsight proposed to Purdue a "Chronic Pain Management" study and education initiative, consisting of teleconferences to providers in the UnitedHealth Group networks.  The themes of the initiatives included that "patients with chronic pain treated over extended periods of time . . . do not become addicted" and to convince prescribers that "[o]pioids are effective, have a low addiction potential, and may have fewer long-term side effects than other pain treatments."

b.    OptumInsight engaged in a multiphase project, pulling data from across the U.S., for Purdue to use in promoting the benefits of opioids for chronic/persistent pain.

c.    OptumInsight engaged in a Purdue study titled "Profiling the OxyContin Patient." The purpose of the study was to assist Purdue with formulary discussions, from a financial perspective to a discussion of promoting benefits of Oxycontin "given the costs associated with the undermanagement of pain."

d.    In May 2003, Purdue contracted with OptumInsight to conduct "Utilization of Characteristics of Long-Acting Opioids," a study on chronic pain.

e.    OptumInsight conducted another study for Purdue titled "A Usual Care, Multicenter, Open-label, Randomized, 4-month Parallel Group Trial to Compare the Impact of Therapy with OxyContin on Health Outcomes and Research Utilization in Subjects with Moderate to Severe Osteoarthritis Pain of the Hip or Knee." The study's purpose was to show "health-system decision-makers" the cost effectiveness of treating osteoarthritis with OxyContin. According to a Purdue marketing plan from 2005, the reliance

on the OptumInsight study would help "increase sales of the 10 mg, 20 mg, and 40 mg tablets" and "to maintain focus on non-cancer pain."

168.    Many of these studies were reverse engineered to support Purdue's marketing messages and increase sales of OxyContin.

169.    In addition, a 2012 Optum presentation to Purdue on the "OptumInsight and Purdue Partnership" promised to "develop clear, prioritized, and multi-year actionable plans for generating the evidence needed to support the value propositions for Intermezzo, Butrans, OxyContin, hydrocodone . . . to achieve the greatest likelihood of favorable treatment by payers" and to "effectively communicate the results of real-world effectiveness and safety studies showing the long-term benefit of OxyContin." In other words, OptumInsight would work to develop evidence to support the "aspirational value propositions" - or marketing messages - for Purdue's products. Thus, Optum had direct knowledge of evidence gaps that existed in Purdue's messaging regarding OxyContin and other opioids and worked to develop evidence to try to fill them. The multiphase project that took place between 2011 and 2015 included, among other things, interviewing "experts" who were "aligned with Purdue" regarding issues related to pain management and OxyContin.

170.    During this time, Optum and Purdue would have multiple hours-long meetings to discuss strategy and other issues, allowing Optum still further insight into Purdue.  OptumInsight conducted payer interviews to guide Purdue in connection with its promotion of OxyContin. OptumInsight's projects for Purdue also included conducting "database studies" analyzing claims data.

171.    Optum knew from its own data that opioid abuse, overdose, and diversion were rising with the increasing amount of opioids that were being prescribed and dispensed, which contradicted Purdue's marketing claims that OxyContin was appropriate for chronic pain patients because, among other misrepresentations, addiction was unlikely. Yet Optum continued to partner

with Purdue and other opioid manufacturers in their efforts to increase utilization of opioids, continued to give OxyContin and other opioids preferred status on national formularies, and continued to resist the implementation of utilization management tools at the manufacturers' behest.

172.     Optum not only worked with Purdue, but other opioid manufacturers as well.  For example, in 2013, United Healthcare, OptumInsight, OptumInsight Life Sciences, and OptumRx conducted a Payer Insights Forum with Janssen to, among other things "provide overview of Big Data available through OptumInsight/Janssen Strategic Data/Research alliance" and "identify opportunities for J&J to participate in shaping a plan for overcoming United Healthcare's challenges in pharmacy and medical device/diagnostics."

173.     UnitedHealth Group and the Optum Defendants worked together, as shown by nearly all of its consulting and research efforts with opioid manufacturers in which OptumInsight utilized the UnitedHealth Group research database, which included UHC and OptumRx claims data to generate the necessary evidence to support the opioid manufacturers' efforts to expand use of opioids.

174.     Like ESI, Optum admittedly understands that deceptive marketing played a role in expanding opioid sales and use. In 2001, an executive of UnitedHealth wrote to Purdue to discuss the "whole OxyContin overuse issue . . . which has been brought about by the 'heightened marketing skills of Purdue.'"  The executive stated, "I believe Purdue has acted irresponsibly in over-promoting the use of oxycodone . . . the activity has resulted in the overuse of morphine, an increase in the abuse of this narcotic, unnecessary and significant increases in pharmacy trend, and most importantly, an increase in patient morbidity and mortality."  He went on to state, "Given that the bad word is leaking out in the press, you have gigger fish to fry than just worrying about what UnitedHealth Group is going to do to manage our trend in this class . . . I would be interested

in knowing what Purdue is doing to solve the problem they created." Optum and UnitedHealth Group recognized that OxyContin was being overused, improperly marketed, and killing people in increasing numbers in at least 2001, yet they did not do anything meaningful to address the opioid "problem" until 2017.

175.    Further, Optum drafted documents include language citing Purdue's $200 million marketing campaign and the efforts of other companies who took notice, to develop additional branded opioids. The same internal document describes "damage" as "done" by 2012, a year in which there were enough opioid prescriptions to offer "every adult US citizen with their own 30-day (180 pill) supply of drug."  It further described the lack of clinical evidence to support this growth in use — a striking admission from within a company that presented "OptumInsight" as offering Purdue expertise in part due to its familiarity with the "development and use of evidence" to support "market access and reimbursement strategies."

176.    In 2016, David Calabrese, SVP, Chief Pharmacy Officer at OptumRx, sent an email internally asking if Optum had "ever considered approaching the mfgs of opioid products (e.g., Purdue) to negotiate a contract that would hold them financially liable for patients who grow addicted to their therapies?" He further stated, "Out of the box, but why the hell not? They've paid out hundreds of millions of $ in falsely claiming the lack of addictive potential of these drugs. Why not hold their feet to the fire in getting them to promote what now national guidelines are promoting."  Mr. Calabrese went on to imply that Purdue may be willing to enter into such an agreement upon the threat of OptumRx "tightening . . . access to [Purdue's] products." However, OptumRx executive Bob Lehman responded that such an agreement "would never happen," and it does not appear that Optum pursued the idea further.

177.    More recently, in 2020, UnitedHealth Care, a subsidiary of UnitedHealth Group, filed a proof of claim in Purdue's bankruptcy seeking $9.8 billion because it was the alleged victim

of deceptive opioid marketing. The claim form alleges that "[P]urdue spent millions of dollars on promotional activities and materials that falsely den[ied] or trivializ[ed] the risks of opioid use while overstating the benefits of using opioids for chronic pain." Like Optum's presentation, it neglects to mention, however, Purdue's spending on the marketing consulting work performed by its sister company, Optum.

**D.    Defendants Facilitated and Encouraged the Use of Opioids and Flooded the Market through Self-Serving Formulary and Utilization Management Offerings.**

178.    Defendants exert significant control over the prescribing, use, and distribution of opioids throughout the nation, including Massachusetts. As described above, Defendants determine what drugs are included on the national formularies they offer and, as such, what drugs will be reimbursed.  In doing so, Defendants largely control what drugs are dispensed by pharmacies and used by patients.  Manufacturers tout formulary status of their drugs when detailing prescribers, a fact that Defendants were well aware of but was not known to the City.

179.    Defendants are contractually obligated to negotiate formulary placement and rebates on behalf of their clients, for their clients' benefit, and their rebate negotiations and formulary offerings are supposed to be consistent and in accordance with their clients' larger, overall interests of providing safe and affordable drugs to their members.  However, Defendants' negotiations with manufacturers are not client specific; their negotiations determine the placement of opioids on their national formularies and implementation of UM measures on their standard, national plans that Defendants then offer to their clients.  Nevertheless, Defendants know that their clients rely on them to perform these functions in the clients' and patients' best interests and that their clients generally accept the standard formularies and plans that they offer.  In pursuit of profits, the Defendants intentionally disregarded these obligations, to the detriment of communities around the country, including the City of Boston.

180.    Defendants did not always prioritize their profits over patient safety.  Express Scripts' predecessor, Medco, initially put a strict quantity limit of 80mg/day on OxyContin when it was introduced in 1996, and it sent letters to prescribers informing them that it would not pay for OxyContin prescriptions for non-cancer pain treatment.

181.    OptumRx's predecessor, Prescription Solutions, initially refused to put OxyContin on its national commercial formularies due to concerns regarding abuse.

182.    During this time, opioids were prescribed infrequently and generally only for acute pain on a short-term basis, for palliative care in end-of-life cancer patients.  Defendants, or their predecessor companies, recognized the dangers of opioids and installed various routine controls on quantity and access.

183.    Purdue knew that this was a substantial threat to OxyContin's success and worked to change the Defendants' policies about OxyContin and opioids generally.  It did this not (primarily) by convincing the PBMs that OxyContin was safe and effective for the treatment of chronic, non-cancer pain, but by convincing them that they could make significant amounts of money by allowing unrestricted access to opioids.

184.    In January of 1997, Purdue sales and marketing executive Michael Friedman sent an email to Purdue's President, Dr. Richard Sackler, stating, "If we do not . . . [demonstrate the value of OxyContin], I can promise you that we will eventually be shut out  . . . This is a serious matter that we cannot ignore and that we must discuss . . . We cannot go on ignoring the reality of [the PBMs'] economic proof requirements . . . If we are to stay in business we need this proof of economic performance."  Purdue recognized that it needed to demonstrate to Medco and other PBMs the economic value of OxyContin use for chronic non-cancer pain.

185.    In 1997 Medco was Purdue's largest customer.  Had Medco decided to exclude OxyContin from its national formularies or put in place UM measures to continue to restrict the

use of OxyContin for non-cancer pain treatment, it would have had a substantial impact on the widespread use of OxyContin, possibly even driving it off the market.  Other companies, such as Cigna, had excluded OxyContin from their formularies, as OptumRx's predecessor Prescription Solutions had done.

186.    However, Medco did not take action to continue to restrict the sales of OxyContin for non-cancer pain, or to exclude it from its standard formulary offerings.  By May of 1997, Medco had reversed course and had "become very interested in 'partnering with Purdue'" on numerous projects.

187.    The opioid manufacturers recognized early on that Express Scripts and Optum would provide unrestricted formulary status on their standard formulary offerings in exchange for rebates and other fees.  For example, in a February 15, 2000 email exchange, Purdue  Managed Care Account Executive David Wallen explained that he could get Express Scripts "to steer [OxyContin] prescriptions" to retail pharmacies because of the rebates it received.  According to Wallen, "Express Scripts makes their money from the rebate, so they cannot make any money on this account if they do not get rebates."  In a later February 25, 2000 email, Wallen explained that Express Scripts pressured its clients to agree to formularies that include OxyContin without restrictions, stating "[Express Scripts] can put pressure on [their client] . . . because they make their money from rebates, and they do not get rebates if OxyContin is prior authorization only."

188.    Motivated by its own profits, Medco/ESI gave OxyContin preferred formulary status on its national formulary offerings and acceded to Purdue's request not to impose prior authorization or other limits on the use of OxyContin. Medco/ESI's early preferential treatment of OxyContin facilitated the widespread use and over-use of the drug nationally and in the City, paving the way for the opioid epidemic.

189.    As an example, a 1996 memo describes Purdue offering a 10% rebate at OxyContin's launch for placement of the drug on Merck Medco's standard formulary offerings. From at least 1997, Purdue and ESI had an agreement for Purdue to pay rebates for opioids dispensed to members by pharmacies.

190.    According to a 2000 spreadsheet of invoices of $25,000 and over, Purdue paid over $3.7 million to Merck Medco in accrued HMO Rebates, and nearly $500,000 to ESI for these rebates for a single month. These early payments helped gain acceptance and use of OxyContin in the key early years after its launch and laid the foundation for the over-use, misuse, diversion and other harms that followed.

191.    ESI gave OxyContin "Preferred Status" on its standard formulary offerings, sparking Purdue to push targeting of "managed care organizations that utilize Express Scripts as their PBMs."

192.    Purdue's 2003 Business Plan for Medco acknowledges that Purdue provided "financial incentives" to increase utilization of OxyContin and indicates that in 2001, Purdue paid Medco over $36 million in rebates and generated $250 million in sales through Medco. Likewise, Medco requested rebates of 17% to 20.25% on OxyContin in return for placing OxyContin on its preferred drug list (or "PDL") for the 11 million lives it covered, along with United's "entire business."

193.    According to a 2005 OxyContin Marketing Plan document, Purdue rebates paid to MCO ("Managed Care Organizations") and PBMs in 2003 were $193 million or an average of 17% of sales, demonstrating Purdue's recognition of the importance of these payments to the commercial success of OxyContin.

194.    A Purdue spreadsheet from 2011 shows that ESI was Purdue's largest vendor. Purdue paid ESI more than $56.5 million in rebates in 2011 alone.

195.    Purdue knew that ESI's placement of OxyContin on its standard, national formulary offerings as a preferred drug was essential to its success.  When ESI requested a higher rebate rate for OxyContin to maintain OxyContin's preferred position on its standard formulary in 2014, Purdue agreed, noting that Medco – Commercial was "20-25% of our total OxyContin gross business" and that *"the spillover effect of a negative move by ESI on OxyContin . . .  cannot be underestimated.*" (emphasis added)  ESI celebrated the increased rebate as a win, stating, "we got $20M in incremental from Purdue on OxyContin."

196.    Yet, ESI knew that its placement of OxyContin on its national formulary offerings as a preferred drug was a problem. In 2012, an ESI executive acknowledged that "OxyContin use at [Medco] is out of control compared with our peers . . . patients are selecting [Medco] because [it has] OxyContin in a preferred position." In 2013, another ESI executive commented that the company was "out of alignment with the rest of the PBM/Health Plans in actually putting [OxyContin] on a preferred tier . . . other organizations have leaned more towards taking a harder stance on this highly abused medication." Nevertheless, ESI's preferred placement of OxyContin continued.

197.    While ESI represents publicly that it approves drugs for its formulary offerings through exhaustive clinical review based on their efficacy and appropriateness, as well as cost, it was actually rebates that drove its decisions. For instance, as late as 2014, ESI notified Purdue that it was reviewing its standard commercial formulary for opioids and "would require deeper discounts to retain OxyContin Preferred status." The Purdue email summarizing negotiations with ESI noted the "importance and impact of this customer on OxyContin sales" and continued, "ESI made it clear that they would prefer not to make changes to OxyContin formulary status. However, they did state that their decision will be contingent on the level of rebate offered, and overall financial value in our bid in making their decision for 2015."

198.    ESI also allowed Purdue to undermine the policy for prior authorizations, as the enticing rebates Purdue offered and paid to ESI were conditioned on the elimination or easing of requirements for prior authorization or other restrictions on OxyContin, while also easing availability of OxyContin by lowering copays.  Thus, in sum and substance, Purdue paid ESI in order to make OxyContin more available to patients – and ESI complied. As concerns arose regarding quantities prescribed, ESI again prioritized profits from Purdue over health and safety.

199.    In its rebate relationships with PBMs, Purdue prioritized preventing the imposition of prior authorization and other requirements that would limit access to opioids. A former Purdue official responsible for ensuring favorable treatment for OxyContin explained, "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug."  The former Purdue official's relationship with Medco was especially important, so much so that, upon information and belief, Purdue moved her geographically to be closer to Medco's New Jersey headquarters.

200.    ESI bowed to Purdue's wishes.  For example, as described by a media outlet which obtained unsealed court records from litigation in West Virginia, state officials planned to require prior authorization for OxyContin after noticing a surge in deaths attributable to oxycodone, the branded drug's active ingredient, in 2001.  Specifically, 2004 deposition testimony revealed that state officials contacted Medco, with whom it contracted to manage the state's employee health plan, and asked the PBM to put in place a plan to limit OxyContin prescribing, but "basically they were refused."   Another state official described similar resistance, testifying that the PBM "felt strongly, and [it was] very, very reluctant or resistant."

