UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
THE CITY OF BOSTON, THE BOSTON )
PUBLIC HEALTH COMMISSION, and  )
THE BOSTON HOUSING AUTHORITY,  )
                              )
               Plaintiffs,     )    Civil Action
v.                             )    No. 24-cv-10525-PBS
                              )
EXPRESS SCRIPTS, INC., et al., )
                              )
               Defendants.     )
_____)
```

## MEMORANDUM AND ORDER

February 11, 2025

Saris, D.J.

## INTRODUCTION

This case involves the opioid epidemic, which has devastated communities nationwide, including the City of Boston. The epidemic has generated national litigation. In 2024, the City of Boston[1] brought this action against Express Scripts[2] and Optum[3] for contributing to the opioid epidemic in their roles as pharmacy

---

[1] Plaintiffs include the City of Boston, the Boston Public Health Commission, and the Boston Housing Authority (collectively, "the City").

[2] "Express Scripts" refers to Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Medco Health Solutions, Inc., ESI Mail Pharmacy Services, Inc., and ESI Mail Order Processing, Inc.

[3] "Optum" refers to Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., and OptumInsight Life Sciences, Inc.

benefit managers ("PBMs"). Express Scripts and Optum, two of the largest PBMs in the United States, have formularies in Massachusetts and partner with major Boston insurers.

The City alleges Express Scripts and Optum collaborated with opioid manufacturers to misrepresent the risks of opioids and used preferred formulary placement to ensure the drugs would be covered by prescription health insurance, increasing demand and proliferation of opioids in the City. The City claims that, through these actions, Defendants created a public nuisance under Massachusetts law and violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

Defendants have moved to dismiss, arguing the claims are time-barred and the complaint fails to state a claim. In addition, Defendants UnitedHealth Group, Inc. and OptumInsight, Inc. seek dismissal for lack of personal jurisdiction.

After a hearing, the Court **ALLOWS** Defendants' motion to dismiss for failure to state a claim (Dkt. 47) on the ground that the claims are time-barred and the City lacks standing to pursue equitable relief. Defendants UnitedHealth Group, Inc. and OptumInsight, Inc.'s motion to dismiss for lack of personal jurisdiction is **DENIED** as moot (Dkt. 45).

**BACKGROUND**

The City alleges the following facts in the amended complaint, which the Court accepts as true at this stage. See Artuso v. Vertex Pharms., Inc., 637 F.3d 1, 5 (1st Cir. 2011).

## I.   The Opioid Epidemic

### A.   National Crisis

In 2016 alone, pharmacies in the United States filled 289 million opioid prescriptions, "enough to medicate every adult in America around the clock for a month." Dkt. 36 ¶ 3. The widespread availability of opioids since the 1990s has contributed to a decline in American life expectancy for the first time in recorded history.

In October 2017, the President of the United States declared the opioid epidemic a public health emergency, a determination that federal officials have renewed multiple times since. Between 1996 and 2019, more than 500,000 people died from an opioid overdose. By 2021, the number of deaths involving prescription opioids was nearly five times the number in 1999. The "worst man-made epidemic in modern medical history" has impacted most Americans either directly or indirectly. Id. ¶¶ 2-3.

### B.   The City's Public Health Crisis

The opioid epidemic has devastated Massachusetts, with Boston hit particularly hard. In Boston, the opioid prescription rate between 2010 and 2016 was double the state average and three times

the national average. Consequently, Boston has accounted for the largest share of opioid-related fatalities in Massachusetts. In 2021, the City recorded 251 opioid overdose deaths, and in 2022, there were 2,670 opioid-related incidents.

In response, the City implemented costly interventions, including an engagement center for recovery services and the installation of opioid reversal kits in public buildings. Despite these efforts, the crisis overwhelmed emergency responders and disrupted daily life. The Boston Fire Department's administration of Narcan, the antidote to opioid overdose, nearly tripled from 2014 to 2017. Law enforcement faced increased arrests, violent crimes, and property theft linked to the crisis. Libraries and parks reported frequent drug overdoses and discarded drug paraphernalia. Residents in public housing encountered needles and unconscious individuals in shared spaces, prompting security upgrades and cleanup efforts. Families suffered, with reports of infants born addicted to opioids and parents who prioritized drug purchases over basic needs.

## II.  **The Role of PBMs**

The City alleges that its harms are connected to the actions of PBMs, which play a critical role in the distribution and accessibility of prescription opioids.