201.    ESI even used its large-scale data in an effort to avoid implementing such restrictions, suggesting that in areas other than West Virginia "there were not that many prescriptions for OxyContin, it was not that much of problem."

202.    In a March 2016 internal ESI email, employees expressed regret that ESI did not target OxyContin with prior authorizations, stating "I would feel better if [this decision was] escalated … up to ensure the rebate gain outweighs the likely erosion of our reputation." Another employee responded by stating, "This is really sad, really disheartening" and made "[n]o clinical sense to say the least."

203.    Lucrative rebates drove not only decisions regarding placement and prior authorization requirements for national formularies, but also quantity limits. PBMs determine criteria such as the number of pills per prescription. Instead of imposing appropriate limits, however, ESI, through its Medco predecessor, became a "behind the scenes" partner working alongside Purdue to persuade plans to accept its standard offerings that did not impose tighter limits.

204.    As discussed above, Medco initially implemented an 80 mg/day quantity limit at the release of OxyContin.  Within five months of the drug's release and following further discussions with Purdue, Medco had doubled the quantity limit to 160 mg/day by May of 1996. By 2001, Medco had again doubled the quantity limit and the "most restrictive [quantity limit] that Medco would recommend [was] for 320 mg/day as per [Purdue's] platform."  Medco's 320 mg/day allowance is equivalent to 480 MME/day – over four times the limit that Medco originally placed on OxyContin upon its release, as well as over five times the limit that Express Scripts now imposes on the drug as part of its Advance Opioid Program.

205.    An August 2002 internal Purdue e-mail chain notes that Purdue reached out to ESI with a suggested talking point in connection with an effort to convince a particular ESI client to loosen quantity limits on OxyContin, by reminding the client that it would lose rebates if it did not do so. The ESI representative later advised Purdue that ESI's client was going to "change their initial thought regarding the quantity limits."

206.    Similarly, a 2003 Purdue email chain noted that a payor agreed to adopt a 124 pill per prescription limit, rather than 68, after ESI was "able to demonstrate the potential loss of rebates and plan impact," and noting that without ESI's "detailed analysis" in this regard, the insurer had been prepared to move forward with a different choice.  The same email also notes a different "success" in which "Medco also got the PA [prior authorization] lifted" at a different health plan covering "192,000 lives" in Pennsylvania.

207.    ESI recognizes that quantity matters when it comes to the abuse and diversion of opioids, and has acknowledged the problem of excess supply, stating that six in ten patients had or expected to have leftover opioids. Express Scrips has also acknowledged that, "[w]ith a 10-day supply of opioids, 1 in 5 become long-term users." It further cited information from the CDC showing that 25% of long-term opioid users struggle with addiction, while one in thirty-two people with dosages above 200 MME per day die.

208.    ESI also acknowledged in 2017 that "rebate contract restrictions had previously prevented clients from obtaining any rebates if certain UM [utilization management] strategies were in place" and that these UM strategies, such as prior authorization, have a "significant impact on the opioid market."

209.    But ESI had long been aware of the effectiveness of UM tools, having done their own studies on UM measures.  For example, in 2003 ESI studied the effect of UM tools on opioid utilization in Medicaid patients in Georgia. One ESI employee noted in 2003 that the deployment of a prior authorization process that included quantity limits significantly curtailed OxyContin use in that state. ESI found that "OxyContin went from ranked number seven to number 14 in drugs spent *[sic]* after the PA implementation." Most significantly, ESI found that "patients who did not receive OxyContin did not have a greater use of medical services[,] so there was not an unintended medical consequence from this program." In other words, the study showed that the UM measures

worked, and there was no medical reason to prevent the implementation of appropriate steps to curtail the excessive use of opioids. A 2006 Express Scripts study similarly found that prior authorization and quantity limits were effective at reducing Oxycontin utilization, without negative effect. Yet, Express Scripts admitted in 2013, "we don't really have a standard OxyContin PA program."

210.    Despite its knowledge of the nationwide opioid health crisis, and despite its knowledge of the impact that formulary offerings with preferred formulary placement and a lack of UM restrictions had on increasing opioid sales, ESI failed to create or to offer a standard prior authorization or other UM protocol on opioids to its clients until 2017. While ESI claimed to have put in place a step therapy policy on long-acting opioids (LAO) in order to combat opioid abuse in 2010, the policy was, in actuality, a cost containment measure. ESI Clinical Director Amy Gross stated, "The [long acting opioid step therapy policy] has nothing to do with pain treatment guidelines. It is just generic before brand." Of course, requiring a patient to start with a generic version of a long-acting opioid before a brand version did not combat opioid abuse, as generic opioids are just as addictive as the brand versions.

211.    Optum has also recognized that the volume of opioids dispensed is directly related to the levels of abuse and diversion in the community. According to a "white paper" from the company, "[a]s opioids flooded the market, unused drugs became vulnerable to sale, theft or misuse." As UnitedHealth Group put it, "[t]he unprecedented volume of prescription painkillers in the market and the leftover supply sitting in homes have triggered inappropriate use—a major contributor to overdose and a potential gateway to heroin."

212.    While OpumRx, through its predecessor entity Prescription Solutions, initially refused to put OxyContin on its national commercial formularies, it changed course early on. OptumRx entered into rebate arrangements with Purdue Pharma and other opioid manufacturers

and, because of its financial interests, made standard formulary offerings that provided favorable formulary status to and failed to impose reasonable restrictions on opioids that were subsequently prescribed, dispensed, and used in the City.

213.    By the mid-2000s, OptumRx was receiving $70 million per year in rebates from Purdue in exchange for preferring OxyContin on its national commercial formularies. As of October 2011, Purdue described OptumRx as "the largest single 3rd party payer for OxyContin in any channel." According to Purdue, OptumRx prescriptions had grown 22% in the prior year, and the PBM represented about $271 million in rebate eligible sales over the previous four quarters.

214.    Despite its knowledge of misuse and diversion of prescription opioids, OptumRx encouraged the use of highly addictive opioids through its formulary offerings.  For example, in one case, OptumRx suggested that a member using a Butrans patch consider switching to lower cost but more highly diverted alternatives, such as OxyContin or extended-release morphine.

215.    Furthermore, UnitedHealth, including its subsidiaries, "places morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first."

216.    Until at least 2014, Optum's rebate contract with Purdue still allowed Purdue to minimize utilization management restrictions on OxyContin and other products in exchange for rebates, stating, "[i]n order to be eligible for Rebates . . . [the drug] must be listed on . . . formulary with Preferred status . . . without restriction (i.e. step therapy, clinical edits, prior authorization or other restrictions)." It specifically noted that "all NDCs of OxyContin . . . are listed without restriction."  The contract also contained a *minimum* quantity for rebate eligibility – 4 tablets a day for the maximum strength and most expensive 80mg Oxycontin, and 2 tablets a day for other strengths.

217.     Optum's rebate contract with Purdue also allowed prior authorization for OxyContin only if prior authorization was implemented on all of OxyContin's competing drugs. This provision, prohibiting a particular opioid from being "disadvantaged" as compared to other opioids, was a common fixture in Optum's and ESI's rebate contracts with Purdue and other opioid manufacturers. ESI's standard rebate agreements defined "disadvantage" as any time when the opioid manufacturer's product is "subject to prior authorization, NDC blocks, counter-detailing, co-pay differentials, or a step edit that negatively . . . affects the reimbursement and/or Formulary status of the Product as compared to other products in its designated [competitive product category] . . ."  Similar provisions prohibiting particular opioids from being "disadvantaged" were included in contracts between Express Scripts and Endo, OptumRx (then known as Prescription Solutions) and Johnson & Johnson regarding Nucynta, OptumRx and Teva regarding Fentora, and between these PBMs and other manufacturers.

218.     Because the financial impact of putting appropriate UM measures across the entire class of opioids was so significant for the Defendants, the parity terms ensured that every effort would be made to avoid the implementation of UM restrictions, even on a piecemeal basis.  These parity terms furthered the common purpose of the Formulary & UM Enterprise because they normalized the  restricted use of UM measures across the entire class of opioids and guaranteed that the overall market for prescription opioids would not diminish because of utilization management.  The rebate agreements conditioned payment on each opioid manufacturer not being disadvantaged with regard to applying UM measures unless the entire market basket of all competing drugs was treated the same.  This ensured that no single opioid manufacturer would be disadvantaged against the other and then, each could be free to compete outside of the Formulary & UM Enterprise for market share of their drug within the fraudulently manipulated system.  The

opioid manufacturers knew that UM presented a slippery slope – if more UM were employed, it would lead to the adoption of restrictions across the entire class of drugs.

219.    This was a significant issue for Express Scripts and Optum who made significant amounts of money on opioids.  For example, in 2016 Express Scripts noted that if it were "to implement either the 7 day or the 10 limit on short acting opioids which are most profitable for us we are looking to lose $10-$20 Million in margin assuming 100% of patients get their first fill and then 50% of patients get their 2nd, 3rd, 4th fill.  Based on the NY data we looked at since their state mandate went in 25% of members shifted from short acting to long acting opioids where we make the least money on . . . If we don't take any action in the next 1 – 3 years all states will move on this and we will lose this margin anyway with a lost opportunity to charge for it now."

220.    As late as 2017, OptumRx delayed implementation of UM measures because of its rebate agreement with Purdue. In an April 2017 email chain regarding implementation of MED (Morphine Equivalent Dosing) limits one employee states, "based solely on the Purdue contract, I would highly suggest delaying the MED implementation on all clients until 1/1/2018 … so we have time to ensure we can protect rebates. Purdue has a clause built into their agreement that mandates that ALL strengths be unrestricted … we cannot sacrifice rebates on only the 80mg strength … we would sacrifice rebates on *all* Oxycontin scripts." Under the direction of then OptumRx Chief Pharmacy Officer David Calabrese, implementation of the MED limit was delayed.

221.    Even when products like Opana ER were being withdrawn from the market because of safety concerns, Optum resisted putting a PA in place that would have prevented new patients from starting on the drug because it would "put [Optum's] rebates at risk."

222.    Defendants could have addressed the opioid crisis that they helped create but refused to do so.  Even after the federal government started requiring certain controls to be put in

place in federal health plans, the PBM Defendants deliberately chose not to offer similar controls in their formulary offerings to the commercial clients, with the full knowledge that not doing so would lead to continued opioid oversupply, diversion, and death.

223.    Defendants and other PBMs also provided cash discount cards that allowed patients to access opioids that were not covered by insurance.  Filling a prescription using a cash discount card could avoid health-plan limits.

224.    Optum refused to place restrictions on the use of cash discount cards for opioid purchases.  At one point, an Optum executive proposed a change to stricter regulation and restriction on the purchase of opioids using cash discount cards. The idea was scrapped as it would cost Optum millions of dollars in profits to enact such restrictions.

**E.    ESI and Optum Chose Not to Use Their "Drug Utilization Review" Tools to Address Overprescribing, Abuse, and Diversion**

225.    In addition to failing to make national formulary and UM offerings that would have controlled the flow of opioids, ESI and Optum did not use their DUR programs to restrict access to opioids.  Rebates from opioid manufacturers directly impacted how ESI and Optum managed their obligations to monitor opioid dispensing on a real-time basis through concurrent drug utilization review.

226.    Concurrent DUR ("cDUR") includes screening at the point of sale for potential drug therapy problems due to therapeutic duplication, age/gender related contraindications, over-utilization and under-utilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical abuse/misuse.

227.    ESI and Optum refused to use cDUR to control opioid misuse because doing so would have impacted their receipt of rebates, the income generated from opioid dispensing, and other fees.  ESI and Optum failed to deploy cDUR initiatives to ensure that only appropriate opioid prescriptions were being dispensed in pharmacies across the country, including in their own mail

order pharmacies. This refusal permitted the dramatic increase in medically inappropriate prescribing and dispensing of prescription opioids that fueled the opioid epidemic.

228.    In 2013, when the FDA removed the indication for use of long-acting narcotics to treat moderate pain, Express Scripts did not change its cDUR program or other UM measures, stating that its OxyContin UM strategy was "more focused on driving preferred products and managing quantities." One ESI employee at the time described the FDA change as "kind of a non-event."

229.    In 2016, when ESI tried to implement cDUR limits on Purdue's drugs, Purdue pushed back by reminding ESI that the cDUR limits, which would have restricted opioid use to acute pain, blocked opioids unless the use was for cancer or other approved uses, or required prior authorization for all opioids, would be in violation of its rebate agreement.

230.    Optum was also unwilling to implement meaningful cDUR restrictions because doing so would impact its ability to receive rebates. In 2017, when OptumRx tried to implement changes to use cDUR to control inappropriate opioid usage, there was internal pushback because it would mean the loss of rebates from existing contracts. In response to these concerns, on March 24, 2017, SVP Calabrese stated, "[i]f our opioid mfg industry partners can't appreciate the magnitude of the problem we are facing [and] the immediacy of the need for intervention[,] . . . I would question whether they are the right partner for us longer term."

231.    Later that day, OptumRx SVP of Industry Relations, Robert Lahman, responded that "I agree with you but you also have to be mindful of our contracts." Lahman warned Calabrese to "[s]top with the attitude and help us make sure we are compliant with our contracts."

232.    Calabrese, seemingly frustrated that OptumRx would delay the changes to its use of cDUR limits to address the "gross overprescribing and overpromotion of these medications . . . , and the countless deaths," later that day sent a response to Lahman stating, "Maybe you should

be the one to take a step back and look at the bigger picture here.  I need <u>you on board with doing your job</u> and convincing the [manufacturers] that we drive the ship here in terms of how their drugs get used, not them!"

**F.     Defendants' Publicity of Belated Efforts Effectively Admits They Could Have Acted Sooner**

233.     The belated steps that Defendants took demonstrate their ability to reduce the supply of opioids through formulary offerings that included appropriate formulary management steps that could, and should, have been taken far earlier. Even when the Defendants did make these steps available, they were not put in place across the board, but were offered to clients as an option for an extra charge.

234.     It was not until far too late, in 2017 at the 21st Annual Express Scripts Outcomes Symposium, that ESI announced a "solution" to lower the risks of opioids at each touchpoint of the care continuum "from safe disposal, to tools for physicians at the point of care and safety checks for dispensing pharmacies." By then, it was much too late for the millions of Massachusetts residents who were suffering from opioid addiction.

235.     ESI communicated in their 2017 Drug Trend Report that they made several efforts around the opioid epidemic including:

> [E]xtraordinary progress in reducing the amount of unnecessary and dangerous dispensing of opioids to our members through the launch of Advanced Opioid Management (Launched in 9/17)
>
> Average days' supply declined nearly 60% in just 90 days for patients in [the] program receiving a first-time opioid prescription
>
> Plans participating in their solution observed a 60% reduction in the average days' supply per initial fill, from 18.6 days to just 7.5 days.
>
> Among commercial plans, the days' supply of opioids dispensed per person per year decreased 10.3%, while utilization of drugs to treat opioid dependence rose 8.5%.

236.   It was not until 2018 when ESI released its Advanced Opioid Management (AOM) program, that ESI put covered patients in greater compliance with the CDC Guidelines. The ESI program includes:

>   a.   First time prescription opioid users are limited to a seven-day supply of short-acting prescription opioids.
>
>   b.   Prior authorization is required for the first fill of a long-acting prescription opioid.
>
>   c.   Pharmacy intervention is triggered when patient dosage across all prescription opioids reaches a certain level based on MME per day.
>
>   d.   Through Express Scripts' proprietary clinical rules engine, the PBM identifies and sends daily alerts to prescription opioid prescribing physicians via their EHR/EMR to make them aware of duplicative therapy, misuse and abuse, medication interactions, use of multiple prescribers or pharmacies, or when their patient is approaching the MME thresholds.