**A.     PBMs and the Pharmaceutical Industry**

PBMs partner with health-care sponsors, such as insurers, employers, government entities, and unions, to administer prescription drug benefits for health-plan members. They create and manage national formularies, which determine the terms under which prescription drugs are reimbursed. When it comes to opioids, their formularies determine the quantities of opioids available, co-pay amounts, the level of authorization needed for dispensing, and whether alternatives, like less addictive drugs, will be available.

Drug manufacturers vie for placement on PBMs' formularies by offering rebates and other incentives. These rebates and incentives to PBMs, which have increased by 16% annually since 2014, now constitute at least 40% of branded prescription drug costs.

**B.     Deceptive Opioid Marketing and Rebates**

According to the amended complaint, Express Scripts and Optum colluded with opioid manufacturers to downplay addiction risks and overstate the benefits of opioids. Express Scripts' "Pharma Portal" provided manufacturers with extensive consumer data, while both PBMs developed studies and presentations misrepresenting opioid safety.

In exchange for substantial rebates, Express Scripts and Optum prioritized opioids on their formularies. For example, in

2000, Purdue Pharma ("Purdue"), an opioid manufacturer, paid $4.2 million in rebate payments to Express Scripts to support OxyContin's, an opioid manufactured by Purdue, formulary placement. By 2011, Purdue's annual rebate payments to Express Scripts exceeded $56.5 million.

Lured by high rebates, Defendants undermined any efforts to implement safeguards to detect and prevent misuse. In 2016, Express Scripts considered enhancing safeguards but decided against it after Purdue tied rebate agreements to low levels of review. Optum refused to heighten safety measures after similar pressures in 2017.

## III. Opioid Multi-District Litigation

The opioid epidemic spurred nationwide litigation. In 2018, the City filed a suit against manufacturers, distributors, and pharmacies due to their roles in the opioid epidemic; Express Scripts and Optum were not defendants in that action.  In 2018 and 2019, three cases were filed by other cities and counties against Express Scripts and Optum for their role in the opioid crisis. See County of Webb v. Purdue Pharma, L.P., No. 18-op-45175 (N.D. Ohio Feb. 15, 2018); City of Independence v. Williams, No. 19-op-45371 (N.D. Ohio June 10, 2019); City of Rochester v. Purdue Pharma, L.P., No. 19-op-45853 (N.D. Ohio Oct. 17, 2019). Those cases, along with another filed in 2020, have been selected as bellwether cases filed against PBM defendants in the National Prescription Opiate

Multi-District Litigation ("MDL") in the Northern District of Ohio. See In re Nat'l Prescription Opiate Litig., No. 17-md-2804 (N.D. Ohio Oct. 27, 2023), Dkt. 5231.

## DISCUSSION

## I.    Lack of Personal Jurisdiction

Defendants UnitedHealth Group, Inc. and OptumInsight, Inc. assert this Court lacks personal jurisdiction over them. No other defendant disputes jurisdiction. Though this Court would "ordinarily satisfy jurisdictional concerns before addressing the merits of a civil action," this "rule is not mechanically . . . applied." Feinstein v. Resol. Tr. Corp., 942 F.2d 34, 40 (1st Cir. 1991), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). In particular,

> in cases such as this one with multiple defendants --
> over some of whom the court indisputably has personal
> jurisdiction -- in which all defendants collectively
> challenge the legal sufficiency of the plaintiff's cause
> of action, [the court] may address first the facial
> challenge to the underlying cause of action and, if [it]
> dismiss[es] the claim in its entirety, decline to
> address the personal jurisdiction claims made by some
> defendants.

Chevron Corp. v. Naranjo, 667 F.3d 232, 246 n.17 (2d Cir. 2012). Because it is undisputed that this Court has personal jurisdiction over eight of the ten Defendants, addressing first Defendants' challenge to the merits of the underlying causes of action does not "violate the Supreme Court's repudiation of the so-called 'hypothetical jurisdiction' doctrine." Id. (quoting Steel Co. v.

Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998)). This approach is especially appropriate when deciding whether this Court has personal jurisdiction over two of the ten Defendants "could require resolution of unsettled jurisdictional questions regarding RICO." San Rocco Therapeutics, LLC v. Leschly, No. 23-cv-10919, 2024 WL 4349251, at *10 (D. Mass. Sept. 30, 2024); see Kalika, LLC v. Bos. & Me. Corp., No. 15-cv-14043, 2019 WL 1276099, at *7 (D. Mass. Mar. 20, 2019) (explaining that the First Circuit has not weighed in on the circuit split surrounding RICO's nationwide service of process provision).