237.   The Advanced Opioid Management programs utilize ESI's ongoing review of claims data that ESI has always had the ability to conduct.  There is no legitimate reason why this program, or similar programs, could not have been implemented long before 2018, especially given ESI's early knowledge of the abuse and diversion of opioids.  A 2017 ESI Power Point presentation demonstrates the significance of ESI's delay.  The presentation, entitled "Comprehensive Opioid Solution: What is Express Scripts Doing to Combat this Epidemic?", included a slide detailing how many of its covered lives would die in the future if ESI did nothing to combat the epidemic.  The slide stated that 11,760 ESI beneficiaries had the potential to die if the company did nothing.  ESI's ability to calculate with precision the number of lives that would be lost going forward if it failed to act demonstrates the significance of its failure to take action to combat the epidemic in the past and the likely extent of lives lost due to that failure.

238.   While ESI publicly asserts that efforts to curb opioid abuse and misuse remain its highest priorities, its 2018 standard formulary offering still afforded OxyContin, one of the most frequently diverted opioids, preferred alternative status over other long-acting opioids.

239.    In 2019, ESI internal emails contained discussions of the opioid litigation as a tactic to sell their AOM program. ESI's 2019 proposed AOM program sales document described a John Hopkins study regarding utilization management, in which ESI asked questions like "What devastation will it do to your plan when you're hit with a lawsuit claiming your plan contributed to the flow of opioids into the community causing overdoses, deaths and other severe consequences?" and "What if there was a way to truly stop the opioid crisis in its tracks and get in front of any potential litigation before you are at risk? […] Only Express Scripts' multi-faceted advanced opioid management program can solve this issue."

240.    Also far too late, OptumRx acknowledged in September 2017 that it is "[c]ritically imperative" for PBMs to address the opioid epidemic, as "[n]o component of our health care system is in a better position to deliver more immediate and more impactful changes to the current course of this crisis than our nation's pharmacy benefit managers given their access to key stakeholders across the system." Its media statement recognized PBM's ability to "to deploy systems-based claims edits" and that "PBMs are uniquely positioned to connect and partner with physicians, pharmacists, patients, pharmaceutical manufacturers, health systems and other components of the industry, and therefore are better able to drive improvements in education surrounding the dangers of opioid therapy, as well as the various tools available for constituents to positively change the course of this epidemic."

241.    OptumRx launched an "Opioid Risk Management Program" (ORM) in 2017. The program is advertised as having several components, including "applying evidence-based utilization management protocols after first fill to reduce excessive dosing, limit unnecessary extension of therapy duration, mitigate abuse and diversion, and decrease exposure to harmful drug combinations through real-time medication checks at the point of sale." The program was tested for a 12-month period before the official launch, and, according to a draft press release,

resulted in a "54% success rate in changing inappropriate opioid consumption behavior, translating to significant reductions in risk of adverse opioid events, hospitalizations, and opioid-related deaths." The final press release notes that "OptumRx's program is showing early but meaningful potential to begin curbing the opioid epidemic in America."

242.   OptumRx's Opioid Risk Management program included various strategies, including prevention and education, minimizing early exposure, reducing inappropriate supply, treating at-risk and high-risk patients, and supporting chronic populations and those in recovery.

243.   Defendants had the capability to implement these programs long before 2017, but they did not have the corporate will to do so. Instead, for years, they chose to continue in profitable agreements with Purdue and other opioid manufacturers to give opioids preferred status on their formulary offerings without implementing restrictions for their use, inevitably resulting in increased opioid utilization, increased opioid addiction, and increased overdose and death. They also chose to continue partnerships with Purdue and other manufacturers to develop research and provide analyses to assist in manufacturers' deceptive opioid marketing that they also disseminated. By 2017, when Defendants decided to take action and develop their opioid programs, more than half a million people had already died from opioid overdose.

## G.   Defendants Disregarded their Obligations Under Federal Controlled Substances and Massachusetts Law in Selling Opioids from Their Own Pharmacies

244.   ESI operates one of the largest mail order pharmacies in the United States, dispensing opioids to patients in the City as well as throughout the United States. OptumRx also operates a mail order pharmacy that dispenses opioids to patients throughout Massachusetts.  As such, Defendants are part of the closed system and are required to comply with the provisions of the federal Controlled Substances Act ("CSA") and its implementing regulations and Massachusetts laws.

245.    Defendants' obligations as registrants included the responsibility to prevent the diversion of opioids.  21 C.F.R. § 1301.71(a); § M.G.L.A. 94C § 7(a), § M.G.L.A. 94C § 12(a)(1) and (2); 247 MA ADC 11.02, 247 MA ADC 2.00 *et seq*.  This includes an obligation to use the information available to them, such as the vast amounts of prescription and prescriber data they maintained or could access, to prevent the diversion of opioids.  Upon information and belief, ESI and OptumRx failed to utilize this data to detect or guard against diversion, and otherwise failed to meet their CSA obligations.

246.    As dispensers of opioids, ESI and OptumRx were also required to ensure that adequate safeguards were in place to dispense opioids in a safe and effective manner, provide effective controls and procedures to deter and detect theft and diversion, and comply with federal and State controlled substances laws, such as the requirement to maintain effective controls against diversion. – *See, e.g.* § M.G.L.A. 94C § 7(a), § M.G.L.A. 94C § 12(a)(1) and (2); 247 MA ADC 11.02; 247 MA ADC 2.00 *et seq*.  ESI and OptumRx failed to meet these obligations.

247.    Under the federal Controlled Substances Act and Massachusetts law, a prescription is legally valid only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 CFR § 1306.04(a); 247 MA ADC 9.06. As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacies who fills the prescription." 21 CFR § 1306.04(a).

248.    A pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose. Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose. *See e.g.* 21 C.F.R. §§ 1306.04, 1306.06; 247 MA ADC 9.06. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a

reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing. ESI and OptumRx failed to meet these obligations in its mail order pharmacy operations.

249.    Instead, during the period for which ARCOS data is available (2006-2014), ESI shipped over 1.4 billion dosage units of opioids to individuals across the nation, and OptumRx's mail order pharmacy was responsible for shipping more than 185 million dosage units.

250.    Further, as described above, ESI shipped opioids to patients of high-volume prescribers being targeted with Purdue's deceptive marketing campaign.

251.    The volume of opioids dispensed by ESI and Optum Rx is not surprising, given how their mail order pharmacies operated to push as many prescriptions as possible out the door, with little or no attempts to identify or resolve red flags.

252.    For example, employees at ESI routinely complained of being under significant pressure to fill as many prescriptions as possible in as short amount of time as possible. ESI instituted a "point system" that governed the prescription-filling process in its mail order facilities. Under this system, employees were awarded points for each prescription processed, and were given daily, weekly, or monthly point targets to reach. Employees would be able to leave early if a daily point threshold was reached and were penalized if specific point targets were not reached. A pattern of point shortfalls would result in employees being placed on a "termination plan" or other reprimands.

253.    This point system acts as an incentive for ESI pharmacists and technicians to fill as many opioid prescriptions as possible in as little time as possible, despite the legal requirements to properly and adequately identify and resolve red flags.

254.     OptumRx's mail order pharmacies had many of the same problems.  For example, pharmacists and technicians had to meet metric requirements that were so high that they could only be met by constantly working overtime, making mistakes more likely and hindering pharmacists' ability to vet each prescription carefully, as required by law.

255.     Defendants' mail order pharmacies provided a vehicle for diversion to continue despite efforts to contain it. Purdue's sales representatives noted, for example, that "mail order pharmacies [we]re filling in" what would otherwise have been "gaps in access to OxyContin and other meds" due to "monitoring or quota issues."

256.     In 2012, Express Scripts, Inc., and Express Scripts Pharmacy Services, Inc. agreed to pay the U.S. Government $2.75 million to settle a case against the companies. A DEA inspection revealed that from 2002 through 2006, prescription-controlled substances were diverted into illicit channels at several ESI mail order facilities located in Pennsylvania. The diversion included thefts by employees, inventory discrepancies, and failures to report to DEA losses that occurred during the mail order delivery process. Perhaps most disturbing, the DEA also found that ESI employees generated invalid DEA registration numbers where it lacked registration numbers from pharmacists, which should have been not only a red flag, but an absolute barrier to dispensing these drugs.

257.     Medco agreed to a $155 million settlement to resolve claims with the U.S. Government related to its mail order pharmacy dispensing.  The government alleged that, among other things, Medco mail order pharmacies failed to conduct adequate cDUR for all prescriptions in order to identify potential adverse interactions.  In order to meet steep quota requirements, Medco's cDUR employees fabricated physician call records, completed physician calls without ever having pharmacists verify the information with the physician's office, changed prescriptions

without a pharmacist's intervention, and/or falsified records to indicate cDUR calls were made to physicians when no call had, in fact, occurred.

258.    David Calabrese recognized that OptumRx's mail order pharmacies' dispensing of opioids was a problem needing "Exec level attention." In a 2017 email he stated, "We [are] dispensing 220k opioid Rx's out of our mail facilities annually at an average number of units per Rx of 187 … We are talking out of both sides of our mouths if we allow this to continue as it is. We are only contributing to the worsening of the problem."

259.    OptumRx admitted in a presentation from 2018 that it was a "[c]hallenge for individual rphs to identify controlled substance diversion in [a] mail order setting," and that, prior to implementing a drug of concern review in 2018, OptumRx's pharmacists had "no visibility of possible diversion indicators such as: Multiple patients with same shipping address [and] Multiple patients with same email address."  They also acknowledged, "Due to lack of visibility diversion activity may occur repeatedly for an extended period of time."

260.    OptumRx is a single entity performing both PBM and mail order pharmacy services.  It must maintain effective controls against diversion.  But OptumRx's business practices as a PBM, as described herein, intentionally and/or negligently and unreasonably ignored the risks of diversion and, at times, even increased that risk.  OptumRx's failure to maintain effective controls against diversion in all of its activities that affect opioid dispensing, whether as a mail order pharmacy, as a PBM, or otherwise, is a violation of Massachusetts law and federal law.

261.    Defendants failed to comply with their obligations under Massachusetts and federal controlled substance laws and failed to use reasonable care in the operation of their mail order pharmacies, permitting an untold number of opioid prescriptions to be filled and the opioids mailed, even though the pills were likely to be diverted.

**H.      Facts Pertaining to the Formulary & UM Enterprise**

262.      As alleged more fully *infra*, Express Scripts, Optum, their mail order pharmacies and each of the opioid manufacturers (including Allergan, Johnson & Johnson/Janssen, Endo, Insys, Mallinckrodt, Purdue, and Teva/Cephalon, referred to collectively as the "Opioid Enterprise Manufacturers" for the purposes of this Section) formed an association in fact enterprise, the "Formulary & UM Enterprise."

263.      The Formulary & UM Enterprise was characterized by a common purpose, relationships among members of the Formulary & UM Enterprise, and sufficient longevity to accomplish the common purpose thereof. The Defendants each conducted and participated in the conduct of the Formulary & UM Enterprise through a pattern of racketeering activity.

264.      Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute pain, and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, opioid use disorder, overdose, and death. Nevertheless, each member of the Formulary & UM Enterprise joined together into an association-in-fact enterprise for the common purpose of profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs.

265.      That each member of the Formulary & UM Enterprise is a for-profit company and may legally pursue profits is not in dispute. However, each member of the Formulary & UM Enterprise sought to fulfill common purpose through a pattern of mail and wire fraud, and felonious manufacture, receiving, concealment, buying, selling or otherwise dealing in controlled substances. Specifically, each member of the Formulary & UM Enterprise supported each other member in perpetrating a fraudulent scheme on the consumers who received prescriptions for prescription opioids, on the American public, and on the Defendants' clients.  Each member of the

Formulary & UM Enterprise also supported each other member in feloniously possessing and dispensing controlled substances in Schedules II through IV in manners that were not authorized by the Federal Controlled Substances Act and Massachusetts Controlled Substances Act.

266.    Each member of the Formulary & UM Enterprise knew that prescription opioids were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute pain, and non-cancer pain. Each member of the Formulary & UM Enterprise was also aware that use of prescription opioids carried risks such as addiction, opioid use disorder, overdose, and death.  Therefore, each member of the Formulary & UM Enterprise knew that they needed to engage in a fraudulent scheme if they were going to increase the market for prescriptions opioids and increase their profits from prescribing, dispensing, and sales of prescription opioids.

267.    For their part, the Opioid Enterprise Manufacturers' illegal marketing and false statements regarding prescription opioids have been well documented. They knew that prescription opioids were dangerous and addictive and, nevertheless, marketed them as safe and non-addictive. These representations furthered the common purpose of the Formulary & UM Enterprise.

268.    The Defendants, for their part, made representations alleged, *supra*, that their businesses were committed to making decisions about their formulary and UM offerings that were driven by a commitment to the health and safety of their covered lives and were focused on delivering safe healthcare.

269.    The Defendants and opioid manufacturers also knew that Defendants' respective mail-order pharmacies were receiving prescriptions that were not lawful or legitimate prescriptions from a practitioner. Defendants and opioid manufacturers knew that Defendants' mail-order pharmacies were filling illegitimate prescriptions.

270.    By these strategies, and the activities alleged *supra* and *infra*, both Defendants and the Opioid Enterprise Manufacturers agreed to further the common purpose of the Formulary &

UM Enterprise through a fraudulent scheme and felonious possession and dispensing of controlled substances, and to grow the market for prescription opioids by increasing prescribing, dispensing, and sales of prescription opioids.

271.   As an example, the Opioid Enterprise Manufacturers contracted and agreed with Defendants to coordinate unfettered formulary placement with no or limited UM measures regarding each opioid drug on Defendants' standard formulary offerings, such that there would be as little impediment as possible to opioid prescribing and dispensing. From their agreements, each member of the Formulary & UM Enterprise stood to reap significant profits from ever-increasing prescribing, dispensing, and sale of prescription opioids: the Opioid Enterprise Manufacturers from sales of their drugs and Defendants from rebates and other fees and payments. As part of these agreements, Defendants gave each of the Opioid Enterprise Manufacturers parity terms, ensuring that no Opioid Enterprise Manufacturer's opioid was disadvantaged within each class of opioid analgesics, and provided the Opioid Enterprise Manufacturers with data about the lives that they managed, the prescriptions written by doctors on their plans, and assistance with pull through efforts which would continue to increase prescribing and sales.

272.   These contracts, and further information described below, evidence an agreement between the Defendants, their mail-order pharmacies, and the Opioid Enterprise Manufacturers. Each Defendant and each Opioid Enterprise Manufacturer understood that the Defendants were going to operate on a fundamentally fraudulent basis. As alleged more fully herein, the Defendants promised their clients that they would take actions that would ensure that opioid prescribing and dispensing were safe and cost effective. Defendants also represented to legislative bodies and the public that their conduct was intended to maximize health, safety, and cost-effective healthcare for their covered lives. However, the Defendants had agreed with each other and the Opioid Enterprise Manufacturers that their conduct would have the opposite effect. Instead of prioritizing health,

safety, and cost-effectiveness, the Formulary & UM Enterprise and its members intended to obtain money and property from the prescribing, dispensing, and sale of prescription opioids that they would not otherwise have received had they been honest and conducted their businesses along the lines of their public representations.

273.    Importantly, some of the conduct alleged, above and below, may appear to be the behavior of competitors working against each other, or of opposing parties working to secure advantage at the expense of each other. However, each Defendant worked with each Opioid Enterprise Manufacturer in negotiations that were intended to maximize the amount of profit for the Defendants and the Opioid Enterprise Manufacturers. As an example, described earlier, discussions of formulary status and prior authorization for standard formulary offerings were always a vehicle for discussions about the amount of rebates and administrative fees.  As the Opioid Enterprise Manufacturers and Defendants knew and intended, the end result was always the same – agreements for favorable formulary status without UM on their standard offerings so that prescribing, dispensing, and sales could continue to increase.