## II.  **Motion to Dismiss for Failure to State a Claim**

### A.  **Legal Standard**

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief" by pleading factual allegations that go beyond "labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 559 (2007). While typically unfavored, a statute-of-limitations defense can succeed on a Rule 12(b)(6) motion if "the complaint and any documents that properly may be read in conjunction with it show beyond doubt that the claim asserted is out of time." Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 17 (1st Cir. 2004).

Though generally documents outside of the complaint are not considered when deciding a motion to dismiss, there is an exception for "documents the authenticity of which are not disputed by the

parties," as well as "official public records; . . . documents central to plaintiffs' claim[s]; [and] documents sufficiently referred to in the complaint." Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 198 (1st Cir. 2020) (alterations in original) (quoting Brennan v. Zafgen, Inc., 853 F.3d 606, 610 (1st Cir. 2017)).

**B.    Statute of Limitations**

The City pleads two claims for legal relief: a RICO violation and the creation of a public nuisance. The Court holds that both claims for damages are untimely.

Federal RICO claims are subject to a four-year statute of limitations. See Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987). According to the "injury discovery accrual rule," RICO claims accrue "'when a plaintiff knew or should have known of his injury' . . . 'even if the plaintiff is unaware of the precise acts of racketeering that caused the injury.'" Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 625-26 (1st Cir. 2019) (first quoting Rodriguez v. Banco Cent., 917 F.2d 664, 666 (1st Cir. 1990); and then quoting Lares Grp., II v. Tobin, 47 F. Supp. 2d 223, 230 (D.R.I. 1999)).

In Massachusetts, public nuisance claims "shall be commenced only within three years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2A. Under Massachusetts' "discovery rule," a claim for public nuisance accrues "when the plaintiff

discovers or with reasonable diligence should have discovered that (1) [she] has suffered harm; (2) [her] harm was caused by the conduct of another; and (3) the defendant is the person who caused that harm." Davalos v. Bay Watch, Inc., 240 N.E.3d 753, 757 (Mass. 2024) (alterations in original) (quoting Magliacane v. City of Gardner, 138 N.E.3d 347, 357 (Mass. 2020)); see Commonwealth v. Purdue Pharma, L.P., No. 1884CV01808, 2019 WL 5495716, at *5 (Mass. Super. Ct. Oct. 8, 2019).

Defendants argue that the City was on notice of its injuries since "at least September 2018" -- nearly six years before this lawsuit was filed in 2024 -- when the City sued manufacturers, distributors, and pharmacies. Dkt. 48 at 17. In response, the City relies on the MDL court's recent opinion holding that the statute of limitations did not bar any of the bellwether plaintiffs' claims at the motion to dismiss stage (Dkt. 80). See In re Nat'l Prescription Opiate Litig., No. 17-md-2804 (N.D. Ohio Aug. 22, 2024), Dkt. 5598. But, critically, the MDL court considered complaints filed in 2018 and 2019, at least five years before the present case was filed. At issue in the MDL case was whether the plaintiffs' RICO claims accrued by 2015 and the state claims by 2016. In contrast, this Court must decide whether the City's RICO claim accrued before 2020 and the public nuisance claim by 2021. The complaints filed in the MDL case against the same PBM defendants involving similar claims were publicly available

beginning in 2018. See County of Webb, No. 18-op-45175 (N.D. Ohio Feb. 15, 2018), Dkt. 1; City of Independence, No. 19-op-45371 (N.D. Ohio Jan. 31, 2019), Dkt. 1-2; City of Rochester, No. 19-op-45853 (N.D. Ohio June 28, 2019), Dkt. 1-5.

The City provides five reasons why its claims are not time-barred: (1) ongoing conspiracies and continuing torts are exempt from the applicable limitations period; (2) the RICO claim is timely under the separate-accrual rule; (3) the claims are tolled under the discovery rule; (4) equitable tolling precludes dismissal; and (5) requests for equitable relief are not subject to the limitations period. The City's arguments are unavailing.

> *1.   Ongoing Conspiracies and Continuing Torts*

The City argues that because the public nuisance is "repeating [and] recurring, and continually results in new harms," the statute of limitations does not bar the public nuisance claim. Dkt. 64 at 11-12. Likewise, the City contends that because "Defendants remain in the conspiracy," they "remain liable for the actions of the conspiracy." Id. at 11. These arguments are unpersuasive.