274.    The similarity of conduct by each Defendant, including similar contract terms, pull-through marketing, facilitating dissemination of the Opioid Enterprise Manufacturers' marketing messages, favorable formulary status, as little UM as possible, research on behalf of the Opioid Enterprise Manufacturers, and free-flowing dispensing of prescription opioids, further evidences the existence of the Formulary & UM Enterprise.  Each Defendant knew of the other's conduct and refrained from commenting on or revealing the behavior, and continued to engage in the same conduct so that all members of the Formulary & UM Enterprise could continue to profit from ever-increasing prescribing, dispensing, and sales.

275.    That the Defendants may have competed with each other for clients, or negotiated sharply with the Opioid Enterprise Manufacturers for increasing rebates and administrative fees

did not undercut the common purpose of the Formulary & UM Enterprise because it did not slow or decrease the overall prescribing, dispensing, and sale of prescription opioids in the market as a whole. Similarly, competition among the Opioid Enterprise Manufacturers for increasing market share of their drug against a competitor's drug clients did not undercut the common purpose of the Formulary & UM Enterprise either. For example, Purdue's competition with Endo for market share of OxyContin over Opana did not slow or decrease the prescribing, dispensing, or sale of prescription opioids as a class of drugs. Furthermore, each member of the Formulary & UM Enterprise knew that there would be competition in the market, but each member also knew that their participation in the Formulary & UM Enterprise was necessary to continue growing the market and agreed to work together towards that goal.

As alleged more fully herein, the Formulary & UM Enterprise caused direct injury to Plaintiffs' money and property.

### a. Formation of the Formulary & UM Enterprise

276. The Formulary & UM Enterprise was formed primarily in two ways, including: the forced dealing of the members with each other in the closed system of controlled substance manufacture, distribution, and dispensing, as well as the members' work together in trade associations and industry working groups like the PCMA and other informal groups described below.

277. First, First, the formation of the Formulary & UM Enterprise occurred, in part, through the parties' dealings with each other required by the closed system imposed by the CSA. The pharmaceutical industry is extremely insular and part of a "closed system" open only to those who register. Other than their CSA obligations for mail order pharmacies, the Defendants are some of the very few participants in the chain of controlled substance distribution and dispensing that are not required to register with the DEA. However, in their efforts to secure cost-effective access

to controlled substances on behalf of their clients, Defendants were forced to work closely with the Opioid Enterprise Manufacturers.

278.    Over at least the last two decades, the consolidation and acquisition of pharmacy benefit management companies into ever-larger entities has led to the formation of close personal business relationships between the few remaining PBMs and the Opioid Enterprise Manufacturers that were based on a shared interest in and the common purpose of ensuring the widespread dispensing of opioids.

279.    There can be no doubt that the Defendants and the Opioid Enterprise Manufacturers maintain interpersonal relationships with each other. As business entities, they have been negotiating with each other since the mid-1990s. And, as alleged above, the negotiations between the Opioid Enterprise Manufacturers and the Defendants often took place at, and/or involved, high level executives at both companies, and a multitude of emails and phone calls, including personal calls between executives, to iron out details. The contractual dealings between the Opioid Enterprise Manufacturers and the Defendants created relationships and provided context in which the common purpose of the Formulary & UM Enterprise could develop. Documents produced by the Opioid Enterprise Manufacturers and the Defendants reveal that there have been decades of contract negotiations over rebate agreements, amendments, re-negotiations, payment discussions, and rebate invoicing. These contract negotiations were always geared towards maximizing the number of prescriptions written for the Defendants' clients and ensuring the most optimal formulary placement and least amount of UM under the Defendants' standard offerings so that the prescribing, dispensing, and sales could continue to grow.

280.    The earliest indications of the existence of the Formulary & UM Enterprise can be found in the Defendants' negotiations with Purdue, their work together on disseminating the Opioid Enterprise Manufacturers' marketing messages about prescription opioids, the presence of

Purdue-paid speakers at the Defendants' offices, and the Defendants' research work supporting the Opioid Enterprise Manufacturers. Although the earliest indications of the Formulary & UM Enterprise's existence begin with Purdue and the predecessors of the Defendants, the allegations above indicate that the Formulary & UM Enterprise grew to include all of the Opioid Enterprise Manufacturers and the Defendants.

281.    Various documents indicate that the Formulary & UM Enterprise found its beginnings with Purdue-sponsored doctors speaking at PBM offices, in the late 1990s, all across the country, and rebate contract negotiations between the Opioid Enterprise Manufacturers and the Defendants that began around the same time and have continued through the present.

282.    The formation of the Formulary & UM Enterprise did not happen solely within the formation of the rebate contracts between the Opioid Enterprise Manufacturers and the Defendants. The Formulary & UM Enterprise also continued to develop through regular non-contractual interactions, including through the use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme in: (1) interactions about the administration of the rebate contracts; (2) pull-through marketing and assistance therewith; and (3) joint participation in trade associations and informal coalitions.

283.    Trade associations and informal coalitions and forums not only provide a basis for the formation of the Formulary & UM Enterprise, but also serve as central conduits for the conduct of and participation in the Formulary & UM Enterprise.  The prime example of a trade association through which the Formulary & UM Enterprise developed and operated is the PBM trade association, the Pharmaceutical Care Management Association ("PCMA").

284.    PCMA describes itself as "lead[ing] the effort in promoting PBMs and the proven tools they utilize, which are recognized by consumers, employers, policymakers, and others as key drivers in lowering prescription drug costs and increasing access."

285.     While PCMA boasts of being the national association representing America's pharmacy benefit managers, it actually has a much broader membership base and focus. As evident from the PCMA website, PCMA membership includes member PBMs  and so-called "Affiliate" drug manufacturers and other entities, including numerous of the Opioid Enterprise Manufacturers as current or former members.

286.     As repeatedly mentioned in the PCMA's annual conference materials, the drug manufacturers are the PBMs' most notable business partners.  For example, one program book stated, "The PCMA Annual Meeting is the industry's premier executive conference.  The event is tailored specifically for senior executives from PBMs and their affiliated business partners – most notably drug manufacturers."

287.     The Defendants are members of PCMA, and due to their leadership positions, have substantial control over PCMA.  Indeed, PCMA is governed by PBM executives. The current (as of April 2024) board of PCMA includes Adam Kautzner, Pharm.D., President of Express Scripts, and Dr. Patrick Conway, CEO of OptumRx.

288.     An image illustrating the membership in the PCMA is as follows:



289.     Active control over the PCMA Board of Directors is important to the Defendants and clearly conditioned on current employment by the PBM. As an example, in 2022, former Express Scripts President Amy Bricker was the former Chair of the PCMA Board of Directors and the only Express Scripts employee on the Board. But, when Ms. Bricker left Express Scripts in late 2022/early 2023, she was removed from the PCMA Board. On February 3, 2023, PCMA issued a press release, naming Mr. Kautzner to the Board and as its Chair.

290.     Each year during the relevant period, PCMA has regularly held industry conferences, including its Annual Meeting and Business Forum conferences.

291.     Every year, high-level representatives and corporate officers from both the Defendants and the Opioid Enterprise Manufacturers have attended these conferences to meet in person and engage in discussions, including those in furtherance of the Formulary & UM Enterprise

292.   In fact, many of the Opioid Enterprise Manufacturers have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PCMA conferences.

293.   Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, the Opioid Enterprise Manufacturers were permitted to host "private meeting rooms" that offer "excellent opportunities for interactions between PBM members, drug manufacturers, and other industry partners."

294.   Representatives from Express Scripts and Optum and the Opioid Enterprise Manufacturers have routinely met during the Annual Meetings and Business Forum conferences that PCMA holds (and the manufacturers sponsor) each year.

295.   In addition, all PCMA members, including Affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."

296.   As PCMA members and Affiliates, the Defendants and the Opioid Enterprise Manufacturers utilized both PCMA-Connect, as well as the meetings facilitated by PCMA (including at conferences), to exchange information and to reach agreements in furtherance of the Formulary & UM Enterprise.

297.   Thus, PCMA served as a conduit of information between the Opioid Enterprise Manufacturers and the Defendants on subjects like access to prescription opioids.

298.   That the PCMA served as a conduit for the sharing of information, and the formation of collaborative partnerships is not reasonably disputable. PCMA hosts regular meetings during which PBMs and Opioid Enterprise Manufacturers, or "Pharma" as they are called by the PBMs, can discuss their coordinated and shared objectives/strategies. PCMA's website posts programs for its regular meetings that highlight the close and "[i[mperative" collaboration and

partnership between the PBMs and the Opioid Enterprise Manufacturers. Some examples from the program agendas and/or booklets currently available on PCMA's website include:

 i. Hot Topics and Trends Impacting Today's PBM and Pharma Strategies;

 ii. Meeting Patients Where They Are: Pharma and PBMs working to close gaps in care in the post pandemic era;

 iii. Unlocking the Value of PBM and Small Manufacturer Relationships;

 iv. Manufacturers and PBMs Working Together to Reward Innovation;

 v. PBM & Pharma Priorities, Opportunities and Challenges in 2022 and Beyond;

 vi. PBM and Pharma Collaboration: Focusing on Patients and Value;

 vii. Collaboration Imperative—Identifying the Shared Interests of PBMs and Pharma;

 viii. Market Dynamics Driving the PBM and Pharma Relationship;

 ix. The Future of PBM-Pharma Relations and Negotiations;

 x. How Health Care Companies are Using Data and Predictive Algorithms to Identify and Address the Opioid Crisis;

 xi. State of the PBM-Manufacturer Partnership;

 xii. Confronting the Crisis We Brought Upon Ourselves: America's Opioid Abuse Epidemic;

 xiii. The PBM/Pharma Relationship in the Era of High Price Drugs;  and

 xiv. PBMs, Specialty Pharmacies and Pharma Program Alignment—Affordability, Adherence and Outcomes.

299.     Notably, PCMA only publishes the agendas and booklets from its regular meetings going back to 2014. Plaintiffs are informed and believe that similar meetings would have been held, and topics discussed throughout the entirety of the relevant discovery period.

300.     Given the foregoing, it is not surprising that Purdue viewed PCMA as a valuable source of information and coordination on subjects regarding prescription opioids and OxyContin. As examples, Purdue employees were notified about meetings at the PCMA conference in 2001 that discussed "oxy attacks as a predatory action on the part of the media or one of your competitors," and Burt Rosen (another Purdue employee) reached out to PCMA in 2014 to find the right person to connect with "on opioids."

301.     More broadly, produced documents show that PCMA (including through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme) served as a clearinghouse for communication, discussion, consensus building and speaking on behalf of the Defendants and the Opioid Enterprise Manufacturers who were Affiliate members. Documents confirm that PCMA was a conduit through which discussions occurred and consensus could be reached and that specific discussions and work took place around efforts to curb opioid abuse (which would have worked against the common purpose of the Formulary & UM Enterprise).

302.     PCMA was not the only way in which the Defendants and the Opioid Enterprise Manufacturers collaborated. Additional documents show that the members of the Formulary & UM Enterprise knew how to, and did form, ongoing informal coalitions that for years met regularly to work on issues of common concern and advance their common interests.  These documents show that a Controlled Substances Stakeholder's Coalition was formed in October 2013 in order to "further collaborate on interprofessional efforts to combat the United States opioid epidemic." At the time of the Coalition meeting in December 2016, these meetings had been ongoing for at

least three years with each organization providing "updates for increasing awareness and decreasing misuse and diversion."

303.    Express Scripts claimed that it was making recommendations to physicians that had substantially decreased opioid prescriptions and taking actions to increase depository sites for drug disposal.  As alleged more fully herein, however, documents confirm that Express Scripts and Optum were at the same time, in order to protect their share of rebates and other fees, actively working with the Opioid Enterprise Manufacturers in the Formulary & UM Enterprise to avoid taking actions that would have reduced prescribing, thus ignoring their obligations to reduce unsafe and inappropriate prescribing.

304.    Finally, documents reflect that groups like PCMA supported the formation of the Formulary & UM Enterprise and agreements within it:

> i.    "The Coalition discusses the terms 'drug abuse' and 'addiction' versus 'substance use disorder,' . . . and agreed";
>
> ii.    "Members then discussed the purpose of the slide deck . . . and agreed";
>
> iii.    "Additionally, the Coalition discussed various communication strategies . . . . Members agreed"; and
>
> iv.    "Members unanimously agreed that further meetings were necessary to ensure that continued progress would be made."

305.    Members of the Formulary & UM Enterprise also participated in similar stakeholder meetings directly and/or through PCMA regarding topics like red flags and warning signs related to prescribing and dispensing controlled substances. The express purpose of these stakeholder meetings was to foster open channels of communication, foster understandings, and to discuss collaborative actions.   Notably, membership in some stakeholders meetings and working groups included some of the Opioid Enterprise Manufacturers' front groups and trade

association (PhRMA), opioid distributors, the National Association of Chain Drug Stores, and other PBMs and pharmacies.

306.    The foregoing facts, and as alleged in more detail herein, demonstrate that the Formulary & UM Enterprise arose from personal business relationships developed between the enterprise members in various ways over the course of at least the last two decades.

**b.    The Common Purpose and Fraudulent Scheme of the Formulary & UM Enterprise**

307.    The personal business relationships that formed the Formulary & UM Enterprise also allowed for the formation of a common purpose between the Opioid Enterprise Manufacturers and the Defendants in the Formulary & UM Enterprise. Specifically, the Formulary & UM Enterprise was formed for the common purpose of illegally and fraudulently profiting from an expansion of the market for prescription opioids, and increased prescribing, dispensing, and sales of those drugs. As alleged more fully herein, the fraudulent scheme that furthered the common purpose of the Formulary & UM Enterprise relied on fraudulent representations from each Defendant to each one of its clients and to the public that it would structure formulary offerings and perform cDUR benefit services in the interests of its clients and patients to ensure that opioids were prescribed and dispensed only for safe and legitimate reasons. Instead of providing standard formulary and UM offerings that were in their clients' best interests or for safe and legitimate reasons, the Defendants made decisions that gave the Opioid Enterprise Manufacturers and their prescription opioids unfettered and preferred formulary access, without utilization management, did not disadvantage any opioid compared with another in the same class or formulary tier, agreed to parity treatment for opioids within the same class and/or formulary, supported the Opioid Enterprise Manufacturers' pull-though marketing, pocketed enormous rebates and other fees, and (through their mail order pharmacies) dispensed prescription opioids without conducting the necessary due diligence.

308.    Each member of the Formulary & UM Enterprise played a part and furthered the common purpose of the Formulary & UM Enterprise.

309.    For their part the Opioid Enterprise Manufacturers have been engaged in fraudulent conduct related to the marketing of prescription opioids beginning in the mid-1990s. The Opioid Enterprise Manufacturers engaged in a fraudulent scheme, including through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme, to grow the market for prescription opioids through the use of branded and unbranded marketing materials, key opinion leaders ("KOLs") to give speaker presentations and publish about prescription opioids, and front groups which would contribute to and publish books, articles, documents, etc., all of which misrepresented the benefits and risks of prescription opioid use.

310.    The Opioid Enterprise Manufacturers commonly made the same misrepresentations through common KOLs and Front Groups. For example, each of the Opioid Enterprise Manufacturers made repeated misrepresentations about the risks and benefits of prescription opioids, including:

      i.   The risk of addiction from chronic opioid therapy is low;

     ii.   To the extent there is a risk of addiction, it can be easily identified and managed;

   iii.   Signs of addictive behavior are "pseudoaddiction," requiring more opioids;

   iv.   Opioid withdrawal can be avoided by tapering;

    v.   Opioid doses can be increased without limit;

   vi.   Long-term opioid use improves functioning;

  vii.   Alternative forms of pain relief pose greater risks than opioids;

 viii.   OxyContin provides twelve hours of pain relief; and

ix.  New formulations of certain opioids, labeled abuse deterrent, successfully deter abuse.