First, RICO claims accrue when a plaintiff knows or should know of her injury. The Supreme Court has rejected the "last predicate act rule" for RICO claims in which the limitations period "run[s] anew upon each predicate act forming part of the same pattern." Rotella v. Wood, 528 U.S. 549, 554 (2000). The Court reasoned that a last predicate act or ongoing conspiracy rule would

"thwart[] the basic objective of repose underlying the very notion
of a limitations period." Id. Instead, RICO claims accrue "when a
plaintiff knew or should have known of his injury." Álvarez-Maurás,
919 F.3d at 625 (quoting Rodriguez, 917 F.2d at 666). Here, the
City should have known of its injury no later than 2018 when the
first bellwether case in the MDL was filed and the City commenced
its own opioid litigation.

Second, the City's amended complaint fails to plead a
qualifying continuing nuisance and is, therefore, subject to the
limitations period. Massachusetts courts have suggested that a
continuing nuisance is one reason a nuisance claim may not be time-
barred. See Prentiss v. Wood, 132 Mass. 486, 489 (1882) ("A person
who continues a nuisance is liable to successive suits, each
continuance being a new nuisance . . . ."); Inhabitants of New
Salem v. Eagle Mill Co., 138 Mass. 8, 10 (1884) ("[I]t is settled
in this State that an action may be maintained for continuing a
nuisance of this description, although a recovery for the harm
done by the original [action] is barred."). To qualify, "a
continuing . . . nuisance must be based on recurring tortious or
unlawful conduct and is not established by the continuation of
harm caused by previous but terminated tortious or unlawful
conduct." Taygeta Corp. v. Varian Assocs., Inc., 763 N.E.2d 1053,
1065 (Mass. 2002) (quoting Carpenter v. Texaco, Inc., 646 N.E.2d
398, 399 (Mass. 1995)).

The City fails to show a qualifying continuing nuisance; therefore, the continuing wrong doctrine does not apply. The City cites to a single paragraph in the amended complaint for the proposition that Defendants' conduct continues to create a public nuisance. See Dkt. 64 at 11. The highlighted sentence from the amended complaint alleges that "Defendants have created and maintained a public nuisance through their ongoing unreasonable conduct." Dkt. 36 ¶ 422. Nowhere in the amended complaint is a sufficiently specific recent act referenced. See id. ¶ 441 ("Defendants' misconduct alleged in this case is ongoing and persistent, as is the nuisance to which they substantially contributed."); id. ¶ 435 ("Defendants' ongoing and persistent misconduct is producing permanent and long-lasting damage."). Simply labeling allegations as "ongoing" does not convert conclusory statements into "factual allegations." See Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012). The most recent actions alleged are remedial measures Defendants took to address the opioid epidemic, not actionable misconduct. See Dkt. 36 ¶ 243 ("By 2017, when Defendants decided to take action and develop their opioid programs, more than half a million people had already died from opioid overdose."); id. ¶ 236 (describing Express Scripts' Advanced Opioid Management program created in 2018 to put patients in better compliance with the Centers for Disease Control

and Prevention). Therefore, the continuing wrong doctrine does not
save the City's public nuisance claim.

### 2.  *Separate-Accrual Rule*

The City argues that any RICO claim for damages predicated on
Defendants' actions within the applicable limitations period is
timely under the separate-accrual rule. Dkt. 64 at 12. Under the
separate-accrual rule, plaintiffs may recover damages from "the
commission of a separable, new predicate act within a 4-year
limitations period" so long as the new act "cause[s] them harm
over and above the harm" from the earlier acts. Klehr v. A.O. Smith
Corp., 521 U.S. 179, 190 (U.S. 1997); see Rodriguez, 917 F.2d at
665-66 ("[E]ach time a plaintiff suffers an injury caused by a
violation of 18 U.S.C. § 1962, a cause of action to recover damages
based on that injury accrues to plaintiff at the time he discovered
or should have discovered the injury." (quoting Bankers Tr. Co. v.
Rhoades, 859 F.2d 1096, 1102 (2d Cir. 1988))).

The separate-accrual rule does not save the City's RICO claim.
The City pleads "ongoing personal business relationships . . .
between the members of the [RICO enterprise]," Dkt. 36 ¶ 347, and
"ongoing unreasonable conduct of . . . encouraging the use of
dangerously addictive opioids by colluding with manufacturers,"
id. ¶ 422. Just as before, simply adding the term "ongoing" is
"not specific enough to survive the burden at this stage." Gov't
of P.R. v. Carpenter Co., 442 F. Supp. 3d 464, 474-75 (D.P.R. 2020)

(granting a motion to dismiss for time-barred Clayton Act claim).