311.    Each of the Opioid Enterprise Manufacturers made nearly identical representations about their branded drugs and/or unbranded prescription opioids as a class of drugs during the relevant time period.

312.    Each of the Opioid Enterprise Manufacturers used similar Front Groups to promote prescription opioid use. As examples, multiple of the Opioid Enterprise Manufacturers used Front Groups including, as examples, the following: the American Pain Foundation, the American Academy of Pain Medicine, the American Pain Society, Federation of State Medical Boards, the Alliance for Patient Access, the United States Pain Foundation, the American Geriatric Society, and the National Initiative on Pain Control.

313.    The Opioid Enterprise Manufacturers took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that the Opioid Enterprise Manufacturers were consistently in control of their content and that it stayed on message in favor of more opioid prescribing. The Opioid Enterprise Manufacturers exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and, through the Front Groups, with each other to deceptively promote the use of prescription opioids.

314.    Each of the Opioid Enterprise Manufacturers used similar Key Opinion Leaders and the strategy of paying opinion leaders and speakers who favored aggressive treatment of pain with prescription opioids. Pro-opioid doctors have been at the hub of the Opioid Enterprise Manufacturers' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that opioids were safe and effective for long term chronic conditions. As examples, multiple Opioid Enterprise Manufacturers used similar Key Opinion

Leaders including, but not limited to: Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman.

315.    Each of these Key Opinion Leaders and numerous other, lower profile doctors, were paid to speak on behalf of prescription opioids as an unbranded class of drugs. They were used extensively to present the appearance that unbiased and reliable medical research supported the broad use of prescription opioids. These pro-opioid doctors also began to write, consult on, edit, and lend their names to books and articles, they gave speeches, and they served on committees, all the while encouraging the use of prescription opioids.

316.    The Opioid Enterprise Manufacturers' marketing conduct did not end with the KOLs and Front Groups—they were merely one of the vehicles for the dissemination of the misrepresentations. The Opioid Enterprise Manufacturers also used branded and unbranded advertising and marketing; funded, edited and distributed pro-opioid publications; speakers bureaus and continuing education programs. Speakers bureaus and continuing medical education events even occurred at Defendants' facilities.   Furthermore, as alleged above, the Defendants often facilitated and/or disseminated the Opioid Enterprise Manufacturers' marketing messages directly to doctors who prescribed for patients covered the Defendants' clients.

317.    One of the primary means by which the Opioid Enterprise Manufacturers disseminated their messaging about prescription opioids was through drug detailing: the practice of sending out pharmaceutical company representatives to provide details about specific branded products in order to persuade prescribers to begin writing (or write more) prescriptions for a specific product.

318.    The Opioid Enterprise Manufacturers adopted detailing as a key component of their prescription opioids strategy early on to capitalize on the fraudulent unbranded marketing—

developing carefully crafted marketing messages and tactics to deliver messages to prescribers through close relationships with sales representatives.

319.     Drug detailing is data driven, requiring identification of the prescribers who are writing high or low volumes of prescriptions, targeting places where additional messaging might be affecting and to test the effectiveness of messaging. In accordance with common industry practice, the Opioid Enterprise Manufacturers purchased and closely analyzed prescription sales data from companies like IMS Health (now IQVIA) and the Defendants which allowed them to track–precisely–the rates of initial and renewal prescribing by individual prescribers.

320.     The nexus between data and detailing helped drive the formation of the common purpose of the Formulary & UM Enterprise. In return for data and unfettered formulary placement from the Defendants on their standard formulary offerings, the Opioid Enterprise Manufacturers were willing to pay higher rebates and other fees to the Defendants.

321.     Once that occurred, the Defendants once again supported the Opioid Enterprise Manufacturers' fraudulent marketing regarding prescription opioids. After the Opioid Enterprise Manufacturers obtained the Defendants' data and favorable formulary placement on their standard formulary offerings, the Opioid Enterprise Manufacturers' sales personnel immediately began to analyze their managed care or PBM data in order to "pull through" the formulary placement in order to drive increased sales. Documents produced from the Opioid Enterprise Manufacturers and the Defendants are replete with examples of pull-through initiatives touting the beneficial formulary placement of Opioid Enterprise Manufacturers' drugs to drive increased sales and use of the Defendants' data to maximize the pull through effort.

322.     These documents make clear that the formulary placement was viewed as a "win" and an opportunity to make the rebate agreements profitable by pulling through sales. Sophisticated presentations outlining the exact steps a sales representative should take were often

included in the sales training materials.  The impact of these agreements and the ability to pull-through increased sales using the PBM data was dramatic:



323.    Using the "Best Practices Identified" of: 1. Identifying the local UHC MC Opportunity; 2. Targeting the Right UHC Customer; 3. Hyper Targeting; 4. Delivering the Right Message; and 5. Consistent Cross-Functional Communication   – the Pittsburgh District experienced dramatic growth in sales, as described by Endo:



324.    Formulary wins were a boon for each member of the Formulary & UM Enterprise. Each prescription opioid that enjoyed a favorable formulary placement, or continued to enjoy prescribing and dispensing without UM, ensured that all prescription opioids would continue to enjoy unrestricted sales due to the privity clauses that the Defendants agreed to with each Opioid Enterprise Manufacturer. And, as indicated by the graph cited above, these wins increased sales. And, by increasing sales, the wins increased profits for the Opioid Enterprise Manufacturers whose drugs were sold and for the PBM who received rebates and administrative fees tied to sales. From that perspective, the graph above is evidence of the Formulary & UM Enterprise and its common purpose.

325.    As alleged herein, the Defendants took on obligations to perform and made representations that they would conduct point-of-sale review and take actions to ensure that only safe and legitimate prescriptions were being filled when they had no intention of doing so. Had the Defendants taken the actions they had promised their clients, it would have dramatically reduced medically inappropriate prescribing, sales and dispensing of prescription opioids. As

alleged more fully herein, the Defendants' failure to do so had a significant role in allowing opioids to flood into communities across America, including into Boston.

326.     The Defendants also paid lip service to their commitment to taking action about prescription opioids. For example, Express Scripts represented in 2013 that it was "leading the fight against prescription drug fraud, waste and abuse." Optum submitted its opioid use/risk management plan for consideration by the National Alliance of Healthcare Purchaser Coalitions, claiming that its program focuses on preventing misuse by educating care providers and consumers, minimizing early exposure, and promoting alternative treatments for pain while advancing best practices and made multiple representations about itself and its programs during the presentation. Similar representations were made on Optum's website, touting its expertise and commitment to fight the opioid epidemic and demonstrating expertise in opioid management: "Optum Rx® implements a multi-dimensional Opioid Risk Management solution to help curb the rising tide of opioid abuse across the United States . . . as part of its commitment to drive opioid safety and prevention."

327.     But the Defendants' claims that they were addressing fraud, waste, and abuse were only empty promises. For example, upon information and belief, one former Fraud, Waste and Abuse investigator for Express Scripts from 2013 to 2019 explained that even when they identified blatant instances of pill seekers and pill mill doctors, nothing happened. "No one really cared," he said. "No one really followed up on anything. The members were just like a number. We'd totally forget this was a human being because it was just a case number. We'd just look at it, type it up and it was gone. They never got the help they needed. I never heard this person is in rehab."

328.     Moreover, upon information and belief, as far as the former investigator knew, none of his findings were ever shared with law enforcement, even if it involved well documented pill mill doctors or pill seekers.

329.     He explained that, when he was hired, he thought he would be investigating "serious major fraud, all of these people writing all of these false prescriptions," he said. "I just thought it was more investigation stuff." They would re-run patients and doctors' names every five months, he said. "We'd see the same people over and over," he said. "Just because we identified the behavior didn't mean it stopped. We'd just call the doctors and they didn't even care. They just felt this patient was in pain, but we're not going to do anything about it. It wouldn't be rare to have [the bad doctors] written up twice in a year. . . . I'd say 90 percent of the reports never got read in my opinion. . . . Let's say I spent months, sometimes weeks on a report—it's being written for the manager. It really doesn't go anywhere else."

330.     Similarly, PCMA and some of its PBM members participated in coalitions or external activities indicating that they were "increasing awareness and decreasing misuse." However, the internal documents produced by the Defendants show a different story and uncover the fraudulent nature of their Enterprise. The Defendants did not make decisions based on the terms of the contracts with their clients or in order to fight abuse and/or diversion. Rather, the Defendants made decisions in order to protect their rebates and generate profit, despite concerns about prescription opioids and the companies that sold them.

331.     The Defendants hid these facts from their clients. In a telling exchange in 2002, when Highmark Blue Cross Blue Shield decided it would put a 300mg daily limit on a drug, Medco pushed back because this meant that Medco would lose Purdue rebates if there was a limit below 320mg per day.  Here, as alleged, was evidence that an action could have been taken to drastically limit inappropriate prescribing, sales and dispensing, but it was ignored in favor of the action that advanced the common purpose of the Formulary & UM Enterprise. Instead of taking action to limit medically unnecessary and inappropriate prescribing, sales, and dispensing, an August 18,

2002, email from Purdue National Account Director Bernadette Katsur reveals that a Medco Vice President convinced its client—Highmark—to drop its daily dosage limit.

332.    Documents created in the mid-2010s confirm that the Defendants regularly delayed taking actions that could have dramatically reduced medically inappropriate prescribing, sales and dispensing despite promises from them to do the same.

333.    As an example, a November 3, 2016, email from Bob Lahman, Trade Relations VP at OptumRx explained that OptumRx had agreed to forego measures that would have used prior authorization as a tool to control the prescription of opioids. The explanation reveals how closely each Opioid Enterprise Manufacturer worked with each PBM Defendant: "It was not unusual for any manufacturer to not want a PA on their product, especially if it was a small molecule product, and very few would have agreed to a rebate where they did not have unrestricted access (no PAs or steps (sic) edits)." Emails like this, and others cited throughout this complaint, demonstrate that the PBM Defendants and the Opioid Enterprise Manufacturers all had an understanding of the game—the end goal was increasing prescribing, dispensing, and sales through favorable formulary access without UM on Defendants' standard formulary offerings, and the means to that end goal was to pay rebates and administrative fees.

334.    When the pressure began mounting to limit access to prescription opioids by use of UM measures like prior authorization, step edit, or days' supply limits, there were serious concerns expressed in 2017 within OptumRx about the impact on the "significant" rebates being received from the drug makers:

> **From:** Merrill, Nathan <Nathan.Merrill@optum.com>
> **Date:** Monday, Feb 06, 2017, 4:09 PM
> **To:** Calabrese, David <David.Calabrese@optum.com>
> **Subject:** RE: BIC
>
> David,
>
> Venkat had concerns about adding a PA to Embeda, Oxycontin, and Opana ER since these are preferred products that are tied to "significant" rebates. By adding a PA to these products we jeopardize any rebates we have contracted with the manufacturer. I wasn't in a position to argue so I just explained that we anticipated there would likely be concerns within this class that we would address later. With BIC scheduled for this Wednesday do you think you would be able to attend to go to battle for us on this one? I know Venkat is going to say we cannot put a PA on those 3 products and I'm not sure there is anything more I can say or do to get around this. I appreciate any feedback you might have.
>
> Thank you,
>
> _____
>
> Nathan Merrill, PharmD, CGP | OptumRx
> Manager, Clinical UM Operations

335.     Later, OptumRx employees discussed whether they would be willing to put a hard limit on morphine equivalent dosing (MED) on OxyContin 80mg to align with the 2016 CDC Prescribing Guidelines. The discussion was immediately interrupted by Brian Sabin, Manager of Industry Relations, who explained that they needed to delay implementation to "ensure we protect rebates" because "we cannot sacrifice rebates on only the 80mg strength here" as that would mean OptumRx would "sacrifice rebates on *all* OxyContin scripts."

> Based solely on the Purdue contract, **I would highly suggest delaying the MED implementation on all clients until 1/1/2018** – as we are doing with the new criteria – so we have time to ensure we can protect rebates.  Purude has a clause built into their agreement that mandates that ALL strengths be unrestricted.  So we cannot sacrifice rebates on only the 80mg strength here.  We would sacrifice rebates on *all* Oxycontin scripts.

336.     Here, again, a PBM Defendant did not take an action that it could have taken to block inappropriate prescription opioid dispensing.

337.     As another example, despite their contractual obligations and their public representations, it was not until 2019 that OptumRx even began to consider exclusion of OxyContin from its formulary offerings.

94

338.     An email exchange in March 2019 between Brian Sabin, Optum Director of Industry Relations, and Venkat Vadlamudi, Optum, raises the question whether they should remove OxyContin from its formularies altogether, "rebate losses be damned," arguing that Purdue caused the opioid epidemic and Optum's continued inclusion of OxyContin on its formularies was "rewarding their bad behavior." He argues that, "[f]rom a purely PR perspective, I think it would look good on us." In response, Vadlamudi states that "[w]e as a company looked into this," but the amount of OxyContin rebates Optum collected "prevented us from doing it." As even Vadlamudi then goes on to admit, "[b]ut times are different now. [I]f you can look into it and model the scenarios <u>maybe</u> we can change."

339.     Even as Purdue explored bankruptcy and OptumRx became aware of the potential for lost rebates, the answer was not to discontinue OxyContin's preferred formulary position, but instead to move other drugs into preferred positions in order to ensure the free flow of prescription opioids from another Opioid Enterprise Manufacturer in the Formulary & UM Enterprise.

340.     Express Scripts went through similar issues with OxyContin prescribing. In a March 2017 email, there were several employees from Express Scripts who derided the decision by the Express Scripts Value Added Committee to overrule the prior authorization limit on OxyContin, stating that the decision did not sit well with them at all. As Express Scripts employees noted, this decision made no clinical sense. Without question, the prior authorization limit would have dramatically reduced medically inappropriate prescribing, sales, and dispensing which would have impacted "rebate gain."

341.     But the Defendants' involvement did not end there. As alleged more fully herein, the Defendants each own and operate a mail order pharmacy. As alleged above, the Defendants' mail order pharmacies dispensed massive amounts of branded and generic opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could

not be resolved through due diligence. As such, the mail order pharmacies provided another mechanism for the goal of the Formulary & UM Enterprise—i.e., the unrestricted increase in prescribing and dispensing of prescription opioids for the profit of the Opioid Enterprise Manufacturers and the Defendants.

342.    As alleged more fully herein, the Formulary & UM Enterprise maintained a common purpose from the late 1990s through to the present day, creating sufficient longevity in their personal business relationships for them to pursue the common purpose of the Formulary & UM Enterprise.

343.    By dispensing branded and generic prescription opioids without performing the requisite due diligence on prescriptions or refusing to fill prescriptions that could not be resolved through due diligence, the Defendants' mail-order pharmacies furthered the common purpose of the Formulary & UM Enterprise. They continued to facilitate the increased dispensing and sale of prescriptions opioids. However, this also violated the law governing dispensing controlled substances in Schedules II through IV in ways that are punishable as felonies.

**c.    Conduct and Participation of the Formulary & UM Enterprise Through a Pattern of Racketeering Activity.**

344.    The common purpose of the Formulary & UM Enterprise alleged more fully herein was perpetrated through a fraudulent scheme fulfilled by multiple acts of mail fraud and wire fraud, and by felonious possession and dispensing of controlled substances. Defendants' predicate acts constitute a pattern of racketing activity.

345.    The pattern of racketeering activity used by the Defendants and their mail order pharmacies likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme through which the common purpose was achieved.

346.     Use of the mail and wire facilities began with the formation of the Formulary &
UM Enterprise. Negotiations and communications about the contracts between the Defendants and
the Opioid Enterprise Manufacturers occurred through interstate mail and wire facilities and
involved meetings, communications, and negotiations about contracts between Defendants' and
the Opioid Enterprise Manufacturers, the Opioid Enterprise Manufacturers' marketing and the
Defendants' assistance therewith, and pull-through marketing which required the transmission of
large volumes of data.