Without plausible allegations of ongoing predicate acts causing
additional injury, the City cannot rely on the separate-accrual
rule.

### 3. *Discovery Rule and Fraudulent Concealment*

The City alleges that the RICO and public nuisance claims are
tolled because Defendants fraudulently concealed their misconduct.
As a threshold matter, to sufficiently allege fraudulent
concealment, the plaintiff must "plead with particularity the
facts giving rise to the fraudulent concealment claim" pursuant to
Rule 9(b) of the Federal Rules of Civil Procedure. Epstein v. C.R.
Bard, Inc., 460 F.3d 183, 189 (1st Cir. 2006) (quoting J. Geils
Band Emp. Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d
1245, 1255 (1st Cir. 1996)). This standard requires the complaint
to specify "the time, place, and content of the alleged false or
fraudulent representations." Id. at 189-90 (quoting Powers v. Bos.
Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991)).

Here, the City supports its allegations with specific
examples of Defendants misrepresenting their role in the
pharmaceutical industry. See, e.g., Dkt. 36 ¶¶ 237-38 (Express
Scripts gave a presentation in 2017 suggesting that it was working
to combat the epidemic while still granting OxyContin preferred
alternative status); id. ¶ 197 ("While [Express Scripts]
represents publicly that it approves drugs for its formulary

15

offerings through exhaustive clinical review based on their efficacy and appropriateness, as well as cost, it was actually rebates that drove its decisions. For instance, as late as 2014, [Express Scripts] notified Purdue that it was reviewing its standard commercial formulary for opioids and 'would require deeper discounts to retain OxyContin Preferred status.'"). Therefore, the City's allegations satisfy Rule 9(b)'s pleading requirements.

Nevertheless, Defendants argue that because the City was not diligent in discovering its injury, the RICO and the public nuisance claims are not tolled under this theory.

              a.   RICO Claim

Fraudulent concealment temporarily tolls RICO's limitations period when "the perpetrator purposefully and successfully conceals his or her misconduct from its victim." Álvarez-Maurás, 919 F.3d at 626. To invoke this doctrine, the claimant must establish "1) wrongful concealment by defendants of their actions; and 2) failure of the claimant to discover, within the limitations period, the operative facts which form the basis of the cause of action; 3) despite the claimant's diligent efforts to discover the facts." Id. If a claimant fails to establish the above elements, then the limitations period applies, and the claimant "is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation." In re Celexa & Lexapro Mktg.

16

& Sales Pracs. Litig., 915 F.3d 1, 15 (1st Cir. 2019) (quoting
McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004)).

   Defendants argue that the City knew or should have known of
its injury by 2018 at the latest such that fraudulent concealment
does not apply. See Álvarez-Maurás, 919 F.3d at 626 ("In this
circuit, the meter begins to tick when the plaintiff discovers the
injury, even if the plaintiff is unaware of the precise acts of
racketeering that caused the injury." (quoting Tobin, 47 F. Supp.
2d at 230)). The complaint itself details the harm of the opioid
epidemic in Boston. Dkt. 36 ¶ 371 ("From 1999 to 2020, more than
263,000 people died in the United States from overdoses involving
prescription opioids."); id. ¶ 377 ("In 2014, the Boston Fire
Department administered Narcan -- the antidote to opioid overdose
-- 401 times. In 2015, this number nearly doubled to 777 overdoses
involving the administration of Narcan."). By 2015, the City had
established programs to combat opioid addiction. See id. ¶ 410
("Under the Office of Recovery Services, which was established in
2015, the Public Health Commission has created several programs to
help those seeking recovery from opioid addiction.").

   The City, motivated by its injuries, sued opioid
manufacturers, opioid distributors, retail pharmacies, and other
individuals who played a role in fostering the opioid epidemic in
September 2018. See City of Boston v. Purdue Pharma, LP, No.
1884CV02860, 2020 WL 416406, at *1, *11 (Mass. Super. Ct. Jan. 3,

17

2020). Significantly, municipalities filed cases against these Defendants and other PBMs in 2018 and 2019 in the highly publicized MDL, where the City's counsel serves as co-lead counsel. See In re Nat'l Prescription Opiate Litig., No. 17-md-2804 (N.D. Ohio Oct. 27, 2023), Dkt. 5362; see also In re Celexa & Lexapro Mktg. & Sales Pracs. Litig., 915 F.3d at 15 (evaluating unsealed court documents as evidence that plaintiffs were on notice of injury for RICO claim).