347.     As alleged more fully herein, the Opioid Enterprise Manufacturers and the
Defendants regularly and continuously communicated through the use of the U.S. Mail and
interstate wire facilities in furtherance of the common purpose of the Formulary & UM Enterprise
and their fraudulent scheme, including discussions of formulary placement, prior authorization
limits, step edits, preferred formulary status and their impact on opioid prescribing and dispensing
and, relatedly, rebates and other fees. Importantly, rarely mentioned during these discussions was
the impact of the burgeoning opioid epidemic. These discussions were clearly intended to further
the common purpose of the Formulary & UM Enterprise, happened over at least the last two
decades (beginning with Purdue's work with predecessors of Optum and Express Scripts and
continuing to involve more Opioid Enterprise Manufacturers over time), and reveal the ongoing
personal business relationships that developed between the members of the Formulary & UM
Enterprise.

348.     Similarly, each Defendant engaged in significant pull-through marketing assistance
with each Opioid Enterprise Manufacturer. As revealed by documents cited herein, each of the
Defendants, through the regular use of the U.S. Mail or interstate wire facilities in furtherance of
the fraudulent scheme, agreed to provide the Opioid Enterprise Manufacturers with preferred
formulary placement on their standard formulary offerings and prescribing data. This ensured that

the unfettered formulary access (granted despite the Defendants' contrary representations to the public and their clients), would facilitate unrestricted opioid prescribing and dispensing. Documents confirm these facts and evidence that unrestricted formulary access was a boon for each Opioid Enterprise Manufacturers marketing efforts and that "pull through" efforts were undertaken after each formulary announcement "win" in order to drive the Opioid Enterprise Manufacturers' profitability. The Defendants were not only aware of this pull through marketing, they actively joined in efforts with the Opioid Enterprise Manufacturers by creating reports about the "value proposition" of unrestricted use of prescription opioids as alleged more fully herein.

349.    Finally, each of the Defendants and the Opioid Enterprise Manufacturers regularly (and through the regular use of the U.S. Mail or interstate wire facilities in furtherance of the fraudulent scheme) participated in trade industry associations and informal coalitions that provided recurring non-contractual opportunities and forums in which to continue developing personal business relations and in which they form a common purpose of growing the unfettered use of opioid drugs.

350.    The Defendants each engaged in essentially uniform conduct with the Opioid Enterprise Manufacturers whereby the Defendants granted the Opioid Enterprise Manufacturers' drugs unfettered formulary access (including preferred formulary placement coupled with refraining from UM) on their standard formulary offerings despite their public promises and contractual obligations to make formulary and UM decisions in their clients' best interests, and facilitated their pull through marketing and/or directly facilitated the dissemination of their marketing messages. The Defendants also provided the Opioid Enterprise Manufacturers with PBM data so that they could pull through the formulary "wins" and drive increased prescribing. At the back end of the fraudulent scheme, the Defendants profited from their fraud by receiving

rebates and other fees while the Opioid Enterprise Manufacturers enjoyed increased sales through pull through marketing and unfettered formulary access.

351.     The fraudulent scheme was advanced through mailings and interstate wire transmissions that constitute racketeering activity. Collectively, these violations constitute a pattern of racketeering activity, through which the Defendants and their mail order pharmacies and the Opioid Enterprise Manufacturers defrauded and intended to defraud Boston and Massachusetts consumers, the State, and other intended victims.

352.     The Defendants and their mail order pharmacies devised and knowingly carried out an illegal and fraudulent scheme using materially false or fraudulent pretenses, representations, promises, or omissions regarding their conduct. Specifically, as alleged more fully herein, the Defendants promised to perform pharmacy benefit management services, including cDURs, formulary and UM offerings in their clients' best interests and in ways that would ensure safe and effective prescribing. As alleged herein, the Defendants further represented to their clients and the public that they were committed to preventing and addressing misuse, abuse, and diversion of prescription opioids. These promises were made in person, in publications, and through the mail and the wires.

353.     The Defendants and their mail order pharmacies did not intend to comply with their contractual obligations, their promises to their clients, or their public representations.  The Defendants and their mail order pharmacies intended to continue to make decisions and take actions that benefitted the members of the Formulary & UM Enterprise and its common purpose by: failing to perform cDURs, and providing unfettered formulary access without meaningful UM measures on their standard formulary offerings. All told, the Defendants and their mail order pharmacies intended to take actions that directly contradicted their promises, contractual

obligations and public promises because they supported increased prescribing, sale, and dispensing of prescription opioids with as little inhibition or impediments as possible.

354.    The Defendants and their mail order pharmacies intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities intentionally and knowingly with the specific intent to advance and for the purpose of executing the illegal and fraudulent scheme.

355.    By engaging in their intended conduct, as alleged more fully herein, the Defendants and their mail order pharmacies engaged in fraudulent and unlawful conduct constituting a pattern of racketeering activity.

356.    The Defendants and their mail order pharmacies used the U.S. Mail and interstate wire facilities to perpetrate the fraudulent scheme of the Formulary & UM Enterprise with thousands of communications, publications, representations, statements, electronic transmissions, and payments including, but not limited to:

    i.   Contracts negotiated and circulated between members of the Formulary & UM Enterprise;

   ii.   Contracts negotiated and circulated between the Defendants and their clients;

  iii.   Public representations by the Opioid Enterprise Manufacturers and the Defendants about their commitment to addressing misuse, abuse, and diversion of prescription opioids;

  iv.   Marketing materials about prescription opioids transmitted between the Opioid Enterprise Manufacturers and the Defendants that were later disseminated by the Defendants;

      v.   Communications between the Defendants and their clients about their commitment to following the terms of their respective contracts;

      vi.   Communications between the Opioid Enterprise Manufacturers and the Defendants regarding formulary changes;

      vii.   Communications between the Opioid Enterprise Manufacturers and the Defendants regarding and including PBM prescribing data;

      viii.   Transmission of rebate payments; and

      ix.   Transmission of payments from the clients of the Defendants.

357.   To achieve the common purpose of the Formulary & UM Enterprise, the Defendants and their mail order pharmacies and the Opioid Enterprise Manufacturers hid from their clients, patients, regulators and Plaintiff: (a) the fraudulent nature of the scheme; (b) the fraudulent nature of their representations; (c) their intention to ignore their contractual cDUR obligations; (d) their intention to make only formulary and UM offerings that failed to limit the medically unnecessary and inappropriate prescribing, sales, or dispensing of prescription opioids or address misuse, abuse, and diversion; and (e) the true nature of the association between each member of the Formulary & UM Enterprise.

358.   Each member of the Formulary & UM Enterprise, including the Defendants and their mail order pharmacies, agreed with the overall objective of the Formulary & UM Enterprise's fraudulent schemes and participated by taking action that furthered the common purpose of the Formulary & UM Enterprise, including in the common course of conduct to commit acts of fraud and indecency.

359.   The pattern of racketeering activity involving the felonious possession and dispensing of controlled substances in Schedules II through IV likely involved thousands, if not millions, if improperly dispensed prescriptions for branded and generic prescription opioids in

violation of the CSA and the Defendants' registration as mail order pharmacies. The Defendants knowingly and intentionally possessed and dispensed branded and generic prescription opioids for reasons that were not authorized by the CSA.

360. The predicate acts of the Formulary & UM Enterprise all had the purpose of furthering the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue for the Defendants and their mail order pharmacies. The predicate acts were committed, and/or caused to be committed, by the Defendants and their mail order pharmacies through their participation in the Formulary & UM Enterprise and in furtherance of the fraudulent schemes, felonious possession and dispensing of controlled substances, and common purpose thereof.

## I.  Defendants Concealed Their Unlawful Conduct

361. Defendants' conduct described herein – colluding with manufacturers deceptively marketing opioids to alter perceptions of opioids and increase their sales, ignoring evidence of misuse, addiction, and diversion visible in their data and instead leveraging the data in further support of manufacturers' opioid marketing, placing opioids on their national formularies with preferred status and without restrictions in exchange for lucrative rebates and fees from manufacturers, failing to maintain effective controls against diversion in their mail order pharmacy operations, and failing to report suspicious prescribers – was concealed from the Plaintiffs and the public at large.

362. Defendants intentionally undertook efforts to conceal their conduct by misrepresenting their role in the pharmaceutical marketplace as promoting safe and effective use of and appropriate dispensing of opioids, by claiming to be a victim of Purdue's misconduct when they were, in fact, a participant in it, and by failing to make public information in their possession

and control that would have revealed the truth regarding their relationships with manufacturers and their financial interest in the increased utilization of opioid medications.

363.    Defendants had in their possession and control information that opioids were addictive, data showing that large amounts of opioids were being diverted from legitimate channels, and information that specific doctors and pharmacies were engaged in improper or illegal conduct.

364.    Defendants fraudulently hid the details of their relationships with opioid manufacturers.

365.    The Plaintiffs did not and could not have known that the Defendants developed their national formularies based on profit and rebates, not based on the safety and efficacy of the medications as they claim.

366.    The Plaintiffs did not know and could not have known that the Defendants were partnering with the opioid manufacturers in their deceptive and misleading marketing of opioids.

367.    The Plaintiffs did not know and could not have known about the volume of opioids that Defendants shipped into the City through their mail order pharmacy business.

368.    The Plaintiffs did not and could not have discovered through a diligent investigation information demonstrating that the Defendants were engaged in the misconduct described herein.

369.    Defendants did not disclose to the Plaintiffs the details of their financial incentives from Purdue or other manufactures or what they knew regarding problematic prescribers, diversion, and adverse consequences. Defendants used their knowledge and scale for their own benefit, rather than their customers', causing injury to the Plaintiffs.

**J.    Defendants Created a Public Health Crisis in Boston by Dramatically Increasing the Availability of Opioids**

370.    By their conduct in improperly increasing opioid prescriptions and failing to address evidence of the overuse, abuse, and addiction to opioids and report suspicious prescribers,

103

Defendants, who portray themselves as champions of public health, had financial incentives to sell higher volumes of opioids, and prioritized pursuit of profits over the well-being of the community and even their own clients. This oversupply allowed non-patients to become exposed to opioids and facilitated access to opioids for both patients who could no longer afford or otherwise access prescription opioids and individuals struggling with addiction and relapse. Individuals addicted to prescription opioids often transition to heroin due to its lower cost, ready availability, and similar high, or to the even more potent illicit opioid fentanyl.

371.    According to the CDC, the number of drug overdose deaths increased by nearly 30% from 2019 to 2020 and has quintupled since 1999. Nearly 75% of the 91,799 drug overdose deaths in 2020 involved an opioid. From 1999 to 2020, more than 263,000 people died in the United States from overdoses involving prescription opioids.

372.    Massachusetts is the 17th highest state for opioid overdose deaths as compared to other states.

373.    Data from 2020 shows that there were 2,106 opioid-related deaths in the state of Massachusetts.  In 2021, an average of 6 Massachusetts citizens died every day from an opioid overdose, a total of 2,234 that year.  The 2021 opioid-related overdose death rate of 33.1 per 100,000 people was 11 percent higher than in 2020 (30.0 per 100,000). Opioid overdose deaths accounted for 88% of all drug overdose deaths in the state in 2021.

374.    As the largest city in Massachusetts, Boston accounts for the largest share of opioid overdose deaths in the state. There were 251 reported opioid overdose deaths in Boston in 2021.

375.    The loss of each of these individuals cannot be adequately conveyed by statistics, nor can the depth and breadth of the impact on those who survive. Because the addictive pull of opioids is so strong, relapse is more common than with other drugs.

376.    According to the Massachusetts Department of Public Health website for Regional Opioid Reports, there were 2,670 total opioid-related incidents in the City of Boston in 2022.

377.    Thousands of Boston residents have experienced opioid-related overdoses, and the number of overdoses has only increased in the last few years.  In 2014, the Boston Fire Department administered Narcan–the antidote to opioid overdose – 401 times.  In 2015, this number nearly doubled to 777 overdoses involving the administration of Narcan.  This number increased again in 2016, to 983 overdoses treated with Narcan, and increased again in 2017 to 1,182 overdoses where Narcan was administered – nearly triple the amount in just three years.

378.    Narcan was credited with reversing nearly 1,124 overdoses in Boston from October 2016 to May 2017 and still plays an important role in saving lives today. The City offers training and education to opioid users, their families, and community partners that work or may come into contact with people at risk of overdosing.

379.    Boston has prioritized the availability of treatment beds due to the number of individuals seeking treatment.  As of May 2015, Boston had 152 treatment beds per 100,000 residents, which is the largest amount in the Commonwealth.  Due to the location of Boston, at any given time, treatment beds based in Boston may be filled by individuals who live outside of Boston.

380.    Many of the City's first responders have been impacted by the opioid epidemic in the City.  The City's Fire Department has faced a high turn-over rate due to "burn-out" from constantly responding to overdoses.  The Fire Department had to work in approximately 3 to 6 month rotations, and saw an uptick in transfers in and out of fire companies in neighborhoods which are impacted by the opioid crisis, including the neighborhood in which it is the headquarters is located, in order to combat fatigue and the emotional toll of the drug crisis in Boston.

381.     Rising opioid use and abuse have negative social and economic consequences far beyond overdoses.   According to a recent analysis by a Princeton University economist, approximately one out of every three working age men who are not in the labor force take daily prescription pain medication.  The same research finds that opioid prescribing alone accounts for 20% of the overall decline in the labor force participation for this group from 2014-16, and 25% of the smaller decline in labor force participation among women.  Many of those taking painkillers still said they experienced pain daily.

382.     The abuse of opioids has caused additional medical conditions that have injured residents in Boston.  A growing number of people need medications aimed at treating secondary effects of opioids—including not only addiction and overdose, but also side effects like constipation and sedation.  According to an analysis by the Washington Post, working-age women and men on opioids are much more likely to have four or more prescriptions from a physician (57% and 41%, respectively) than their counterparts who do not take opioids (14% and 9%, respectively). These secondary-effect medications—essentially, drugs to treat the effects of opioids—generated at least $4.6 billion in spending nationally in 2015, on top of $9.57 billion in spending on opioids themselves.

383.     The deceptive marketing and overprescribing of opioids also had a significant detrimental impact on children.  Prescription opioid use before high school graduation is related to a 33% increase in the risk of later opioid misuse. Additionally, the adolescent misuse of opioid medications greatly predicts the later use of heroin.  However, according to the CDC Guidelines, there has been a significant increase in the prescribing of opioids to adolescents and children for headaches and injuries.  Boston is no exception.  According to a report regarding substance abuse amongst Boston youth, from 2010 to 2015, 2.1% of hospital visits for Boston residents, ages 12-17, involved opioids.

384.    In May 2022, according to a National Center for Health Statistics Report, Massachusetts ranks second "when it comes to teen illicit drug use, just behind Vermont."

385.    Additionally, according to a 2015 survey conducted on students in Boston public high schools and vocational schools, 8% stated that they used prescription drugs, and 1% have admitted to using heroin.  According to a survey conducted of Boston Public Middle School students, 7% of 10,691 students have admitted to using prescription pain medications without a prescription.  Additionally, several school nurses within Boston Public Schools have asked that the schools carry Narcan, as they are concerned about overdoses within their schools.  However, School officials are concerned that the costs associated with Narcan, which include training on Narcan administration and the hiring of additional nurses, will detract from other needs, such as asthma and diabetes medications.

386.    Plaintiffs' resources have been diverted from specific programs, including the gang-outreach task force, to fight the opioid epidemic.  The Boston Public Health Commission's outreach workers have had to devote time and efforts to children and families who struggle with opioid addiction, instead of to at-risk children susceptible to gangs.  Additionally, children in Boston have been exposed to overdoses and drug paraphernalia in public buildings.