By 2018, all the "telltale warning signs" were present that the City suffered injury as a result of the PBMs' role in the opioid epidemic. Álvarez-Maurás, 919 F.3d at 628 (quoting Young v. Lepone, 305 F.3d 1, 8 (1st Cir. 2002)). Thus, despite Defendants' misrepresentations, the City's actions to combat the opioid epidemic, combined with the widespread scrutiny and litigation concerning the role of PBMs, "leave no doubt" that the City knew or should have known of its injuries. Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005) (quoting LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998)); see Abdallah v. Bain Cap. LLC, 752 F.3d 114, 119 (1st Cir. 2014) (affirming dismissal where the complaint "and . . . other properly considered documents" failed "to sketch a factual predicate that would provide a basis for tolling the statute of limitations" (internal citations omitted)). But cf. Ohio Cnty. Comm'n v. Express Scripts, Inc., No. 24-cv-142 (N.D. W.

Va. Dec. 23, 2024), Dkt. 140 at 4-8 (declining to address statute-of-limitations defense at the Rule 12(b)(6) stage without mentioning prior MDL proceedings). Accordingly, the Court finds the RICO claims for damages untimely under the discovery rule.

b.  Public Nuisance Claim

The City's lack of diligence is also fatal to its public nuisance tolling theory. Massachusetts' common-law discovery rule dictates that "a cause of action accrues when the plaintiff discovers or with reasonable diligence should have discovered that (1) he has suffered harm; (2) his harm was caused by the conduct of another; and (3) the defendant is the person who caused that harm." Harrington v. Costello, 7 N.E.3d 449, 455 (Mass. 2014). The City contends the limitations period is tolled under a Massachusetts statute entitled "Fraudulent concealment; commencement of limitations." Mass. Gen. Laws ch. 260, § 12; see Dkt. 64 at 13 ("[A]ll applicable statutes of limitations are tolled here by statute."). Under Massachusetts law, "[w]here there is fraudulent concealment, the common-law discovery rule gives way to the statutory discovery rule." Magliacane, 138 N.E.3d at 357.

However, statutory tolling does not apply when "the plaintiff has actual knowledge of the claim." Id. at 357 (emphasis omitted). Massachusetts courts impute knowledge to a plaintiff when she "had the means to acquire [the] facts, in circumstances where the probability of wrongdoing was so evident that possession of the

19

means was equivalent to actual knowledge." Id. at 357–58 (quoting Demoulas v. Demoulas Super Mkts., Inc., 677 N.E.2d 159, 174 n.25 (Mass. 1997)).

As previously discussed, the profound harm caused by the opioid epidemic, coupled with public investigations by state actors and the national MDL litigation, made the "probability of wrongdoing . . . so evident" that reasonable diligence would have uncovered it. Id. (quoting Demoulas, 677 N.E.2d at 174 n.25). As a result, statutory fraudulent concealment does not toll the limitation period.

### 4. *Equitable Tolling*

Assuming equitable tolling applies to RICO claims, the doctrine does not save the City's claims. See In re New Eng. Life Ins. Co. Sales Pracs. Litig., 346 F.3d 218, 222 (1st Cir. 2003) (assuming equitable tolling applies to RICO claims). Equitable tolling requires the plaintiff to demonstrate two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Neves v. Holder, 613 F.3d 30, 36 (1st Cir. 2010) (per curiam) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). The City's failure to exercise due diligence in pursuing its rights after the role of the PBMs in causing its harm was showcased in the MDL is fatal to its equitable tolling claim. Without evidence of extraordinary

circumstances or diligent effort, equitable tolling cannot apply. As a result, the City's claims are time-barred.

     5.   *Request for Equitable Relief*

Finally, the City seeks equitable relief under its RICO claim, arguing that such claims are not subject to the four-year statute of limitations applied to legal claims. See In re Nat'l Prescription Opiate Litig., No. 17-MD-2804, 2019 WL 4194296, at *6 (N.D. Ohio Sept. 4, 2019). The parties dispute whether private RICO plaintiffs can seek equitable relief and whether these claims are exempt from the statute of limitations.