387.    According to an employee of the Boston Public Libraries, overdoses have occurred, and drug paraphernalia has been found in the public libraries' bathroom stalls, which children often use.  There have also been numerous fatal and non-fatal overdoses within the Boston Public Library system.  For example, from July 1, 2016, until June 30, 2017, 3 fatal overdoses and 12 non-fatal overdoses occurred in the City's libraries.  From July 1, 2017, until June 30, 2018, there were 6 non-fatal overdoses that occurred in the City's libraries.  Additionally, the library system has experienced an increase in drug related incident reports.

388.    The opioid epidemic has affected other public areas in Boston, as areas such as some public parks with playgrounds have become dangerous due to needles and drug paraphernalia being left in the parks.  There are 276 parks within the City of Boston Park System, and 146 of these parks have active play features, which include tot lots, ball fields, and ball courts.  According to a City employee, a park in the Roxbury neighborhood became "infested" with needles, as people often used drugs at the park, and left their needles behind.  From 2013 until August 15, 2018, there were 219 calls to constituent services due to needles being found in parks.  The disposal of needles and drug paraphernalia in the parks has created a safety concern for Boston residents, as children play in the playgrounds and bleachers.  Additionally, several Boston day care centers utilize the parks for children to play.

389.    In an August 2022 CBS News article, Suffolk County District Attorney Kevin Hayden detailed how a member of his security team was injured during the park clean up, stating "My detail, who was here with me for this cleanup today, was stuck in the foot with a needle." "And if this doesn't highlight how tragic this can be, then I don't know what does. That could've been a kid."

390.    In October of 2022, a 9-year-old boy was pricked by a needle in Clifford Park while practicing with is football team. This was further discussed during a Boston City Council meeting where the state of the park facilities was discussed.

391.    In an article published in the American Journal of Public Health, Bearnot, et al. Determined that between May 2015 and August 2017 there were 4,763 discarded needles reported. The data collected showed that almost 80% of the needles reported were within "1 kilometer of methadone clinics, safe needle deposit sites, homeless shelters, or hospitals."

392.    From 2014 until August 15, 2018, the Boston Fire Department administered Narcan in the City parks due to overdoses 37 times.  During this time period the Boston Fire Department

responded to 10 calls in City parks due to overdoses in which Narcan was not administered. Additionally, Emergency Medical Services responded to 128 narcotic-related illness calls at the City's parks during this time.

393.    Residential neighborhoods have also become areas for drug use.  According to the Department of Inspection Services, an abandoned park which is located in the middle of a residential neighborhood, has a tree cluster, which is often utilized for drug use.  In one day, the Boston Public Health Commission cleaned up over 400 used needles in the tree cluster.

394.    Additionally, children and families in Boston witness first-hand the devastation of the opioid crisis in Boston public housing.  According to the Boston Housing Authority, in 2018 there were approximately 6,491 children, ages 17 and under, who resided in the Boston Housing Authority's public housing buildings.  Individuals who are addicted to opioids and other drugs have at times lived in the hallways of the public housing provided by the Boston Housing Authority, and mothers and children have had to step over individuals who are unconscious due to taking drugs, including opioids.  Fatal and non-fatal overdoses have occurred in the public housing buildings.

395.    In order to combat drug dealing and drug related violent crimes, the Boston Housing Authority has installed several security cameras to prevent and document drug dealing within the buildings.  Children and families frequently come across needles in the building. Although the Boston Housing Authority cleans the building, the day after the cleaning the complex returns to a terrible condition, with needles, urine, and feces found in the hallways and stairwells.

396.    Children attending summer camps have also been affected by the opioid crisis. According to the City's Department of Property Management, several children attend summer camps in buildings owned by the City.  Children have been unable to use certain bathrooms in these buildings due to drug use and overdoses that have occurred in the bathrooms, and needles

being found in the toilet.  The Department has had to find other bathrooms in the buildings for their use.  Department employees have found individuals who have overdosed in the City buildings' bathrooms, with needles still in their arms.

397.    Many children in Boston have gone without meals due to their parents' drug addiction.  There are several public buildings in Boston which provide breakfast, lunch, and dinner to Boston residents.  Many of the residents who come for the meals are children whose parents have spent money on drugs, including opioids, as opposed to food.  Additionally, members of the Boston Fire Department frequently witness people injecting drugs in broad daylight on Boston's streets, around the perimeter of the Fire Department headquarters.

398.    Even infants have not been immune to the impact of opioid abuse.  There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS").  These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms.  The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued, serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction.  When untreated, NAS can be life-threatening.  In 2009, more than 13,000 infants in the United States were born with NAS, or about one every hour.

399.    NAS rates in Boston have steadily increased.  In 2010, there were 6.2 babies born with NAS for every 1,000 live births in Boston.  In 2013, this number increased to 7.4 babies born with NAS for every 1,000 live births and jumped again in 2015 to 8.5 babies for every 1,000 live births in Boston.  In 2017, that number basically doubled as 15.9 infants were diagnosed with NAS

per 1,000 hospital births in Massachusetts. At Boston Medical Center, the average cost of a hospital stay for a baby with NAS is just under $20,000.  According to the Boston Public Health Commission, from 2012 to 2015, 168 pregnant women in the City received treatment for opioid use disorder.

400.    Additionally, according to Boston Public School officials, school principals have noticed that more children as young as ages 3 to 5-years old have been demonstrating intensive behavioral problems.  These principals suspect that these children may have been born with NAS and are continuing to suffer from the effects of this painful disease.  Additionally, according to the Director of the Boston Public Schools Health Services, the schools' psychological services numbers have increased, mostly due deaths in the family, and many of these deaths are related to opioid addiction.

401.    A large number of children in Boston have been placed in foster care because their parents or caregivers are addicted to opioids.  As of June 30, 2016, 9,655 children in Massachusetts were in foster care, and the majority of these children were removed from their homes due to opioid addiction.  Several grandparents in Boston are now raising their grandchildren and are becoming the custodial grandparent due to their children's substance abuse disorder.  The Boston Public School system has noted that many of its children have been removed from their homes due to parental opioid addiction.  According to the Boston Public Schools system, many children are displaced and entering the foster care system or living with elderly grandparents due to the opioid crisis, and many of these children bring trauma with them to the classroom.

402.    Defendants' success in extending the market for opioids also created an abundance of drugs available for non-medical or criminal use and fueled a new wave of addiction, abuse, and injury.  According to the Boston Police Department, there has been a general increase in theft-related crimes due to the opioid epidemic.  Additionally, the City has experienced thousands of

arrests related to opioids.  From 2014 until August 2018, the Boston Police Department had 5,718 calls and/or arrests related to opioids.  Additionally, according to the head of the Boston Centers for Youths and Families, violent crimes, such as child homicides, increased due to resources being reallocated from gang-outreach in order to assist children and families who deal with opioid addiction.  Additionally, more thefts are occurring on City property.  For example, many thefts have occurred in Faneuil Hall, as people are stealing laptops, backpacks, and items from retail stores owned by the City in order to pay for drugs.

403.    The opioid epidemic in Boston has caused an additional increase in crimes such as prostitution.  Vacant properties in Boston are often used as centers for prostitution, where individuals offer sexual activity in exchange for money to purchase drugs.  Individuals addicted to opioids also use these vacant buildings to use drugs.   Additionally, elderly residents in Boston have been victims of crime due to the opioid crisis.  Many of these residents are vulnerable and have family members who are addicted to opioids who have stolen from them in order to pay for drugs.  Boston's elderly population also has a high-risk for home burglaries where either their medications or their money is stolen to pay for drugs.

404.    Most illicit drug use originates from *prescribed* opioids. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from drug dealers or the internet.

405.    The Partnership to End Addiction website contains information about safeguarding medicine misuse, which was updated in 2018. "Two-thirds of teens and young adults who report misuse of prescription medicine are getting it from friends, family and acquaintances."

406.    Those who are addicted to prescription opioids are 40 times more likely to become addicted to heroin.  The CDC identified addiction to prescription pain medicine as the strongest

risk factor for heroin addiction. The heroin epidemic has directly impacted Boston. Boston EMS responded to 2,433 cases involving heroin, which increased by 20% in 2017 to 2,927 cases.

407.   The City of Boston and its corresponding agencies have taken various steps to curb the epidemic that was fueled by those involved with prescription opioids. A few examples are described below.

408.   The Boston Public Health Commission has taken numerous significant steps to fight the opioid epidemic in Boston.  Annually, Boston EMS dedicates 80 percent of a department paramedic's time to review every potential Boston EMS narcotic-related incident, the dataset of verified cases allows for near-real time reporting and trend analysis supporting situational awareness, outreach and recovery services. Data analysis and case review is supported in-house by a deputy superintendent and a medical director.

409.   In 2017, Boston Emergency Medical Services added a non-transport Community Assistance Team, referred to as Squad 80, to support emergency medical calls in two sections of the city with a high volume of overdoses.  Squad 80 has four additional EMTs, who work full-time day and evening shifts, with 75% of the call volume for the day crew and 50% of the evening crew being for incidents that are narcotic-related.

410.   Under the Office of Recovery Services, which was established in 2015, the Public Health Commission has created several programs to help those seeking recovery from opioid addiction.  In 2017, the Public Health Commission opened an Engagement Center, which is a drop-in center for Boston residents that has snacks, a television, books, as well as a nurse, street outreach workers, and clinical workers who can connect Boston residents to recovery programs.  The Center is open daily and assists Boston Police Department officers and Street outreach workers as a resource to guide individuals in need of support. Additionally, in 2016, the Public Health Commission greatly expanded the Providing Access to Addiction Treatment, Hope, and Support

("PAATHS Program").  Under the PAATHS program, anyone in Boston is able to dial 311, 24 hours a day, seven days a week, in order to access all levels of substance abuse and addiction treatment recovery-related support services for friends and family members, and answers to general questions related to substance use and addiction. When the PAATHS Program first opened, it had 5 or 6 full-time staff members.  As of 2018, the program has tripled its staff to 15 full-time staff members.

411.   Boston's Health Care for the Homeless Program (BHCHP) created an initiative to find a solution for preventing overdose deaths and managing the amount of overdoses happening. The agency created and opened the Supportive Place for Observation and Treatment (SPOT) center which "accommodates up to eight people, staff provide medical observation and, when necessary, preventive or emergency treatment for people who have already used drugs – most commonly a mix of several opiates, sedatives, and other substances."

412.   As of 2019, Boston has included overdose reversal kits in municipal buildings throughout the city.

413.   The Boston Public Health Commission's Office of Recovery Services also has several outreach workers who visit areas known for drug use to help connect those who suffer from drug addiction with treatment services.  The outreach workers carry duffle bags with boxed syringes, as well as items to help them pick-up used drug paraphernalia.  In less than a six-month timespan, the outreach workers connected over 600 Boston residents with treatment services and services from other Boston agencies.  In addition to the outreach workers, in 2015 the Boston Public Health Commission created the "Mobile Sharps Collection Team," which safely cleans up and disposes discarded needles.  Boston residents are able to report the locations of the needles through its "Citizens Connect" app, or the 24-hour 311 line.  In June of 2015, the program collected over 2,000 loose needles in Boston.

414.    The proliferation of opioids and the resulting increase in use, misuse and addiction has caused other problems as well. Many patients who become addicted to opioids will lose their jobs. Some will lose their homes and their families. Some will get treatment, but fewer will successfully complete it; many of those patients will relapse, returning to opioids of some other drug. Of those who continue to take opioids, some will overdose – some fatally, some not. Others will die prematurely from related causes – falling or getting into traffic accidents due to opioid-induced somnolence; dying in their sleep from opioid-induced respiratory depression; suffering assaults while engaging in illicit drug transactions; or dying from opioid-induced heart or neurological disease.

415.    Absent the conduct of Defendants as described herein, the public health crisis caused by opioid misuse, abuse, and addiction in Massachusetts, including the City of Boston, would have been averted or much less severe.

## V.  CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### *Public Nuisance*

416.    Plaintiffs reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein unless inconsistent with the allegations in this Count, and further alleges:

417.    A public nuisance is an unreasonable interference with a right common to the general public, such as a condition dangerous to health, offensive to community moral standards, or unlawfully obstructing the public in the free use of public property.

418.    Defendants' conduct, as described in the Complaint, involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, and unreasonably interferes with a public right by creating a public health epidemic in Massachusetts.

419.   Defendants created and maintained a public nuisance which proximately caused injury to Plaintiffs.

420.   Each Defendant is liable for the public nuisance because its conduct has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, the Plaintiffs' injury.  *See* Restatement Second, Torts §821B.

421.   Defendants, by colluding with manufacturers to make opioids more available and ignoring evidence of addiction and misuse found in their own claims data and/or other actions and inactions described herein, created and maintained the opioid epidemic in the City of Boston, which is harmful and disruptive to and unreasonably annoys, injures, endangers, and interferes with the public health, public safety, public peace, public comfort, and/or public convenience.  The public nuisance caused by Defendants has significantly harmed the Plaintiffs and a considerable number of Boston residents.

422.   Defendants have created and maintained a public nuisance through their ongoing unreasonable conduct of facilitating and encouraging the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on their national commercial formulary offerings with preferred status and declining to include UM offerings with meaningful limits on their approval for use in exchange for payments and fees from manufacturers in violation of their above described duties, assisting in promoting but failing to disclose the real risks and appropriate limits on the use of opioids, and failing to use the wealth of data available to them to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion.  Their conduct caused prescriptions and sales of opioids to skyrocket, and Defendants failed to limit their use even as evidence of the epidemic mounted, including in the City, flooding

the City with opioids and facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the City and its residents.

423.    Defendants knew, or should have known, that their intentional, unreasonable, and/or unlawful conduct would and did cause opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of the City and its residents.

424.    Defendants' conduct has injuriously affected rights common to the general public, specifically including the rights of the people of Boston to public health, safety, peace, comfort, and convenience.  The public nuisance caused by Defendants' actions has caused substantial annoyance, inconvenience, and injury to the public.

425.    The interference is unreasonable because Defendants' nuisance-creating conduct:

a.   Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

b.   At all relevant times was and is proscribed by state and federal laws and regulations; and/or

c.   Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

426.    The significant interference with rights common to the general public is described in detail throughout this Complaint and includes but is not limited to:

a.   The creation and fostering of an illegal, secondary market for prescription opioids;

b.   Easy access to prescription opioids by children and teenagers;

c.   A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

d.   Infants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

     e.   Employers losing the value of productive and healthy employees; and

     f.   Increased costs and expenses for Plaintiffs relating to healthcare services, law enforcement, the criminal justice system, social services, housing services, and education systems.

427.    Defendants knowingly, intentionally, recklessly, unreasonably and/or unlawfully pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of the City, a higher level of fear, discomfort and inconvenience to the residents of the City, and direct costs to the City and its residents.

428.    Defendants are liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of the Defendants was a substantial factor in producing the public nuisance and harm to Plaintiffs.

429.    Defendants' intentional and unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, is described throughout this Complaint and includes:

     a.   Facilitating the increased use of opioids through formulary offerings that gave opioids unwarranted preferred status in exchange for profiting from payments from opioid manufacturers;

     b.   Failing to offer meaningful prior authorization requirements or limits on the availability of opioids in exchange for payments from opioid manufacturers;

     c.   Colluding with opioid manufacturers in deceptive marketing schemes that were designed to, and successfully did, change the perception of opioids and cause their prescribing and sales to skyrocket;

     d.   Ignoring evidence of addiction, abuse, and illegitimate prescribing found in their own extensive data instead of using it to report suspicious prescribers or to enact policies to help address these issues;

     e.   Failing to maintain adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids through their mail order pharmacies; and

118

f.   Failing to report suspicious prescribers and pharmacies.

430.   At all times relevant to this Complaint, Defendants knew that increasing the availability of opioids would increase the number of opioids that would be abused, misused, and diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.  Upon information and belief, Defendants also knew that the marketing by manufacturers with which they colluded was deceptive and that Defendants' conduct served to increase opioid sales.