The availability of equitable relief under RICO for private plaintiffs is unsettled, with circuits split on the issue. The Fourth, Fifth, and Ninth Circuits have held that RICO precludes equitable relief for private plaintiffs. See Hengle v. Treppa, 19 F.4th 324, 356 (4th Cir. 2021); In re Fredeman Litig., 843 F.2d 821, 830 (5th Cir. 1988); Religious Tech. Ctr. v. Wollersheim, 796 F.2d 1076, 1084 (9th Cir. 1986). In contrast, the Second and Seventh Circuits have found that RICO authorizes private rights of action for equitable relief. See Chevron Corp. v. Donziger, 833 F.3d 74, 137 (2d Cir. 2016); Nat'l Org. For Women, Inc. v. Scheidler, 267 F.3d 687, 698 (7th Cir. 2001), rev'd on other grounds, 537 U.S. 393 (2003). The First Circuit has not definitively ruled on the matter and has expressed uncertainty about whether equitable relief is available to private plaintiffs

under RICO. <u>See</u> <u>DeMauro v. DeMauro</u>, 115 F.3d 94, 98 (1st Cir. 1997) (citing <u>Lincoln House, Inc. v. Dupre</u>, 903 F.2d 845, 848 (1st Cir. 1990)).

Beginning with the text of the statute, the RICO statute, in relevant part, reads:

> (a) <u>The district courts of the United States shall have</u> <u>jurisdiction to prevent and restrain violations of</u> <u>section 1962 of this chapter by issuing appropriate</u> <u>orders</u>, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; <u>imposing reasonable</u> <u>restrictions on the future activities or investments of</u> <u>any person</u>, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

> (b) <u>The Attorney General may institute proceedings under</u> <u>this section. Pending final determination thereof, the</u> <u>court may at any time enter such restraining orders or</u> <u>prohibitions</u>, or take such other actions . . . as it shall deem proper.

> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter <u>may sue therefor in any appropriate United States</u> <u>district court and shall recover threefold the damages</u> <u>he sustains and the cost of the suit, including a</u> <u>reasonable attorney's fee</u> . . . .

18 U.S.C. § 1964 (emphasis added).

In <u>Wollersheim</u>, the Ninth Circuit rejected the private right to equitable relief by relying heavily on two pieces of legislative history. First, during the debate on the bill establishing the RICO statute, the House of Representatives rejected an amendment

to expressly permit private parties to sue for injunctive relief under § 1964(a). <u>See</u> <u>Wollersheim</u>, 796 F.2d at 1085. Second, the year after its passage, Congress refused to enact a bill amending the RICO statute to give private plaintiffs injunctive relief. <u>See</u> <u>id.</u> At the same time, the <u>Wollersheim</u> court acknowledged that other pieces of legislative history support the opposite conclusion. <u>Id.</u> Since 1986, when <u>Wollersheim</u> was decided, the Supreme Court has resisted using congressional inaction as a determinative form of legislative history. <u>See, e.g.,</u> <u>Solid Waste Agency of N. Cook Cnty.</u> <u>v. U.S. Army Corps of Eng'rs</u>, 531 U.S. 159, 169–70 (2001) ("Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute. A bill can be proposed for any number of reasons, and it can be rejected for just as many others." (cleaned up)); <u>Cent. Bank of Denver, N.A. v.</u> <u>First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 187 (1994) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." (quoting <u>Pension Benefit Guar.</u> <u>Corp. v. LTV Corp.</u>, 496 U.S. 633, 650 (1990))). As a result, <u>Wollersheim</u>'s reliance on legislative history carries little persuasive weight.

More recently, the Fourth Circuit held that private plaintiffs could not seek equitable relief. <u>Hengle</u>, 19 F.4th at

354. In Hengle, the Fourth Circuit read § 1964(a) as describing district courts' remedial powers, while later portions of the statute identify who may invoke those powers. Id. at 353-54. For the Hengle court, the language authorizing a party to seek injunctive relief appears only in § 1964(b) where the statute reads, "[t]he Attorney General may institute proceedings under this section." Id. at 354 (first emphasis added) (quoting 18 U.S.C. § 1964(b)). The Fourth Circuit found that "under this section" is "a clear cross-reference to the broad remedial powers authorized in Section 1964(a)." Id. Notably, "under this section" is missing from § 1964(c) where private plaintiffs are given the right to seek treble damages. Id. The Fourth Circuit bolstered its reading by comparing the statute to an analogous provision in the Clayton Act, 15 U.S.C. § 15, where private plaintiffs are empowered to seek damages and not empowered to seek equitable relief. Id. at 355. Instead, a separate provision in the Clayton Act, 15 U.S.C. § 26, which has no analog in the RICO statute, explicitly provides that private parties are entitled to sue for injunctive relief. Id. at 355-56. As a result, the Fourth Circuit concluded that the language of the RICO statute only allows private plaintiffs to seek damages. Id. at 356.