431.   At all times relevant to this Complaint, Defendants knew that opioids were dangerous because these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

432.   Indeed, opioids are akin to medical grade heroin. Defendants' wrongful and unreasonable conduct of pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiffs – exactly as would be expected when medical grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

433.   It was foreseeable to Defendants that their conduct would unreasonably interfere with the public health, public safety, public peace, public comfort, and/or public convenience.

434.   Defendants' conduct is substantial, unreasonable, intentional, unlawful, reckless, or negligent.  It has caused and continues to cause significant harm to the City and its residents, and the harm inflicted outweighs any offsetting benefit.

435.   Defendants' conduct is widespread and persistent and creates substantial and ongoing harm.  The harm inflicted outweighs any offsetting benefit.  Defendants' conduct has caused deaths, serious injuries, and a severe disruption of public peace, health, order and safety. Defendants' ongoing and persistent misconduct is producing permanent and long-lasting damage.

436. All Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used in the City. Because of Defendants' actions in using their unique position to increase the availability of opioids in the marketplace and inflate opioid sales, because of their collusion with manufacturers in the deceptive marketing of opioids, and because of Defendants' special position within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

437. Defendants had control over their conduct in and affecting Boston as is described in this Complaint, and that conduct has had an adverse effect on the public. Defendants had sufficient control over, and responsibility for, the public nuisance they created. Defendants were in control of the "instrumentality" of the nuisance, namely the dissemination of prescription opioids, their collusion with manufacturers in promoting opioids, and their formulary and UM offerings that increased utilization of opioids as described herein.

438. Plaintiffs have suffered and continue to suffer special injuries distinguishable from those suffered by the general public. As discussed herein, they have incurred and continue to incur substantial harms.

439. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

440. The public nuisance – i.e., the opioid epidemic - created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

441.   Defendants' misconduct alleged in this case is ongoing and persistent, as is the nuisance to which they substantially contributed.

442.   Plaintiffs have incurred and will incur expenditures for special programs to abate the nuisance that are over and above Plaintiffs' ordinary public services.

443.   Plaintiffs seek to abate the nuisance created by Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

444.   Plaintiffs are asserting their own rights and interests and Plaintiffs' claims are not based upon or derivative of the rights of others.

445.   The tortious conduct of the Defendants was a substantial factor in producing harm to Plaintiffs.

446.   Plaintiffs have suffered an indivisible injury as a result of the tortious conduct of the Defendants.

447.   Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

448.   Plaintiffs have been, and continue to be, injured by Defendants' actions in creating a public nuisance.

449.   Plaintiffs seek legal and equitable relief as allowed by law for public nuisance, including inter alia injunctive relief, abatement, attorneys' fees and costs, pre- and post-judgment interest, and such other relief as this Court deems appropriate.

**SECOND CLAIM FOR RELIEF**
**Violation of Federal Civil RICO, 18 U.S.C. 1961, ET SEQ.; 1964(c)**
**(Brought by Plaintiffs against All Defendants)**

450.   At all relevant times, Defendants were "persons" under 18 U.S.C. § 1961(3) because they were capable of holding, and do hold, legal or beneficial interests in property.

451.   As alleged more fully herein, the Defendants formed an association-in-fact enterprise with each of the Opioid Enterprise Manufacturers, described above as the Formulary & UM Enterprise, for the purpose of carrying out a fraudulent scheme and felonious possession and dispensing of controlled substances to maximize profits for themselves and the Opioid Enterprise Manufacturers by increasing sales of prescription opioids through unfettered and preferential formulary access without UM in their standard offerings, despite the Defendants' promises, representations and contractual obligations to take actions, including through cDUR, formulary decisions, and UM decisions, that were in their clients' best interests, to ensure safe and medically appropriate opioids were being dispensed, and to address opioid abuse, misuse and diversion.

452.   As alleged more fully herein, the Formulary & UM Enterprise consisted of personal business relationships formed through contractual negotiations over decades and participation in and through the PCMA and other informal coalitions and working groups. Evidence of the existence of the Formulary & UM Enterprise can be found in the way in which each Defendant took nearly identical actions towards formulary and UM offerings, in the contracts that each negotiated with the Opioid Enterprise Manufacturers that gave them preferential formulary positions and prohibited the implementation of UM measures, in the research that each performed for Opioid Enterprise Manufacturers, pull-through marketing and PBM data exchange, their failure to comply with the dispensing requirements of the CSA and Massachusetts law, and interactions through PCMA and other informal coalitions.

453.   At all relevant times, the Formulary & UM Enterprise (a) had an existence separate and distinct from each of the members; (b) was separate and distinct from the pattern of racketeering in which the members engaged; (c) was an ongoing and continuing organization

122

consisting of legal entities, including each of the members; (d) was characterized by interpersonal business relationships among the members; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as continuing units.

454.    Each member of the Formulary & UM Enterprise conducted, and participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding profits.

455.    The Defendants carried out, or attempted to carry out, a scheme to defraud by knowingly conducting and participating in the conduct of the Formulary & UM Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that made use of the mail and wire facilities in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

456.    The Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Formulary & UM Enterprise members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Formulary & UM Enterprise members' regular use of the facilities, services, distribution channels, and employees of the Formulary & UM Enterprise. The Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

457.    The Defendants also conducted and participated in the conduct of the affairs of the Formulary & UM Enterprise through a pattern of racketeering activity by the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in controlled substances, punishable under any law of the United States.

458.    The Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 841 makes it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance except as authorized by Subchapter I of the CSA. A violation of § 841 in the case of controlled substances on Schedule II is punishable by not more than 20 years of imprisonment, or not less than 20 years imprisonment if death or seriously bodily injury results from the use of such substance.  Similarly, a violation of § 841 in the case of controlled substances on Schedule III is punishable by not more than 10 years imprisonment, or not less than 15 years imprisonment if death or seriously bodily injury results from the use of such substance. Similarly, a violation of § 841 in the case of controlled substances in Schedule IV is punishable by not more than 5 years imprisonment.  All three violations of § 841 are felonies.

459.    The Defendants' mail order pharmacies are registrants as defined in the CSA. Their status as registrants imposes obligations on them to ensure that they only dispense "to the extent authorized by [their] registration and in conformity with the [CSA]."

460.    The Defendants registered their mail order pharmacies with the DEA to dispense Schedule II-V controlled substances. Their DEA registration only authorized their owned pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user…by, or pursuant to the lawful order of, a practitioner."

461.    The Formulary & UM Enterprise's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

      a.   Mail Fraud: The Formulary & UM Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of the Formulary & UM Enterprise.

      b.   Wire Fraud: The Formulary & UM Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or

received, materials by wire for the purpose of executing the unlawful scheme of the Formulary & UM Enterprise.

c.  Felony Controlled Substance Violations: Defendants  violated 21 U.S.C. § 841 by knowingly or intentionally possessing and dispensing controlled substances for reasons and purposes not authorized by the Controlled Substance Act.

462.  The Formulary & UM Enterprise conducted their pattern of racketeering activity in this jurisdiction and throughout the United States.

463.  The Formulary & UM Enterprise aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses, and the 21 U.S.C. § 841 offense.

464.  The members of the Formulary & UM Enterprise, with knowledge and intent, agreed to the overall objective of the Formulary & UM Enterprise, including the fraudulent scheme and felonious possession and dispensing of controlled substances, and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing, distributing, and dispensing prescription opioids.

465.  Indeed, for the Formulary & UM Enterprise's fraudulent scheme to work, each member of the Formulary & UM Enterprise had to agree to implement their necessary portion of the Formulary & UM Enterprise's activities in the manner alleged above.

466.  As alleged more fully herein, the Formulary & UM Enterprise engaged in a pattern of related and continuous predicate acts for years. The predicate acts were each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

467.  The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff's business and property, while simultaneously generating billion-

dollar revenue and profits for the Formulary & UM Enterprise. The predicate acts were conducted by members of the Formulary & UM Enterprise and in furtherance of its fraudulent scheme.

468.    The pattern of racketeering activity alleged herein and the Formulary & UM Enterprise  are separate and distinct from each other. Likewise, the Defendants are distinct from the Formulary & UM Enterprise.

469.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

470.    Many of the precise dates of the Formulary & UM Enterprise's actions at issue here have been hidden by the Defendants and the members of the Formulary & UM Enterprise and cannot be alleged without complete access to the Defendants' books, records, and dispensing data. Indeed, an essential part of the successful operation of the Formulary & UM Enterprise alleged herein depended upon secrecy.

471.    It was foreseeable to the Defendants and members of the Formulary & UM Enterprise that Plaintiffs would be harmed when they engaged in the fraudulent scheme that forms the common purpose of the Formulary & UM Enterprise and the pattern of racketeering activities alleged herein.

472.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

473.    The Formulary & UM Enterprise members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property.

474.    The Formulary & UM Enterprise members' pattern of racketeering activity logically, substantially and foreseeably has caused an opioid epidemic. Plaintiffs were injured by

the Formulary & UM Enterprise's pattern of racketeering activity and the opioid epidemic that its members created through their actions.

475.    Members of the Formulary & UM Enterprise knew that the prescription opioids at the center of their pattern of racketeering activity were extremely dangerous, highly addictive, prone to diversion, abuse and misuse, and often cause overdose and death. They were also aware that standard formulary and plan offerings that placed those drugs in favorable formulary positions without meaningful UM controls in place would grow the market for prescription opioids through increased prescribing, dispensing and sales. They were also aware that the growth in prescribing, dispensing and sales would be driven, in large part, by oversupply, addiction, and misuse and abuse.  Members of the Formulary & UM Enterprise also knew that the oversupply, addiction, misuse and abuse would result in the writing of illegitimate prescriptions about which the Defendants' mail-order pharmacies would need to conduct due to diligence or refuse to fill.

476.    Nevertheless, members of the Formulary & UM Enterprise engaged in a scheme of deception, which utilized the mail and wires as part of their fraud, in order to increase prescribing of prescription opioids, and providing the Opioid Enterprise Manufacturers' drugs unfettered formulary access without limits from UM in their standard formulary offerings. Members of the Formulary & UM Enterprise also engaged in felonious possession and dispensing of controlled substances by filling prescriptions without performing due diligence and failing to refuse to fill prescriptions, thereby providing the Formulary & UM Enterprise with unfettered and illegal possession and dispensing by the Defendants' mail-order pharmacies.

477.    Plaintiffs were and continue to be damaged in their business and property by reason and as a result of the Defendants' conduct of the Enterprise through the pattern and practice of racketeering activity described herein, which was a logical, direct, foreseeable, and substantial cause of the opioid epidemic.

478.    Specifically, Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

a. Losses caused by purchasing and/or paying reimbursements for the Formulary & UM Enterprise Defendants' prescription opioids, that Plaintiffs would not have paid for or purchased but for the Formulary & UM Enterprise Defendants' conduct;

b. Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

c. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

d. Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

e. Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone, an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

f. Costs associated with emergency response by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

g. Costs for providing treatment of infants born with opioid-related medical conditions, or born addicted to opioids due to drug use by a mother during pregnancy;

h. Costs for providing mental health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

i. Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

j. Costs associated with increased burden on Plaintiffs' judicial system, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

k. Costs associated with providing care for children whose parents are suffering from opioid-related disability or incapacitation;

l. Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' community;

m. Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

n. Losses caused by diminished property values in the form of decreased business investment and tax revenue.

479. Plaintiffs' injuries were proximately caused by the Defendants' racketeering activities because they were a logical, substantial, and foreseeable cause of Plaintiff's injuries. But for the opioid-addiction epidemic created by the Defendants' conduct, Plaintiffs would not have lost money or property.

480. Plaintiffs' injuries were directly caused by the pattern of racketeering activities by the members of the Formulary & UM Enterprise.

481. Plaintiffs are most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

482. Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief in the form of court supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, *inter alia*:

a. Actual damages and treble damages, including pre-suit and post-judgment interest;

b. An order enjoining any further violations of RICO;

c. An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d.   An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

e.   An order enjoining any future marketing or misrepresentations;

f.   An order enjoining future decisions by the Defendants that result in formulary and UM offerings that prioritize rebates and profits over patient safety and proper, clinically based, decision making regarding formulary status, prior authorization, step therapy or utilization management measures related to prescription opioids;

g.   An order enjoining the Defendants' mail order pharmacies from dispensing prescriptions without conducting proper due diligence and documenting that due diligence before dispensing prescriptions;

h.   An order compelling Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court;

i.   An order enjoining any future lobbying or legislative efforts regarding the manufacture, marketing, distribution, prescription, or use of opioids;

j.   An order requiring Defendants to disclose publicly all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

k.   An order establishing a national foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by Defendants in an amount to be determined by the Court;

l.   An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious prescribing, dispensing, abuse, or diversion of opioids;

m.   An order requiring Defendants to publicly disclose to federal and state law enforcement all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding prescribing, dispensing, abuse, or diversion of opioids;

n.   An order divesting Defendants of any interest in, and the proceeds of any interest in, the Formulary & UM Enterprise, including any interest in property associated therewith;

o.   Dissolution and/or reorganization of any trade industry organization, or any other entity or association associated with the Formulary & UM Enterprise identified in this Complaint, as the Court sees fit;

130

p.   Dissolution and/or reorganization of any Defendant named in this Complaint as the Court sees fit;

q.   Suspension and/or revocation of the license, registration, permit, or prior approval granted to Defendants, entities, associations or enterprises named in the Complaint regarding the prescribing or dispensing of opioids;

r.   Forfeiture as deemed appropriate by the Court; and

s.   Attorney's fees and all costs and expenses of suit.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a.   A finding that, by the acts alleged herein, Defendants have created a public nuisance;

b.   An injunction permanently enjoining Defendants from engaging in the conduct described herein that caused the public nuisance;

c.   An order directing Defendants to abate the public nuisance;

d.   Equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

e.   For costs, filing fees, pre and post judgment interest, and attorney's fees;

f.   For actual damages;

g.   For treble or multiple damages and civil penalties as allowed by statute;

h.   For punitive damages; and

i.   For all other relief at law or in equity, deemed just by this Court.

**PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.**

Dated:  April 15, 2024                    Respectfully submitted,

THE CITY OF BOSTON, THE BOSTON
PUBLIC HEALTH COMMISSION, and THE
BOSTON HOUSING AUTHORITY,

*/s/ Christopher C. Naumes*
Christopher C. Naumes, BBO #: 6717601
Robert T. Naumes, Sr., BBO #: 367660
NAUMES LAW GROUP, LLC
2 Granite Avenue, Suite 425
Milton, MA 02186
Phone: (617) 227-8444
christopher@naumeslaw.com
robert@Naumeslaw.com

THE CITY OF BOSTON

*/s/ Adam Cederbaum*
Adam Cederbaum, BBO #661549
Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
Phone: (617) 635-4034
adam.cederbaum@boston.gov

THE BOSTON HOUSING AUTHORITY

*/s/ Caesar P. Cardozo*
Caesar P. Cardozo, BBO # 549744
General Counsel
Boston Housing Authority
52 Chauncy Street
Boston, MA 02111
Phone: (617) 988-4164
caesar.cardozo@bostonhousing.org

THE BOSTON PUBLIC HEALTH COMMISSION

*/s/ Batool Raza*
Batool Raza, Esq. BBO#691173
General Counsel
Boston Public Health Commission
1010 Massachusetts Ave., 6th Floor
Boston, Ma 02118
617-534-4322

MOTLEY RICE LLC

*/s/ Elizabeth Smith*
Elizabeth Smith *(Pro Hac Vice)*
401 9th Street, NW

132

Suite 630
Washington, DC 20004
Phone: (202) 386-9626
Phone: (202) 386-9627
esmith@motleyrice.com

Vincent Greene (*Pro Hac Vice)*
40 Westminster St., 5th Fl
Providence, RI 02903
Phone:  (401) 457-7730
Fax:  (401) 457-7708
vgreene@motleyrice.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I herby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on April 15, 2024.

*/s/ Christopher C. Naumes*
Christopher C. Naumes