The Second and Seventh Circuits read § 1964(a) as granting jurisdiction and "expansively authorizing federal courts to exercise their traditional equity powers." Donziger, 833 F.3d at

24

137; see Scheidler, 267 F.3d at 697. Subsection (b) then goes on
to authorize the Attorney General to bring suit under the law and
grants additional remedies the Attorney General may seek, namely
forms of interim relief. Donziger, 833 F.3d at 138; Scheidler, 267
F.3d at 695. In parallel, subsection (c) authorizes private
plaintiffs to bring suit and grants them the additional remedies
of treble damages and attorney's fees. Donziger, 833 F.3d at 138;
Scheidler, 267 F.3d at 695. These subsections "limit the categories
of plaintiffs to which the relief they respectively specify may be
granted": the United States may not seek damages, and private
plaintiffs may not seek interim relief. Donziger, 833 F.3d at 138.
In other words, in the view of these courts, Section 1964(a)
broadly authorizes final equitable relief without imposing
specific limitations.

The Second Circuit explained that this reading "is consistent
with Congress's intent 'to "encourag[e] civil litigation to
supplement Government efforts to deter and penalize the . . .
prohibited practices. The object of civil RICO is thus not merely
to compensate victims but to turn them into prosecutors, 'private
attorneys general,' dedicated to eliminating racketeering
activity."'" Id. at 139 (alterations in original) (quoting
Scheidler, 267 F.3d at 698); see Sedima, S.P.R.L. v. Imrex Co.,
473 U.S. 479, 491 n.10 (1985) ("Indeed, if Congress' liberal-

25

construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident.").

The Seventh Circuit also reasoned that the comparison to the Clayton Act does not undermine private parties' ability to seek equitable relief under RICO. Scheidler, 267 F.3d at 700. The Clayton Act spreads private rights of action into two separate sections, one authorizing damages relief and another authorizing injunctive relief. See 15 U.S.C. §§ 15(a), 26. "[T]he mere fact that the Clayton Act spreads its remedial provisions over a number of different sections of the U.S. Code, and RICO does not, adds little to our understanding of either statute." Scheidler, 267 F.3d at 700 (footnote omitted). In fact, "the Supreme Court regularly treats the remedial sections of RICO and the Clayton Act identically, regardless of superficial differences in language." Id.

Although the Court finds the reasoning of the Second and Seventh Circuits persuasive, the issue is a close one, and the Court need not resolve this difficult question because the City lacks standing to pursue equitable relief. To obtain injunctive relief, a plaintiff must demonstrate "a threat of injury that is both '"real and immediate," not "conjectural" or "hypothetical."'" In re Nexium (Esomeprazole) Antitrust Litig., 845 F.3d 470, 475 (1st Cir. 2017) (order of court) (quoting In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 14 (1st Cir. 2008));

see <u>O'Shea v. Littleton</u>, 414 U.S. 488, 494 (1974). "Past injury, in and of itself, 'is an insufficient predicate for equitable relief.'" <u>Gray v. Cummings</u>, 917 F.3d 1, 19 (1st Cir. 2019) (quoting <u>Am. Postal Workers Union v. Frank</u>, 968 F.2d 1373, 1376 (1st Cir. 1992)). Instead, there must be "a sufficient likelihood that [the City] will again be wronged in a similar way." <u>Id.</u> (quoting <u>Am. Postal Workers Union</u>, 968 F.2d at 1376); <u>see</u> <u>Levier v. Scarborough Police Dep't</u>, No. CIV. 00-54-P-H, 2000 WL 761003, at *1 (D. Me. May 10, 2000) (granting a motion to dismiss a claim for injunctive relief because threat of future injury was "too speculative"). Here, the City fails to allege any ongoing predicate acts by the PBMs that would establish an immediate or real threat of future harm. Accordingly, the Court dismisses the claim for equitable relief under RICO.

## ORDER

After a hearing, the Court **ALLOWS** Defendants' motion to dismiss for failure to state a claim (Dkt. 47) on the ground that the claims are time-barred and the City lacks standing to pursue equitable relief. Defendants UnitedHealth Group, Inc. and OptumInsight, Inc.'s motion to dismiss for lack of personal jurisdiction is **DENIED** as moot (Dkt. 45).

SO ORDERED.

                                    /s/ PATTI B. SARIS
                                    Hon. Patti B. Saris
                                    United States District Judge